## YOUNGSTOWN SHEET & TUBE CO. ET AL. *v.* SAWYER.

NO. 744.

Argued May 12–13, 1952.—Decided June 2, 1952.

580

*John W. Davis* argued the cause for petitioners in No. 744 and respondents in No. 745. On the brief were *Mr. Davis, Nathan L. Miller, John Lord O'Brian, Roger M. Blough, Theodore Kiendl, Porter R. Chandler* and *Howard C. Westwood* for the United States Steel Co.; *Bruce Bromley, E. Fontaine Broun* and *John H. Pickering* for the Bethlehem Steel Co.; *Luther Day, T. F. Patton, Edmund L. Jones, Howard Boyd* and *John C. Gall* for the Republic Steel Corp.; *John C. Bane, Jr., H. Parker Sharp* and *Sturgis Warner* for the Jones & Laughlin Steel Corp.; *Mr. Gall, John J. Wilson* and *J. E. Bennett* for the Youngstown Sheet & Tube Co. et al.; *Charles H. Tuttle, Winfred K. Petigrue* and *Joseph P. Tumulty, Jr.* (who also filed an additional brief) for the Armco Steel Corp. et al.; and *Randolph W. Childs, Edgar S. McKaig* and *James Craig Peacock* (who also filed an additional brief) for E. J. Lavino & Co., petitioners in No. 744 and respondents in No. 745.

*Solicitor General Perlman* argued the cause for respondent in No. 744 and petitioner in No. 745. With him on the brief were *Assistant Attorney General Baldridge, James L. Morrisson, Samuel D. Slade, Oscar H. Davis, Robert W. Ginnane, Marvin E. Frankel, Benjamin Forman* and *Herman Marcuse.*

By special leave of Court, *Clifford D. O'Brien* and *Harold C. Heiss* argued the cause for the Brotherhood of Locomotive Engineers et al., as *amici curiae,* supporting petitioners in No. 744 and respondents in No. 745. With them on the brief were *Ruth Weyand* and *V. C. Shuttleworth.*

By special leave of Court, *Arthur J. Goldberg* argued the cause for the United Steelworkers of America, C. I. O., as *amicus curiae.* With him on the brief was *Thomas E. Harris.*

MR. JUSTICE BLACK delivered the opinion of the Court.

We are asked to decide whether the President was acting within his constitutional power when he issued an order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills. The mill owners argue that the President's order amounts to lawmaking, a legislative function which the Constitution has expressly confided to the Congress and not to the President. The Government's position is that the order was made on findings of the President that his action was necessary to avert a national catastrophe which would inevitably result from a stoppage of steel production, and that in meeting this grave emergency the President was acting within the aggregate of his constitutional powers as the Nation's Chief Executive and the Commander in Chief of the Armed Forces of the United States. The issue emerges here from the following series of events:

In the latter part of 1951, a dispute arose between the steel companies and their employees over terms and conditions that should be included in new collective bargaining agreements. Long-continued conferences failed to resolve the dispute. On December 18, 1951, the employees' representative, United Steelworkers of America, C. I. O., gave notice of an intention to strike when the existing bargaining agreements expired on December 31. The Federal Mediation and Conciliation Service then intervened in an effort to get labor and management to agree. This failing, the President on December 22, 1951, referred the dispute to the Federal Wage Stabilization

Board [1] to investigate and make recommendations for fair and equitable terms of settlement. This Board's report resulted in no settlement. On April 4, 1952, the Union gave notice of a nation-wide strike called to begin at 12:01 a. m. April 9. The indispensability of steel as a component of substantially all weapons and other war materials led the President to believe that the proposed work stoppage would immediately jeopardize our national defense and that governmental seizure of the steel mills was necessary in order to assure the continued availability of steel. Reciting these considerations for his action, the President, a few hours before the strike was to begin, issued Executive Order 10340, a copy of which is attached as an appendix, *post,* p. 589. The order directed the Secretary of Commerce to take possession of most of the steel mills and keep them running. The Secretary immediately issued his own possessory orders, calling upon the presidents of the various seized companies to serve as operating managers for the United States. They were directed to carry on their activities in accordance with regulations and directions of the Secretary. The next morning the President sent a message to Congress reporting his action. Cong. Rec., April 9, 1952, p. 3962. Twelve days later he sent a second message. Cong. Rec., April 21, 1952, p. 4192. Congress has taken no action.

Obeying the Secretary's orders under protest, the companies brought proceedings against him in the District Court. Their complaints charged that the seizure was not authorized by an act of Congress or by any constitutional provisions. The District Court was asked to declare the orders of the President and the Secretary invalid and to issue preliminary and permanent injunctions restraining their enforcement. Opposing the motion for pre-

---

[1] This Board was established under Executive Order 10233, 16 Fed. Reg. 3503.

liminary injunction, the United States asserted that a strike disrupting steel production for even a brief period would so endanger the well-being and safety of the Nation that the President had "inherent power" to do what he had done—power "supported by the Constitution, by historical precedent, and by court decisions." The Government also contended that in any event no preliminary injunction should be issued because the companies had made no showing that their available legal remedies were inadequate or that their injuries from seizure would be irreparable. Holding against the Government on all points, the District Court on April 30 issued a preliminary injunction restraining the Secretary from "continuing the seizure and possession of the plants . . . and from acting under the purported authority of Executive Order No. 10340." 103 F. Supp. 569. On the same day the Court of Appeals stayed the District Court's injunction. 90 U. S. App. D. C. ——, 197 F. 2d 582. Deeming it best that the issues raised be promptly decided by this Court, we granted certiorari on May 3 and set the cause for argument on May 12. 343 U. S. 937.

Two crucial issues have developed: *First.* Should final determination of the constitutional validity of the President's order be made in this case which has proceeded no further than the preliminary injunction stage? *Second.* If so, is the seizure order within the constitutional power of the President?

I.

It is urged that there were non-constitutional grounds upon which the District Court could have denied the preliminary injunction and thus have followed the customary judicial practice of declining to reach and decide constitutional questions until compelled to do so. On this basis it is argued that equity's extraordinary injunctive relief should have been denied because (a) seizure of the companies' properties did not inflict irreparable dam-

ages, and (b) there were available legal remedies adequate to afford compensation for any possible damages which they might suffer. While separately argued by the Government, these two contentions are here closely related, if not identical. Arguments as to both rest in large part on the Government's claim that should the seizure ultimately be held unlawful, the companies could recover full compensation in the Court of Claims for the unlawful taking. Prior cases in this Court have cast doubt on the right to recover in the Court of Claims on account of properties unlawfully taken by government officials for public use as these properties were alleged to have been. See *e. g., Hooe* v. *United States,* 218 U. S. 322, 335–336; *United States* v. *North American Co.,* 253 U. S. 330, 333. But see *Larson* v. *Domestic & Foreign Corp.,* 337 U. S. 682, 701–702. Moreover, seizure and governmental operation of these going businesses were bound to result in many present and future damages of such nature as to be difficult, if not incapable, of measurement. Viewing the case this way, and in the light of the facts presented, the District Court saw no reason for delaying decision of the constitutional validity of the orders. We agree with the District Court and can see no reason why that question was not ripe for determination on the record presented. We shall therefore consider and determine that question now.

## II.

The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself. There is no statute that expressly authorizes the President to take possession of property as he did here. Nor is there any act of Congress to which our attention has been directed from which such a power can fairly be implied. Indeed, we do not understand the Government to rely on statutory authorization for this seizure. There are two statutes which do authorize the President

to take both personal and real property under certain conditions.[2] However, the Government admits that these conditions were not met and that the President's order was not rooted in either of the statutes. The Government refers to the seizure provisions of one of these statutes (§ 201 (b) of the Defense Production Act) as "much too cumbersome, involved, and time-consuming for the crisis which was at hand."

Moreover, the use of the seizure technique to solve labor disputes in order to prevent work stoppages was not only unauthorized by any congressional enactment; prior to this controversy, Congress had refused to adopt that method of settling labor disputes. When the Taft-Hartley Act was under consideration in 1947, Congress rejected an amendment which would have authorized such governmental seizures in cases of emergency.[3] Apparently it was thought that the technique of seizure, like that of compulsory arbitration, would interfere with the process of collective bargaining.[4] Consequently, the plan Congress adopted in that Act did not provide for seizure under any circumstances. Instead, the plan sought to bring about settlements by use of the customary devices of mediation, conciliation, investigation by boards of inquiry, and public reports. In some instances temporary injunctions were authorized to provide cooling-off periods. All this failing, unions were left free to strike after a secret vote by employees as to whether they wished to accept their employers' final settlement offer.[5]

---

[2] The Selective Service Act of 1948, 62 Stat. 604, 625–627, 50 U. S. C. App. (Supp. IV) § 468; the Defense Production Act of 1950, Tit. II, 64 Stat. 798, as amended, 65 Stat. 132.

[3] 93 Cong. Rec. 3637–3645.

[4] 93 Cong. Rec. 3835–3836.

[5] Labor Management Relations Act, 1947, 61 Stat. 136, 152–156, 29 U. S. C. (Supp. IV) §§ 141, 171–180.

It is clear that if the President had authority to issue the order he did, it must be found in some provision of the Constitution. And it is not claimed that express constitutional language grants this power to the President. The contention is that presidential power should be implied from the aggregate of his powers under the Constitution. Particular reliance is placed on provisions in Article II which say that "The executive Power shall be vested in a President . . ."; that "he shall take Care that the Laws be faithfully executed"; and that he "shall be Commander in Chief of the Army and Navy of the United States."

The order cannot properly be sustained as an exercise of the President's military power as Commander in Chief of the Armed Forces. The Government attempts to do so by citing a number of cases upholding broad powers in military commanders engaged in day-to-day fighting in a theater of war. Such cases need not concern us here. Even though "theater of war" be an expanding concept, we cannot with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production. This is a job for the Nation's lawmakers, not for its military authorities.

Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the President. In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. The

first section of the first article says that "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ." After granting many powers to the Congress, Article I goes on to provide that Congress may "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President. The preamble of the order itself, like that of many statutes, sets out reasons why the President believes certain policies should be adopted, proclaims these policies as rules of conduct to be followed, and again, like a statute, authorizes a government official to promulgate additional rules and regulations consistent with the policy proclaimed and needed to carry that policy into execution. The power of Congress to adopt such public policies as those proclaimed by the order is beyond question. It can authorize the taking of private property for public use. It can make laws regulating the relationships between employers and employees, prescribing rules designed to settle labor disputes, and fixing wages and working conditions in certain fields of our economy. The Constitution does not subject this lawmaking power of Congress to presidential or military supervision or control.

It is said that other Presidents without congressional authority have taken possession of private business enterprises in order to settle labor disputes. But even if this be true, Congress has not thereby lost its exclusive constitutional authority to make laws necessary and proper to carry out the powers vested by the Constitu-

tion "in the Government of the United States, or any Department or Officer thereof."

The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times. It would do no good to recall the historical events, the fears of power and the hopes for freedom that lay behind their choice. Such a review would but confirm our holding that this seizure order cannot stand.

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE FRANKFURTER.

Although the considerations relevant to the legal enforcement of the principle of separation of powers seem to me more complicated and flexible than may appear from what MR. JUSTICE BLACK has written, I join his opinion because I thoroughly agree with the application of the principle to the circumstances of this case. Even though such differences in attitude toward this principle may be merely differences in emphasis and nuance, they can hardly be reflected by a single opinion for the Court. Individual expression of views in reaching a common result is therefore important.

## APPENDIX TO OPINION OF THE COURT.

### EXECUTIVE ORDER

Directing the Secretary of Commerce to Take Possession of and Operate the Plants and Facilities of Certain Steel Companies

WHEREAS on December 16, 1950, I proclaimed the existence of a national emergency which requires that the military, naval, air, and civilian defenses of this country be strengthened as speedily as possible to the end that we may be able to repel any and all threats against our na-

590

tional security and to fulfill our responsibilities in the efforts being made throughout the United Nations and otherwise to bring about a lasting peace; and

WHEREAS American fighting men and fighting men of other nations of the United Nations are now engaged in deadly combat with the forces of aggression in Korea, and forces of the United States are stationed elsewhere overseas for the purpose of participating in the defense of the Atlantic Community against aggression; and

WHEREAS the weapons and other materials needed by our armed forces and by those joined with us in the defense of the free world are produced to a great extent in this country, and steel is an indispensable component of substantially all of such weapons and materials; and

WHEREAS steel is likewise indispensable to the carrying out of programs of the Atomic Energy Commission of vital importance to our defense efforts; and

WHEREAS a continuing and uninterrupted supply of steel is also indispensable to the maintenance of the economy of the United States, upon which our military strength depends; and

WHEREAS a controversy has arisen between certain companies in the United States producing and fabricating steel and the elements thereof and certain of their workers represented by the United Steel Workers of America, CIO, regarding terms and conditions of employment; and

WHEREAS the controversy has not been settled through the processes of collective bargaining or through the efforts of the Government, including those of the Wage Stabilization Board, to which the controversy was referred on December 22, 1951, pursuant to Executive Order No. 10233, and a strike has been called for 12:01 A. M., April 9, 1952; and

WHEREAS a work stoppage would immediately jeopardize and imperil our national defense and the defense

of those joined with us in resisting aggression, and would add to the continuing danger of our soldiers, sailors, and airmen engaged in combat in the field; and

WHEREAS in order to assure the continued availability of steel and steel products during the existing emergency, it is necessary that the United States take possession of and operate the plants, facilities, and other property of the said companies as hereinafter provided:

NOW, THEREFORE, by virtue of the authority vested in me by the Constitution and laws of the United States, and as President of the United States and Commander in Chief of the armed forces of the United States, it is hereby ordered as follows:

1. The Secretary of Commerce is hereby authorized and directed to take possession of all or such of the plants, facilities, and other property of the companies named in the list attached hereto, or any part thereof, as he may deem necessary in the interests of national defense; and to operate or to arrange for the operation thereof and to do all things necessary for, or incidental to, such operation.

2. In carrying out this order the Secretary of Commerce may act through or with the aid of such public or private instrumentalities or persons as he may designate; and all Federal agencies shall cooperate with the Secretary of Commerce to the fullest extent possible in carrying out the purposes of this order.

3. The Secretary of Commerce shall determine and prescribe terms and conditions of employment under which the plants, facilities, and other properties possession of which is taken pursuant to this order shall be operated. The Secretary of Commerce shall recognize the rights of workers to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining, adjustment of grievances, or other mutual aid or protection, provided

592

that such activities do not interfere with the operation of such plants, facilities, and other properties.

4. Except so far as the Secretary of Commerce shall otherwise provide from time to time, the managements of the plants, facilities, and other properties possession of which is taken pursuant to this order shall continue their functions, including the collection and disbursement of funds in the usual and ordinary course of business in the names of their respective companies and by means of any instrumentalities used by such companies.

5. Except so far as the Secretary of Commerce may otherwise direct, existing rights and obligations of such companies shall remain in full force and effect, and there may be made, in due course, payments of dividends on stock, and of principal, interest, sinking funds, and all other distributions upon bonds, debentures, and other obligations, and expenditures may be made for other ordinary corporate or business purposes.

6. Whenever in the judgment of the Secretary of Commerce further possession and operation by him of any plant, facility, or other property is no longer necessary or expedient in the interest of national defense, and the Secretary has reason to believe that effective future operation is assured, he shall return the possession and operation of such plant, facility, or other property to the company in possession and control thereof at the time possession was taken under this order.

7. The Secretary of Commerce is authorized to prescribe and issue such regulations and orders not inconsistent herewith as he may deem necessary or desirable for carrying out the purposes of this order; and he may delegate and authorize subdelegation of such of his functions under this order as he may deem desirable.

Harry S. Truman.

The White House, April 8, 1952.

Mr. Justice Frankfurter, concurring.

Before the cares of the White House were his own, President Harding is reported to have said that government after all is a very simple thing. He must have said that, if he said it, as a fleeting inhabitant of fairyland. The opposite is the truth. A constitutional democracy like ours is perhaps the most difficult of man's social arrangements to manage successfully. Our scheme of society is more dependent than any other form of government on knowledge and wisdom and self-discipline for the achievement of its aims. For our democracy implies the reign of reason on the most extensive scale. The Founders of this Nation were not imbued with the modern cynicism that the only thing that history teaches is that it teaches nothing. They acted on the conviction that the experience of man sheds a good deal of light on his nature. It sheds a good deal of light not merely on the need for effective power, if a society is to be at once cohesive and civilized, but also on the need for limitations on the power of governors over the governed.

To that end they rested the structure of our central government on the system of checks and balances. For them the doctrine of separation of powers was not mere theory; it was a felt necessity. Not so long ago it was fashionable to find our system of checks and balances obstructive to effective government. It was easy to ridicule that system as outmoded—too easy. The experience through which the world has passed in our own day has made vivid the realization that the Framers of our Constitution were not inexperienced doctrinaires. These long-headed statesmen had no illusion that our people enjoyed biological or psychological or sociological immunities from the hazards of concentrated power. It is absurd to see a dictator in a representative product of the sturdy democratic traditions of the Mississippi Val-

ley. The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority.

The Framers, however, did not make the judiciary the overseer of our government. They were familiar with the revisory functions entrusted to judges in a few of the States and refused to lodge such powers in this Court. Judicial power can be exercised only as to matters that were the traditional concern of the courts at Westminster, and only if they arise in ways that to the expert feel of lawyers constitute "Cases" or "Controversies." Even as to questions that were the staple of judicial business, it is not for the courts to pass upon them unless they are indispensably involved in a conventional litigation—and then, only to the extent that they are so involved. Rigorous adherence to the narrow scope of the judicial function is especially demanded in controversies that arouse appeals to the Constitution. The attitude with which this Court must approach its duty when confronted with such issues is precisely the opposite of that normally manifested by the general public. So-called constitutional questions seem to exercise a mesmeric influence over the popular mind. This eagerness to settle—preferably forever—a specific problem on the basis of the broadest possible constitutional pronouncements may not unfairly be called one of our minor national traits. An English observer of our scene has acutely described it: "At the first sound of a new argument over the United States Constitution and its interpretation the hearts of Americans leap with a fearful joy. The blood stirs powerfully in their veins and a new lustre brightens their eyes. Like King Harry's men before Harfleur, they stand like greyhounds in the slips, straining upon the start." The Economist, May 10, 1952, p. 370.

The path of duty for this Court, it bears repetition, lies in the opposite direction. Due regard for the implications of the distribution of powers in our Constitution and for the nature of the judicial process as the ultimate authority in interpreting the Constitution, has not only confined the Court within the narrow domain of appropriate adjudication. It has also led to "a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." Brandeis, J., in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341, 346. A basic rule is the duty of the Court not to pass on a constitutional issue at all, however narrowly it may be confined, if the case may, as a matter of intellectual honesty, be decided without even considering delicate problems of power under the Constitution. It ought to be, but apparently is not, a matter of common understanding that clashes between different branches of the government should be avoided if a legal ground of less explosive potentialities is properly available. Constitutional adjudications are apt by exposing differences to exacerbate them.

So here our first inquiry must be not into the powers of the President, but into the powers of a District Judge to issue a temporary injunction in the circumstances of this case. Familiar as that remedy is, it remains an extraordinary remedy. To start with a consideration of the relation between the President's powers and those of Congress—a most delicate matter that has occupied the thoughts of statesmen and judges since the Nation was founded and will continue to occupy their thoughts as long as our democracy lasts—is to start at the wrong end. A plaintiff is not entitled to an injunction if money damages would fairly compensate him for any wrong he may have suffered. The same considerations by which the Steelworkers, in their brief *amicus,* demonstrate, from the seizure here in controversy, con-

sequences that cannot be translated into dollars and cents, preclude a holding that only compensable damage for the plaintiffs is involved. Again, a court of equity ought not to issue an injunction, even though a plaintiff otherwise makes out a case for it, if the plaintiff's right to an injunction is overborne by a commanding public interest against it. One need not resort to a large epigrammatic generalization that the evils of industrial dislocation are to be preferred to allowing illegality to go unchecked. To deny inquiry into the President's power in a case like this, because of the damage to the public interest to be feared from upsetting its exercise by him, would in effect always preclude inquiry into challenged power, which presumably only avowed great public interest brings into action. And so, with the utmost unwillingness, with every desire to avoid judicial inquiry into the powers and duties of the other two branches of the government, I cannot escape consideration of the legality of Executive Order No. 10340.

The pole-star for constitutional adjudications is John Marshall's greatest judicial utterance that "it is *a constitution* we are expounding." *McCulloch* v. *Maryland,* 4 Wheat. 316, 407. That requires both a spacious view in applying an instrument of government "made for an undefined and expanding future," *Hurtado* v. *California,* 110 U. S. 516, 530, and as narrow a delimitation of the constitutional issues as the circumstances permit. Not the least characteristic of great statesmanship which the Framers manifested was the extent to which they did not attempt to bind the future. It is no less incumbent upon this Court to avoid putting fetters upon the future by needless pronouncements today.

Marshall's admonition that "it is *a constitution* we are expounding" is especially relevant when the Court is required to give legal sanctions to an underlying principle of the Constitution—that of separation of pow-

ers. "The great ordinances of the Constitution do not establish and divide fields of black and white." Holmes, J., dissenting in *Springer* v. *Philippine Islands,* 277 U. S. 189, 209.

The issue before us can be met, and therefore should be, without attempting to define the President's powers comprehensively. I shall not attempt to delineate what belongs to him by virtue of his office beyond the power even of Congress to contract; what authority belongs to him until Congress acts; what kind of problems may be dealt with either by the Congress or by the President or by both, cf. *La Abra Silver Mng. Co.* v. *United States,* 175 U. S. 423; what power must be exercised by the Congress and cannot be delegated to the President. It is as unprofitable to lump together in an undiscriminating hotch-potch past presidential actions claimed to be derived from occupancy of the office, as it is to conjure up hypothetical future cases. The judiciary may, as this case proves, have to intervene in determining where authority lies as between the democratic forces in our scheme of government. But in doing so we should be wary and humble. Such is the teaching of this Court's rôle in the history of the country.

It is in this mood and with this perspective that the issue before the Court must be approached. We must therefore put to one side consideration of what powers the President would have had if there had been no legislation whatever bearing on the authority asserted by the seizure, or if the seizure had been only for a short, explicitly temporary period, to be terminated automatically unless Congressional approval were given. These and other questions, like or unlike, are not now here. I would exceed my authority were I to say anything about them.

The question before the Court comes in this setting. Congress has frequently—at least 16 times since 1916—

specifically provided for executive seizure of production, transportation, communications, or storage facilities. In every case it has qualified this grant of power with limitations and safeguards. This body of enactments— summarized in tabular form in Appendix I, *post,* p. 615— demonstrates that Congress deemed seizure so drastic a power as to require that it be carefully circumscribed whenever the President was vested with this extraordinary authority. The power to seize has uniformly been given only for a limited period or for a defined emergency, or has been repealed after a short period. Its exercise has been restricted to particular circumstances such as "time of war or when war is imminent," the needs of "public safety" or of "national security or defense," or "urgent and impending need." The period of governmental operation has been limited, as, for instance, to "sixty days after the restoration of productive efficiency." Seizure statutes usually make executive action dependent on detailed conditions: for example, (a) failure or refusal of the owner of a plant to meet governmental supply needs or (b) failure of voluntary negotiations with the owner for the use of a plant necessary for great public ends. Congress often has specified the particular executive agency which should seize or operate the plants or whose judgment would appropriately test the need for seizure. Congress also has not left to implication that just compensation be paid; it has usually legislated in detail regarding enforcement of this litigation-breeding general requirement. (See Appendix I, *post,* p. 615.)

Congress in 1947 was again called upon to consider whether governmental seizure should be used to avoid serious industrial shutdowns. Congress decided against conferring such power generally and in advance, without special Congressional enactment to meet each particular need. Under the urgency of telephone and coal strikes in

the winter of 1946, Congress addressed itself to the problems raised by "national emergency" strikes and lockouts.[1] The termination of wartime seizure powers on December 31, 1946, brought these matters to the attention of Congress with vivid impact. A proposal that the President be given powers to seize plants to avert a shutdown where the "health or safety" of the Nation was endangered, was thoroughly canvassed by Congress and rejected. No room for doubt remains that the proponents as well as the opponents of the bill which became the Labor Management Relations Act of 1947 clearly understood that as a result of that legislation the only recourse for preventing a shutdown in any basic industry, after failure of mediation, was Congress.[2] Authorization for seizure as

---

[1] The power to seize plants under the War Labor Disputes Act ended with the termination of hostilities, proclaimed on Dec. 31, 1946, prior to the incoming of the Eightieth Congress; and the power to operate previously seized plants ended on June 30, 1947, only a week after the enactment of the Labor Management Relations Act over the President's veto. 57 Stat. 163, 165, 50 U. S. C. App. (1946 ed.) § 1503. See 2 Legislative History of the Labor Management Relations Act, 1947 (published by National Labor Relations Board, 1948), 1145, 1519, 1626.

[2] Some of the more directly relevant statements are the following: "In most instances the force of public opinion should make itself sufficiently felt in this 80-day period to bring about a peaceful termination of the controversy. Should this expectation fail, the bill provides for the President laying the matter before Congress for whatever legislation seems necessary to preserve the health and safety of the Nation in the crisis." Senate Report No. 105, 80th Cong., 1st Sess. 15.

"We believe it would be most unwise for the Congress to attempt to adopt laws relating to any single dispute between private parties." Senate Minority Report, id., Part 2, at 17.

In the debates Senator H. Alexander Smith, a member of the Senate Committee on Labor and Public Welfare, said, "In the event of a deadlock and a strike is not ended, the matter is referred to the President, who can use his discretion as to whether he will present

600

an available remedy for potential dangers was unequivocally put aside. The Senate Labor Committee, through its Chairman, explicitly reported to the Senate that a general grant of seizure powers had been considered and rejected in favor of reliance on *ad hoc* legislation, as a particular emergency might call for it.[3] An amendment presented in the House providing that, where necessary "to preserve and protect the public health and security," the President might seize any industry in which there is

the matter to the Congress, whether or not the situation is such that emergency legislation is required.

"Nothing has been done with respect to the Smith-Connally Act. There is no provision for taking over property or running plants by the Government. We simply provide a procedure which we hope will be effective in 99 out of 100 cases where the health or safety of the people may be affected, and still leave a loophole for congressional action." 93 Cong. Rec. 4281.

The President in his veto message said, ". . . it would be mandatory for the President to transfer the whole problem to the Congress, even if it were not in session. Thus, major economic disputes between employers and their workers over contract terms might ultimately be thrown into the political arena for disposition. One could scarcely devise a less effective method for discouraging critical strikes." 93 Cong. Rec. 7487.

[3] Senator Taft said:

"If there finally develops a complete national emergency threatening the safety and health of the people of the United States, Congress can pass an emergency law to cover the particular emergency. . . .

"We have felt that perhaps in the case of a general strike, or in the case of other serious strikes, after the termination of every possible effort to resolve the dispute, the remedy might be an emergency act by Congress for that particular purpose.

". . . But while such a bill [for seizure of plants and union funds] might be prepared, I should be unwilling to place such a law on the books until we actually face such an emergency, and Congress applies the remedy for the particular emergency only. Eighty days will provide plenty of time within which to consider the possibility of what should be done; and we believe very strongly that there should not be anything in this law which prohibits finally the right to strike." 93 Cong. Rec. 3835–3836.

an impending curtailment of production, was voted down after debate, by a vote of more than three to one.[4]

In adopting the provisions which it did, by the Labor Management Relations Act of 1947, for dealing with a "national emergency" arising out of a breakdown in peaceful industrial relations, Congress was very familiar with Governmental seizure as a protective measure. On a balance of considerations, Congress chose not to lodge this power in the President. It chose not to make available in advance a remedy to which both industry and labor were fiercely hostile.[5] In deciding that authority to seize should be given to the President only after full consideration of the particular situation should show such legislation to be necessary, Congress presumably acted on experience with similar industrial conflicts in the past. It evidently assumed that industrial shutdowns in basic industries are not instances of spontaneous generation,

---

[4] 93 Cong. Rec. 3637–3645.

[5] See, for instance, the statements of James B. Carey, Secretary of the C. I. O., in opposition to S. 2054, 77th Cong., 1st Sess., which eventually became the War Labor Disputes Act. Central to that Act, of course, was the temporary grant of the seizure power to the President. Mr. Carey then said:

"Senator BURTON. If this would continue forever it might mean the nationalization of industry?

"Mr. CAREY. Let us consider it on a temporary basis. How is the law borne by labor? Here is the Government-sponsored strike breaking agency, and nothing more.

. . . . .

"Our suggestion of a voluntary agreement of the representatives of industry and labor and Government, participating in calling a conference, is a democratic way. The other one is the imposition of force, the other is the imposition of seizure of certain things for a temporary period; the destruction of collective bargaining, and it would break down labor relations that may have been built up over a long period."

Hearing before a Subcommittee of the Senate Committee on the Judiciary on S. 2054, 77th Cong., 1st Sess. 132.

and that danger warnings are sufficiently plain before the event to give ample opportunity to start the legislative process into action.

In any event, nothing can be plainer than that Congress made a conscious choice of policy in a field full of perplexity and peculiarly within legislative responsibility for choice. In formulating legislation for dealing with industrial conflicts, Congress could not more clearly and emphatically have withheld authority than it did in 1947. Perhaps as much so as is true of any piece of modern legislation, Congress acted with full consciousness of what it was doing and in the light of much recent history. Previous seizure legislation had subjected the powers granted to the President to restrictions of varying degrees of stringency. Instead of giving him even limited powers, Congress in 1947 deemed it wise to require the President, upon failure of attempts to reach a voluntary settlement, to report to Congress if he deemed the power of seizure a needed shot for his locker. The President could not ignore the specific limitations of prior seizure statutes. No more could he act in disregard of the limitation put upon seizure by the 1947 Act.

It cannot be contended that the President would have had power to issue this order had Congress explicitly negated such authority in formal legislation. Congress has expressed its will to withhold this power from the President as though it had said so in so many words. The authoritatively expressed purpose of Congress to disallow such power to the President and to require him, when in his mind the occasion arose for such a seizure, to put the matter to Congress and ask for specific authority from it, could not be more decisive if it had been written into §§ 206–210 of the Labor Management Relations Act of 1947. Only the other day, we treated the Congressional gloss upon those sections as part of the Act. *Bus Employees* v. *Wisconsin Board,* 340 U. S. 383, 395–

396. Grafting upon the words a purpose of Congress thus unequivocally expressed is the regular legislative mode for defining the scope of an Act of Congress. It would be not merely infelicitous draftsmanship but almost offensive gaucherie to write such a restriction upon the President's power in terms into a statute rather than to have it authoritatively expounded, as it was, by controlling legislative history.

By the Labor Management Relations Act of 1947, Congress said to the President, "You may not seize. Please report to us and ask for seizure power if you think it is needed in a specific situation." This of course calls for a report on the unsuccessful efforts to reach a voluntary settlement, as a basis for discharge by Congress of its responsibility—which it has unequivocally reserved—to fashion further remedies than it provided.[6] But it is now claimed that the President has seizure power by virtue of the Defense Production Act of 1950 and its Amendments.[7] And the claim is based on the occurrence of new events—Korea and the need for stabilization, etc.—although it was well known that seizure power was withheld by the Act of 1947, and although the President, whose specific requests for other authority were in the main granted by Congress, never suggested that in view of the new events he needed the power of seizure which Congress in its judgment had decided to withhold from him. The utmost that the Korean conflict may imply is that it may have been desirable to have given the President further authority, a freer hand in these matters. Absence of authority in the President to deal with a crisis does not

---

[6] Clearly the President's message of April 9 and his further letter to the President of the Senate on April 21 do not satisfy this requirement. Cong. Rec., April 9, 1952, pp. 3962–3963; id., April 21, 1952, p. 4192.

[7] 64 Stat. 798 et seq., 65 Stat. 131 et seq., 50 U. S. C. App. § 2061 et seq.

imply want of power in the Government. Conversely the fact that power exists in the Government does not vest it in the President. The need for new legislation does not enact it. Nor does it repeal or amend existing law.

No authority that has since been given to the President can by any fair process of statutory construction be deemed to withdraw the restriction or change the will of Congress as expressed by a body of enactments, culminating in the Labor Management Relations Act of 1947. Title V of the Defense Production Act, entitled "Settlement of Labor Disputes," pronounced the will of Congress "that there be effective procedures for the settlement of labor disputes affecting national defense," and that "primary reliance" be placed "upon the parties to any labor dispute to make every effort through negotiation and collective bargaining and the full use of mediation and conciliation facilities to effect a settlement in the national interest." [8] Section 502 authorized the President to hold voluntary conferences of labor, industry, and public and government representatives and to "take such action as may be agreed upon in any such conference and appropriate to carry out the provisions of this title," provided that no action was taken inconsistent with the Labor Management Relations Act of 1947.[9] This provision [10] was said by the Senate Commit-

---

[8] §§ 501, 502, 64 Stat. 798, 812, 50 U. S. C. App. §§ 2121, 2122.

[9] §§ 502, 503, 64 Stat. 798, 812, 50 U. S. C. App. §§ 2122, 2123.

[10] The provision of § 502 in S. 3936, as reported by the Senate Committee on Banking and Currency, read as follows: "The President is authorized, after consultation with labor and management, to establish such principles and procedures and to take such action as he deems appropriate for the settlement of labor disputes affecting national defense, including the designation of such persons, boards or commissions as he may deem appropriate to carry out the provisions

tee on Banking and Currency to contemplate a board similar to the War Labor Board of World War II and "a national labor-management conference such as was held during World War II, when a no-strike, no-lock-out pledge was obtained." [11] Section 502 was believed nec-

---

of this title." That language was superseded in the Conference Report by the language that was finally enacted. H. R. Rep. No. 3042, 81st Cong., 2d Sess. 16, 35. The change made by the Conference Committee was for the purpose of emphasizing the voluntary nature of the cooperation sought from the public, labor, and management; as Senator Ives explained under repeated questioning, "If any group were to hold out, there would be no agreement [on action to carry out the provisions of this title]." 96 Cong. Rec. 14071. Chairman Maybank of the Senate Committee on Banking and Currency said, "The labor disputes title of the Senate was accepted by the House with amendment which merely indicates more specific avenues through which the President may bring labor and management together." *Id.*, at 14073.

[11] S. Rep. No. 2250, 81st Cong., 2d Sess. 41; H. R. Rep. No. 3042, 81st Cong., 2d Sess. 35. It is hardly necessary to note that Congressional authorization of an agency similar to the War Labor Board does not imply a Congressional grant of seizure power similar to that given the President specifically by § 3 of the War Labor Disputes Act of 1943. The War Labor Board, created by § 7 of the 1943 Act, had only administrative sanctions. See 57 Stat. 163, 166–167; see Report of Senate Committee on Labor and Public Welfare, The Disputes Functions of the Wage Stabilization Board, 1951, S. Rep. No. 1037, 82d Cong., 1st Sess. 6. The seizure power given by Congress in § 3 of the 1943 Act was given to the President, not to the War Labor Board, and was needed only when the War Labor Board reported it had failed; the seizure power was separate and apart from the War Labor Board machinery for settling disputes. At most the Defense Production Act does what § 7 of the War Labor Disputes Act did; the omission of any grant of seizure power similar to § 3 is too obvious not to have been conscious. At any rate, the Wage Stabilization Board differs substantially from the earlier War Labor Board. In 1951 the Senate Committee studying the disputes functions of the Wage Stabilization Board pointed out the substan-

essary in addition to existing means for settling disputes voluntarily because the Federal Mediation and Conciliation Service could not enter a labor dispute unless requested by one party.[12] Similar explanations of Title V were given in the Conference Report and by Senator Ives, a member of the Senate Committee to whom Chairman Maybank during the debates on the Senate floor referred questions relating to Title V.[13] Senator Ives said:

> "It should be remembered in this connection that during the period of the present emergency it is expected that the Congress will not adjourn, but, at most, will recess only for very limited periods of time. If, therefore, any serious work stoppage should arise or even be theatened, in spite of the terms of the Labor-Management Relations Act of 1947, the Congress would be readily available to pass such legislation as might be needed to meet the difficulty." [14]

tial differences between that Board and its predecessor and concluded that "The new Wage Stabilization Board . . . does not rely on title V of the Defense Production Act for its authority." S. Rep. No. 1037, 82d Cong., 1st Sess., *supra*, at 4–6.

[12] S. Rep. No. 2250, 81st Cong., 2d Sess. 41.

[13] See 96 Cong. Rec. 14071.

[14] *Id.*, at 12275. Just before the paragraph quoted in the text, Senator Ives had said:

"In fact, the courts have upheld the constitutionality of the national emergency provisions of the Labor-Management Relations Act of 1947, which can require that workers stay on the job for at least 80 days when a strike would seriously threaten the national health and safety in peacetime.

"By the terms of the pending bill, the Labor-Management Relations Act of 1947 would be controlling in matters affecting the relationship between labor and management, including collective bargaining. It seems to me, however, that this is as far as we should go in legislation of this type."

The Defense Production Act affords no ground for the suggestion that the 1947 denial to the President of seizure powers has been impliedly repealed, and its legislative history contradicts such a suggestion. Although the proponents of that Act recognized that the President would have a choice of alternative methods of seeking a mediated settlement, they also recognized that Congress alone retained the ultimate coercive power to meet the threat of "any serious work stoppage."

That conclusion is not changed by what occurred after the passage of the 1950 Act. Seven and a half months later, on April 21, 1951, the President by Executive Order 10233 gave the reconstituted Wage Stabilization Board authority to investigate labor disputes either (1) submitted voluntarily by the parties, or (2) referred to it by the President.[15] The Board can only make "recommendations to the parties as to fair and equitable terms of settlement," unless the parties agree to be bound by the Board's recommendations. About a month thereafter Subcommittees of both the House and Senate Labor Committees began hearings on the newly assigned disputes functions of the Board.[16] Amendments to deny the

[15] 16 Fed. Reg. 3503. The disputes functions were not given to the Wage Stabilization Board under Title V, see note 11, *supra,* but apparently under the more general Title IV, entitled "Price and Wage Stabilization."

[16] See Hearings before a Subcommittee of the House Committee on Education and Labor, Disputes Functions of Wage Stabilization Board, 82d Cong., 1st Sess. (May 28–June 15, 1951); Hearings before the Subcommittee on Labor and Labor-Management Relations of Senate Committee on Labor and Public Welfare, Wage Stabilization and Disputes Program, 82d Cong., 1st Sess. (May 17–June 7, 1951). The resulting Report of the Senate Committee, S. Rep. No. 1037, 82d Cong., 1st Sess. 9,.recommended that "Title V of the Defense Production Act be retained" and that "No statutory limitations be imposed on the President's authority to deal with disputes through

608

Board these functions were voted down in the House,[17] and Congress extended the Defense Production Act without changing Title V in relevant part.[18] The legislative history of the Defense Production Act and its Amendments in 1951 cannot possibly be vouched for more than Congressional awareness and tacit approval that the President had charged the Wage Stabilization Board with authority to seek voluntary settlement of labor disputes. The most favorable interpretation of the statements in the committee reports can make them mean no more than "We are glad to have all the machinery possible for the voluntary settlement of labor disputes." In considering the Defense Production Act Amendments, Congress was never asked to approve—and there is not the slightest indication that the responsible committees ever had in mind—seizure of plants to coerce settlement of disputes.

*voluntary* machinery; such limitations, we believe, would infringe on the President's constitutional power." (Emphasis added.) The Committee found, *id.*, at 10, that the "Wage Stabilization Board relies completely on voluntary means for settling disputes and is, therefore, an extension of free collective bargaining. The Board has no powers of legal compulsion." "Executive Order No. 10233," the Committee found further, "does not in any way run counter to the . . . Taft-Hartley Act. It is simply an additional tool, not a substitute for these laws." Of particular relevance to the present case, the Committee declared:

"The recommendations of the Wage Stabilization Board in disputes certified by the President have no compulsive force. The parties are free to disregard recommendations of the Wage Stabilization Board . . . .

"There is, of course, the President's authority to seize plants under the Selective Service Act [a power not here used], but this is an authority which exists independently of the Wage Stabilization Board and its disputes-handling functions. In any case, seizure is an extraordinary remedy, and the authority to seize, operates whether or not there is a disputes-handling machinery." *Id.*, at 5.

[17] 97 Cong. Rec. 8390–8415.

[18] 65 Stat. 131.

We are not even confronted by an inconsistency between the authority conferred on the Wage Board, as formulated by the Executive Order, and the denial of Presidential seizure powers under the 1947 legislation. The Board has been given merely mediatory powers similar to those of agencies created by the Taft-Hartley Act and elsewhere, with no other sanctions for acceptance of its recommendations than are offered by its own moral authority and the pressure of public opinion. The Defense Production Act and the disputes-mediating agencies created subsequent to it still leave for solution elsewhere the question what action can be taken when attempts at voluntary settlement fail. To draw implied approval of seizure power from this history is to make something out of nothing.

It is one thing to draw an intention of Congress from general language and to say that Congress would have explicitly written what is inferred, where Congress has not addressed itself to a specific situation. It is quite impossible, however, when Congress did specifically address itself to a problem, as Congress did to that of seizure, to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld. To find authority so explicitly withheld is not merely to disregard in a particular instance the clear will of Congress. It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress.

The legislative history here canvassed is relevant to yet another of the issues before us, namely, the Government's argument that overriding public interest prevents the issuance of the injunction despite the illegality of the seizure. I cannot accept that contention. "Balancing the equities" when considering whether an injunction should issue, is lawyers' jargon for choosing between conflicting public interests. When Congress itself has struck

the balance, has defined the weight to be given the competing interests, a court of equity is not justified in ignoring that pronouncement under the guise of exercising equitable discretion.

Apart from his vast share of responsibility for the conduct of our foreign relations, the embracing function of the President is that "he shall take Care that the Laws be faithfully executed . . . ." Art. II, § 3. The nature of that authority has for me been comprehensively indicated by Mr. Justice Holmes. "The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power." *Myers* v. *United States,* 272 U. S. 52, 177. The powers of the President are not as particularized as are those of Congress. But unenumerated powers do not mean undefined powers. The separation of powers built into our Constitution gives essential content to undefined provisions in the frame of our government.

To be sure, the content of the three authorities of government is not to be derived from an abstract analysis. The areas are partly interacting, not wholly disjointed. The Constitution is a framework for government. Therefore the way the framework has consistently operated fairly establishes that it has operated according to its true nature. Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them. It is an inadmissibly narrow conception of American constitutional law to confine it to the words of the Constitution and to disregard the gloss which life has written upon them. In short, a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents who have also sworn to uphold the Constitution, making as it were such exercise of power part

of the structure of our government, may be treated as a gloss on "executive Power" vested in the President by § 1 of Art. II.

Such was the case of *United States* v. *Midwest Oil Co.*, 236 U. S. 459. The contrast between the circumstances of that case and this one helps to draw a clear line between authority not explicitly conferred yet authorized to be exercised by the President and the denial of such authority. In both instances it was the concern of Congress under express constitutional grant to make rules and regulations for the problems with which the President dealt. In the one case he was dealing with the protection of property belonging to the United States; in the other with the enforcement of the Commerce Clause and with raising and supporting armies and maintaining the Navy. In the *Midwest Oil* case, lands which Congress had opened for entry were, over a period of 80 years and in 252 instances, and by Presidents learned and unlearned in the law, temporarily withdrawn from entry so as to enable Congress to deal with such withdrawals. No remotely comparable practice can be vouched for executive seizure of property at a time when this country was not at war, in the only constitutional way in which it can be at war. It would pursue the irrelevant to reopen the controversy over the constitutionality of some acts of Lincoln during the Civil War. See J. G. Randall, Constitutional Problems under Lincoln (Revised ed. 1951). Suffice it to say that he seized railroads in territory where armed hostilities had already interrupted the movement of troops to the beleaguered Capital, and his order was ratified by the Congress.

The only other instances of seizures are those during the periods of the first and second World Wars.[19] In his eleven seizures of industrial facilities, President Wilson

---

[19] Instances of seizure by the President are summarized in Appendix II, *post*, p. 620.

612

acted, or at least purported to act,[20] under authority granted by Congress. Thus his seizures cannot be adduced as interpretations by a President of his own powers in the absence of statute.

Down to the World War II period, then, the record is barren of instances comparable to the one before us. Of twelve seizures by President Roosevelt prior to the enactment of the War Labor Disputes Act in June, 1943, three were sanctioned by existing law, and six others

[20] One of President Wilson's seizures has given rise to controversy. In his testimony in justification of the Montgomery Ward seizure during World War II, Attorney General Biddle argued that the World War I seizure of Smith & Wesson could not be supported under any of the World War I statutes authorizing seizure. He thus adduced it in support of the claim of so-called inherent Presidential power of seizure. See Hearings before House Select Committee to Investigate the Seizure of Montgomery Ward, 78th Cong., 2d Sess. 167–168. In so doing, he followed the ardor of advocates in claiming everything. In his own opinion to the President, he rested the power to seize Montgomery Ward on the statutory authority of the War Labor Disputes Act, see 40 Op. Atty. Gen. 312 (1944), and the Court of Appeals decision upholding the Montgomery Ward seizure confined itself to that ground. *United States* v. *Montgomery Ward & Co.*, 150 F. 2d 369. What Attorney General Biddle said about Smith & Wesson was, of course, *post litem motam.* Whether or not the World War I statutes were broad enough to justify that seizure, it is clear that the taking officers conceived themselves as moving within the scope of statute law. See Letter from Administrative Div., Advisory Sec. to War Dep't. Bd. of Appraisers, National Archives, Records of the War Department, Office of the Chief of Ordnance, O. O. 004.002/194 Smith & Wesson, Apr. 2, 1919; n. 3, Appendix II, *post*, p. 620. Thus, whether or not that seizure was within the statute, it cannot properly be cited as a precedent for the one before us. On this general subject, compare Attorney General Knox's opinion advising President Theodore Roosevelt against the so-called "stewardship" theory of the Presidency. National Archives, Opinions of the Attorney General, Book 31, Oct. 10, 1902 (R. G. 60); Theodore Roosevelt, Autobiography, 388–389; 3 Morison, The Letters of Theodore Roosevelt, 323–366.

were effected after Congress, on December 8, 1941, had declared the existence of a state of war. In this case, reliance on the powers that flow from declared war has been commendably disclaimed by the Solicitor General. Thus the list of executive assertions of the power of seizure in circumstances comparable to the present reduces to three in the six-month period from June to December of 1941. We need not split hairs in comparing those actions to the one before us, though much might be said by way of differentiation. Without passing on their validity, as we are not called upon to do, it suffices to say that these three isolated instances do not add up, either in number, scope, duration or contemporaneous legal justification, to the kind of executive construction of the Constitution revealed in the *Midwest Oil* case. Nor do they come to us sanctioned by long-continued acquiescence of Congress giving decisive weight to a construction by the Executive of its powers.

A scheme of government like ours no doubt at times feels the lack of power to act with complete, all-embracing, swiftly moving authority. No doubt a government with distributed authority, subject to be challenged in the courts of law, at least long enough to consider and adjudicate the challenge, labors under restrictions from which other governments are free. It has not been our tradition to envy such governments. In any event our government was designed to have such restrictions. The price was deemed not too high in view of the safeguards which these restrictions afford. I know no more impressive words on this subject than those of Mr. Justice Brandeis:

"The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but,

> by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers* v. *United States,* 272 U. S. 52, 240, 293.

It is not a pleasant judicial duty to find that the President has exceeded his powers and still less so when his purposes were dictated by concern for the Nation's well-being, in the assured conviction that he acted to avert danger. But it would stultify one's faith in our people to entertain even a momentary fear that the patriotism and the wisdom of the President and the Congress, as well as the long view of the immediate parties in interest, will not find ready accommodation for differences on matters which, however close to their concern and however intrinsically important, are overshadowed by the awesome issues which confront the world. When at a moment of utmost anxiety President Washington turned to this Court for advice, and he had to be denied it as beyond the Court's competence to give, Chief Justice Jay, on behalf of the Court, wrote thus to the Father of his Country:

> "We exceedingly regret every event that may cause embarrassment to your administration, but we derive consolation from the reflection that your judgment will discern what is right, and that your usual prudence, decision, and firmness will surmount every obstacle to the preservation of the rights, peace, and dignity of the United States." Letter of August 8, 1793, 3 Johnston, Correspondence and Public Papers of John Jay (1891), 489.

In reaching the conclusion that conscience compels, I too derive consolation from the reflection that the President and the Congress between them will continue to safeguard the heritage which comes to them straight from George Washington.

APPENDIX I—SYNOPTIC ANALYSIS OF LEGISLATION AUTHORIZING SEIZURE OF INDUSTRIAL PROPERTY.

| STATUTE | DURATION | | SCOPE OF AUTHORITY | LIMITATIONS ON ITS EXERCISE | CONDITIONS OF EMPLOYMENT DURING SEIZURE | COMPENSATION |
|---|---|---|---|---|---|---|
| | As enacted | As extended or repealed | | | | |
| 1. Railroad and Telegraph Act of 1862, 12 Stat. 334. Enacted 1/31/32 amended, 12 Stat. 625, 7/14/62. | Not "in force any longer than is necessary for the suppression of this rebellion." | | President may "take possession of" telegraph lines and railroads; prescribe rules for their operation; and place all officers and employees under military control. | a. "When in his [the President's] judgment the public safety may require it." b. President may not "engage in any work of railroad construction." | Non[e] | President shall appoint three commissioners to assess compensation to which the company is entitled and to report to Congress for its action. |
| 2. § 120 of National Defense Act of 1916, 39 Stat. 166, 213, 50 U.S.C. § 80, as amended. Enacted 6/3/16. | No time limit. | | President, through the head of any department, may seize any plant and may operate plants through the Army Ordnance Department. | a. Exercisable "in time of war or when war is imminent." b. Plant is equipped for making "necessary supplies or equipment for the Army" or "in the opinion of the Secretary of War" can be transformed readily to such use. c. Owner refuses to give government order precedence or to perform. | Non[e] | Compensation "shall be fair and just." |
| 3. Army Appropriation Act of 1916, 39 Stat. 619, 645, 10 U.S.C. § 1361. Enacted 8/29/16. | No time limit. | | President, through Secretary of War, may take possession of and utilize any system or part of any system of transportation. | Exercisable "in time of war."* | Non[e] | Compensation "shall be fair and just." |
| 4. Naval Emergency Fund Act of 1917, 39 Stat. 1168, 1192–1195, 50 U.S.C. § 82. Enacted 3/4/17. (Cf. Emergency Shipping Fund Act of 1917, infra.) | No time limit. | | President may 1. "take over for use or operation" any factory "whether [or not] the United States has . . . agreement with the owner or occupier." 2. "take immediate possession of any factory" producing ships or war material for the Navy. | Exercisable "in time of war" (or of national emergency determined by the President before 3/1/18). a. Owner fails or refuses to give precedence to an order for "ships or war material as the necessities of the Government"; refuses to deliver or to comply with a contract as modified by President. b. Exercisable within "the limits of the amounts appropriated therefor." | Non[e] | President shall determine "just compensation"; if the claimant is dissatisfied, he shall be paid 50 percent of the amount determined by the President and may sue, subject to existing law, in the district courts and the Court of Claims for the rest of "just compensation." |

Governmental possession of the Nation's railroads, taken on December 28, 1917, was specifically terminated by statute on March 1, 1920, prior to the end of the "war." See § 200 of the Transportation Act of 1920, 41 Stat. 456, 4...

| STATUTE | DURATION | | SCOPE OF AUTHORITY | LIMITATIONS ON ITS EXERCISE | TERMS AND CONDITIONS OF EMPLOYMENT DURING SEIZURE | COMPENSATION |
|---|---|---|---|---|---|---|
| | As enacted | As extended or repealed | | | | |
| 5. Emergency Shipping Fund Act of 1917, 40 Stat. 182. Enacted 6/15/17. | To 6 months after peace with the German Empire, 40 Stat. 182, 183. | Repealed after 3 years, § 2 (a) (1), 41 Stat. 988, 6/5/20. | President may 1. "take over for use or operation" any plant, "whether [or not] United States has ... agreement with the owner or occupier." | Exercisable "within the limits of the amounts herein authorized." | Not | Same as next above, except that the prepaid percentage when the owner is dissatisfied is 75 percent. |
| | | | 2. "take immediate possession of any ... plant" "equipped for the building or production of ships or material." | Failure or refusal of owner of ship-building plant to give Government orders precedence or to comply with order. | | |
| 6. 1918 Amendments to Emergency Shipping Fund Act of 1917. A. 40 Stat. 535. Enacted 4/22/18. | To 6 months after peace with the German Empire. | Repealed after 2 years, 41 Stat. 988, 6/5/20. | President may 1. "take possession of ... any street railroad." | a. The street railroad is necessary for transporting employees of plants which are or may be hereafter engaged in "construction of ships or equipment therefor for the United States." b. Exercisable "within the limits of the amounts herein authorized." | Not | Same as next above. |
| | | | 2. extend seized plants constructing ships or materials therefor and requisition land for use in extensions. | Exercisable "within the limits of the amounts herein authorized." | Not | |
| B. 40 Stat. 1020, 1022. Enacted 11/4/18. | To 6 months after peace with the German Empire. | Repealed after 1½ years, 41 Stat. 988, 6/5/20. | | | | |
| 7. Food and Fuel Act of 1917, 40 Stat. 276. Enacted 8/10/17. | To end of World War I with Germany. | | | | Not | |
| § 10, 40 Stat. 276, 279. | | | President may 1. requisition foods, fuels, feeds, etc., and storage facilities for them. | The requisitioning is "necessary to the support of the Army or the ... Navy, or any other public use connected with the common defense." | Not | President "shall ascertain and pay a just compensation"; if the owner is dissatisfied, he shall be paid 75 percent of the amount determined by the President and may sue in the district courts, which are hereby given jurisdiction, for the rest of "just compensation." |
| § 12, 40 Stat. 276, 279. | | | 2. take over any factory, packing house, oil pipe line, mine, or other plant where any necessaries are or may be "produced, prepared, or mined, and to operate the same." | a. President finds "it necessary to secure an adequate supply of necessaries for ... the Army or ... the Navy, or for any other public use connected with the common defense." b. President must turn facility back as soon as further Government operation "is not essential for the national security or defense." | President may make regulations for the employment, control, and compensation of employees." | Same as in the Emergency Shipping Fund Act of 1917, supra. |

| STATUTE | DURATION (As enacted) | DURATION (As extended or repealed) | SCOPE OF AUTHORITY | LIMITATIONS ON ITS EXERCISE | TERMS AND CONDITIONS OF EMPLOYMENT DURING SEIZURE | COMPENSATION |
|---|---|---|---|---|---|---|
| Food and Fuel Act of 1917—Continued. § 25, 40 Stat. 276, 284. | To end of World War I with Germany. | | 3. "requisition and take over the plant, business, and all appurtenances thereof belonging to such producer or dealer" of coal and coke, and may operate it through an agency of his choice. | Producer or dealer *a.* Fails to conform to prices or regulations set by the Federal Trade Commission under the direction of the President, who deems it "necessary for the efficient prosecution of the war," or *b.* Fails to operate efficiently, or conducts business in a way "prejudicial to the public interest." | President r[...] regulatio[...] ployment [...] [co]ntrol, and compensation [...] the employees." | Same as next above. |
| 8. Joint Resolution of July 16, 1918, 40 Stat. 904. | during the continuance of the present war." | Terminated on 7/31/19 by repeal, 7/11/19, 41 Stat. 157. | President may "take possession . . . of [and operate] any telegraph, telephone, marine cable or radio system." | President deems "it necessary for the national security or defense." | None. | Same as next above. |
| 9. § 16 of Federal Water Power Act of 1920, 41 Stat. 1063, 1072, 16 U. S. C. § 809. Enacted 6/10/20. | No time limit. | | President may take possession of any project, dams, power houses, transmission lines, etc., constructed or operated under a license from the Federal Power Commission and may operate them. | *a.* President believes, as "evidenced by a written order addressed to the holder of any license hereunder [that] the safety of the United States demands it." *b.* Seizure is "for the purpose of manufacturing nitrates, explosives, or munitions of war, or for any other purpose involving the safety of the United States." *c.* Control is limited to the "length of time as may appear to the President to be necessary to accomplish said purposes." | None. | Owner shall be paid "just and fair compensation for the use of said property as may be fixed by the [Federal Power] commission upon the basis of a reasonable profit in time of peace, and the cost of restoring said property to as good condition as existed at the time of the taking over thereof, less the reasonable value of any improvements . . . made thereto by the United States and which are valuable and serviceable to the [owner]." |
| 10. § 606 of Communications Act of 1934, 48 Stat. 1064, 1104, 47 U. S. C. § 606(c). Enacted 6/19/34. | No time limit. | | President may "use or control . . . any such station and/or its apparatus and equipment by any department of the Government under such regulations as he may prescribe." | *a.* President proclaims that there exists (1) war or threat of war or (2) a state of public peril or disaster or other national emergency, or *b.* It is necessary to preserve the neutrality of the United States. | None. | President shall ascertain just compensation and certify it to Congress for appropriation; if the owner is dissatisfied, he shall be paid 75 percent of the amount determined by the President and may sue, subject to existing law, in the district courts and the Court of Claims for the rest of "just compensation." |

| STATUTE | DURATION | | SCOPE OF AUTHORITY | LIMITATIONS ON ITS EXERCISE | TERMS AND CONDITIONS OF EMPLOYMENT DURING SEIZURE | COMPENSATION |
|---|---|---|---|---|---|---|
| | As enacted | As extended or repealed | | | | |
| 11. Amendments to Communications Act, 56 Stat. 18, 47 U. S. C. § 606(d).<br><br>Enacted 1/26/42. | No time limit. | | Same power as in § 606(c), Communications Act of 1934, next above. | a. President proclaims a state or threat of war.<br>b. President "deems it necessary in the interest of the national security and defense."<br>c. Power to seize and use property continues to "not later than six months after the termination of such state or threat of war" or than a date set by concurrent resolution of Congress. | None. | Same as next above. |
| 12. § 8(b) of National Defense Act of 1940, 54 Stat. 676, 680.<br><br>Enacted 6/28/40. | No time limit. | Repealed in less than 3 months, 9/16/40, 54 Stat. 885, 898. | Secretary of Navy, under President's direction, may "take over and operate such plant or facility." | a. Secretary of Navy deems any existing plant necessary for the national defense.<br>b. He is unable to reach agreement with its owner for its use or operation. | Secretary of Navy may operate the plant "either by Government personnel or by contract with private firms." | Secretary of Navy may "fix the compensation." |
| 13. § 9 of Selective Training and Service Act of 1940, 54 Stat. 885, 892, 50 U. S. C. App. (1946 ed.) § 309.<br><br>Enacted 9/16/40; amended by War Labor Disputes Act, 57 Stat. 163, 164, q. v., infra. | To 5/15/45, 54 Stat. 885, 897. | Extended to 3/31/47, 60 Stat. 341, 342. | President may "take immediate possession of any such plant." (Extended by amendment to "any plant, mine, or facility", capable of producing "any articles or materials which may be required . . . or which may be useful" for the war effort. 57 Stat. 163, 164.) | a. Plant is equipped for or capable of being readily transformed for the manufacture of necessary supplies.<br>b. Owner refuses to give Government order precedence or to fill it. | None. | "The compensation . . . shall be fair and just." |
| 14. § 3 of War Labor Disputes Act of 1943, 57 Stat. 163, 164, 50 U. S. C. App. (1946 ed.) § 1503.<br><br>Enacted 6/25/43. | To termination of this Act by concurrent resolution by Congress or of hostilities. Plants seized previously may be operated until 6 months after termination of hostilities. | | President may "take immediate possession" of "any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required . . . or which may be useful" for the war effort. | a. Finding and proclamation by the President that (1) there is an interruption on account of a labor disturbance, (2) the war effort will be unduly impeded, (3) seizure is necessary to insure operation.<br>b. Plant must be returned to owner within 60 days "after the restoration of the productive efficiency." | Same "terms and conditions of employment which were in effect at time [of taking] possession except that terms and conditions might be changed by order of the War Labor Board, on application. §§ 4, 5, 57 Stat. 163, 165." | Same as next above. |

| STATUTE | DURATION | | SCOPE OF AUTHORITY | LIMITATIONS ON ITS EXERCISE | TERMS AND CONDITIONS OF EMPLOYMENT DURING SEIZURE | COMPENSATION |
|---|---|---|---|---|---|---|
| | As enacted | As extended or repealed | | | | |
| *15.* Title VIII, "Repricing of War Contracts," of Revenue Act of 1943, 58 Stat. 21, 92; 50 U. S. C. App. (1946) § 1192.<br><br>Enacted 2/25/44. | To termination of hostilities. | | President may "take immediate possession of the plant or plants . . . and . . . operate them in accordance with section 9 of the Selective Training and Service Act of 1940, as amended." | *a.* The Secretary of a Department deems the price of an article or service required directly or indirectly by the Department is unreasonable.<br>*b.* The Secretary, after the refusal of the person furnishing the article or service to agree to a price, sets a price.<br>*c.* The person "wilfully refuses, or wilfully fails" to furnish the articles or services at the price fixed by the Secretary. | None. | Same as next above. |
| *16.* Selective Service Act of 1948, 62 Stat. 604, 625, 626, 50 U. S. C. App. § 468.<br><br>Enacted 6/24/48. | No time limit. | | President may "take immediate possession of any plant, mine, or other facility . . . and to operate it . . . for the production of such articles or materials." | *a.* President with advice of the National Security Resources Board determines prompt delivery of articles or materials is "in the interest of the national security."<br>*b.* Procurement "has been authorized by the Congress exclusively for the use of the armed forces" or the A. E. C.<br>*c.* Owner refuses or fails to give precedence to Government order placed with notice that it is made pursuant to this section, or to fill the order properly. | None. | "Fair and just compensation shall be paid." |
| *17.* § 201(a) Production 798,799,50 § 2081(a).<br><br>Enacted 9/8/50; amended, 6, Stat. 131, 132, *q. v., in* | To 6/30/51. But see § 716(a), 64 Stat. 798, 822. | Extended to 7/31/51, 65 Stat. 110. Extended to 6/30/52, § 111, 65 Stat. 131, 144. | President may "requisition" "equipment, supplies or component parts thereof, or materials or facilities necessary for the manufacture, servicing, or operation of such equipment, supplies, or component parts." 64 Stat. 798, 799. Restricted in the main to personal property by § 102(b), 65 Stat. 132. | President determines that—<br>*a.* its use is "needed for national defense,"<br>*b.* the need is "immediate and impending," "will not admit of delay or resort to any other source of supply."<br>*c.* other reasonable means of obtaining use of the property have been exhausted. | None. | President shall determine just compensation as of the time the property is taken; if owner is dissatisfied, he shall be promptly paid 75 percent of the amount determined by the President and may sue within three years in the district courts or the Court of Claims, regardless of the amount involved, for the rest of "just compensation." |
| *18.* § 102(b) (2) Production ments of 15, 131,132, 50 § 2081(b).<br><br>Enacted 7/31 | To 6/30/52, 65 Stat. 131, 144. | | Court condemnation of real property in accordance with existing statutes. | President deems the real property "necessary in the interest of national defense." | None. | Under existing statutes for condemnation. Immediate possession given only upon deposit of amount "estimated to be just compensation," 75 percent of which is immediately paid without prejudice to the owner. |

# APPENDIX II.—SUMMARY OF SEIZURES OF INDUSTRIAL PLANTS AND FACILITIES BY THE PRESIDENT.

## Civil War Period.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE | | ORDER EFFECTING SEIZURE | AUTHORITY CITED | REASON FOR SEIZURE | OPERATIONS DURING SEIZURE |
|---|---|---|---|---|---|---|
| | From | To | | | | |
| Railroads and telegraph lines between Washington and Annapolis, Md.[1] | 4/27/61 | (?) | Order of Secretary of War dated 4/27/61 appointing Thomas A. Scott officer in charge. War of the Rebellion, Official Records of the Union and Confederate Armies, Ser. I, Vol. II, 603. | None. | Communications between Washington and the North were interrupted by bands of southern sympathizers who destroyed railway and telegraph facilities. | Northern troops guarded railway and telegraph facilities; they were repaired and restored to operation under orders of the Secretary of War. |
| Telegraph lines. | 2/26/62 | (?) | Order of Secretary of War dated 2/25/62 appointing Anson Stager officer in charge. Richardson, Messages and Papers of the Presidents, Lincoln, Order of Feb. 25, 1862. | "by virtue of the act of Congress" (presumably Railroad and Telegraph Act of 1862, 12 Stat. 334). | To insure effective transmission and security of military communications. | Lines operated under military supervision; censorship of messages; lines extended and completed subject to limitations of Joint Resolution of July 14, 1862, 12 Stat. 625. |
| Railroads. | 5/25/62 | 65 | Order of Secretary of War dated 5/25/62. Richardson, Messages and Papers of the Presidents, Lincoln, Order of May 25, 1862. | "by virtue of the authority vested by act of Congress" (presumably Railroad and Telegraph Act of 1862, 12 Stat. 334). | To insure effective priority to movement of troops and supplies. | Railways operated under military supervision; lines extended and completed subject to limitations of Joint Resolution of July 14, 1862, 12 Stat. 625; interruption of regular passenger and freight traffic. |

## World War I Period. [2]

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE | | ORDER EFFECTING SEIZURE | AUTHORITY CITED | REASON FOR SEIZURE | OPERATIONS DURING SEIZURE |
|---|---|---|---|---|---|---|
| | From | To | | | | |
| Bigelow-Hartford Carpet Co., Lowell, Mass. | 12/27/17 | 1/1/19 | Order of Secretary of War, Req. 20 A/C, Ord. No. 62, dated 12/27/17. | Constitution and laws.[3] | Requisitioned for use of United States Cartridge Co. for cartridge manufacture. | |
| Railroads. | 12/28/17 | 3/1/20 | Presidential proclamation, 40 Stat. 1733. | Joint Resolution of April 6, 1917. Joint Resolution of Dec. 7, 1917. Act of Aug. 29, 1916. "all other powers thereto me enabling." | Labor difficulties; congestion; ineffective operation in times of war effort. | Wage increase; changes in operating practices and procedures. |
| Liberty Ordnance Co., Bridgeport, Conn. | 1/7/18 | 5/19 | Order of Secretary of War, Req. 26 A/C, Ord. No. 27, dated 1/5/18. | Constitution and laws.[3] | Inadequate financing and other difficulties leading to failure to perform contract for manufacture of 6 mm. guns. | Turned over to American Can Co. for operation. |
| Hoboken Land & Improvement Co., Hoboken, N. J. | 2/28/18 | 4/9 | Order of Secretary of War, Req. 37 A/C, Ord. No. 516, dated 2/28/18. | Constitution and laws.[3] | Requisitioned for use of Remington Arms-U. M. C. Co. for cartridge manufacture. | |
| Bijur Motor Appliance Co., Hoboken, N. J. | 4/1/18 8/15/18 | 5/9 | Order of Secretary of War, Req. 37 A/C, Ord. No. 516, dated 2/28/18. | Constitution and laws.[3] | Requisitioned for use of Remington Arms-U. M. C. Co. for cartridge manufacture. | |
| Jewel Tea Co., Hoboken, N. J. | 4/1/18 | 9/9 | Order of Secretary of War, Req. 37 A/C, Ord. No. 516, dated 2/28/18. | Constitution and laws.[3] | Requisitioned for use of Remington Arms-U. M. C. Co. for cartridge manufacture. | |

[1] Clyde B. Aitchison states that on March 31, 1861, the Federal authorities took "under military control the Philadelphia, Wilmington & Baltimore Railway to insure uninterrupted communication between the North Atlantic States and Washington." Aitchison, War Time Control of American Railways, 26 Va. L. Rev. 847, 856 (1940). He adds that the return of the road to its private owners followed "shortly thereafter." Ibid. Original documents on this seizure are unavailable and it has, therefore, not been included in the table.

[2] The material in this table is taken from original documents in the National Archives and Hearings before the Senate Special Committee Investigating the Munitions Industry, 73d Cong., Part 17, 4270–4271 (1934).

[3] Although no specific statutory authority was cited in the seizing order, it is clear from correspondence and reports in connection with the administration of the program that the seizure was effected under wartime legislation. See, e. g., Davisson, History of the Advisory Section, Administrative Division, Ordnance Office in connection with the Commandeering of Private Property, National Archives, Records of the War Department, Office of the Chief of Ordnance, O. O. 023/1362, Nov. 1920; Letter from Ordnance Office, Administrative Division to The Adjutant General, National Archives, Records of the War Department, Office of The Adjutant General, AG 386.2, Jan. 7, 1919.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE From | To | ORDER EFFECTING SEIZURE | AUTHORITY CITED | REASON FOR SEIZURE | OPERATIONS DURING SEIZURE |
|---|---|---|---|---|---|---|
| Telegraph lines. | 7/25/18 | ...19 | Presidential proclamation, 40 Stat. 1807. | Joint Resolution of July 16, 1918. "all other powers thereto me enabling." | Labor difficulties | Anti-union discrimination terminated. |
| Smith & Wesson, Springfield, Mass. | 9/13/18 | ...19 | Order of Secretary of War, Req. 709 B/C, Ord. No. 604, dated 8/31/18. | Constitution and laws.[3] | Labor difficulties | Anti-union discrimination terminated; operation by the National Operating Co., a Government corporation. |
| Federal Enameling & Stamping Co, McKees Rocks, Pa. | 9/23/18 | ...3/18 | Order of Secretary of War, Req. 738 B/C, Ord. No. 609, dated 9/11/18. | Constitution and laws.[3] | Failure to fill [20] compulsory order. | |
| Mosler Safe Co, Hamilton, Ohio. | 9/23/18 | ...19 | Order of Secretary of War, Req. 781 B/C, Ord. No. 612, dated 9/23/18. | Constitution and laws.[3] | Failure to fill compulsory order. | |
| Bush Terminal Co, Brooklyn, N.Y. | (?) | (?) | (?) | Act of Aug. 29, 1916. Food and Fuel Act of 1917. | (?) | (?) |

## World War II Period 4—Seizures Connected With Labor Disputes.

### 1. Before Pearl Harbor.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE From | To | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED[5] | DURATION OF STOPPAGE From | To[6] | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE[7] | REASONS FOR SEIZURE | BASIS FOR CHANGES | REPORTED LEGAL ACTION[8] |
|---|---|---|---|---|---|---|---|---|---|---|
| North American Aviation, Inc., Inglewood, Calif. | 6/9/41 | 7/2/41 | 8773. 6 Fed. Reg. 2777. | None. (Order cites contracts of company with Government and ownership by Government of machinery, materials and work in progress in plant.) | 6/5/41 | 6/10/41 | Property returned ... agreement of parties to wage increase and maintenance of membership. | | Agreement of parties on National Defense Mediation Board recommendation. | |
| Federal Shipbuilding & Drydock Co., Kearny, N.J. | 8/23/41 | 1/6/42 | 8868. 6 Fed. Reg. 4849. | None. (Order cites contracts of company with Government and ownership by Government of vessels under construction, materials and equipment in yard.) | 8/6/41 | 8/23/41 | Maintenance of membership during period | | National Defense Mediation Board recommendation. | |
| Air Associates, Inc., Bendix, N.J. | 10/30/41 | 2/29/42 | 8928. 6 Fed. Reg. 5559. | None. (Order cites contracts of company with Government and ownership by Government of facilities in plant.) | 7/11/41, 9/30/41 | 7/27/41, 10/24/41 | Strikers reinstated over replacements hired by company prior to seizure. | | Agreement of parties on National Defense Mediation Board recommendation. | |

[3] See n. 3, p. 620, supra.

[4] The material in this table is summarized from a number of sources, chief of which are the War Labor Reports, contemporary accounts in the New York Times, United States National Wage Stabilization Board, Research and statistics report No. 2 (1946), and Johnson, Government Seizures and Labor Disputes (Philadelphia, Pa., 1948) (unpublished doctoral dissertation at the University of Pennsylvania). Question marks appear in the tables in instances where no satisfactory information on the particular point was available.

[5] Each of the Executive Orders uses the phrase "the Constitution and laws" and tell as his position as Commander in Chief. Only specific statutory authority relied upon is given in this table. The form of reference of the particular Executive Order is used. Statutes referred to in the table are analyzed in Appendix I, supra, p. 615. For convenience, their citations are repeated here:
(1) Army Appropriations Act of Aug. 29, 1916, 39 Stat. 619, 645, 10 U.S.C. § 1361.
(2) Federal Water Power Act of 1920, § 16, 41 Stat. 1063, 1072, 16 U.S.C. § 809.
(3) Selective Training and Service Act of 1940, § 9, 54 Stat. 885, 892.
(4) War Labor Disputes Act, § 3, 57 Stat. 163, 164.
(5) Revenue Act of 1943, Tit. VIII, "Repricing of War Contracts," 58 Stat. 21, 92.
When seizures of transportation facilities were effected through agencies other than the War Department, the First War Powers Act of 1941, 55 Stat. 8[3] was cited. Title I of that Act permitted the President to shift certain functions among executive agencies and of the war effort. The Act of Aug. 29, 1916, authorizing seizure of transportation facilities, specified that it should be accomplished through the Secretary of War.

[7] stoppages continuing during seizure are indicated by an asterisk (*). ... unless otherwise indicated, changes in conditions of employment in... started during seizure were continued by management upon the return of the facilities to its control.

[8] validity of seizure was challenged in comparatively few cases. Most litigation concerned the consequences of seizure. Cases in which the validity of the seizure was attacked are indicated by a dagger (†).

## 2. Between Pearl Harbor and the Passage of the War Labor Disputes Act, June 25, 1943.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE From | To | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED [5] | DURATION OF STOPPAGE From | To [6] | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE | BASIS FOR CHANGES | REPORTED LEGAL ACTION [8] |
|---|---|---|---|---|---|---|---|---|---|
| Toledo, P. & W. R. Co. | 3/21/42 | 10/1/45 | 9108. 7 Fed. Reg. 2201. | None. | 12/28/41 | 3/21/42 | Wage increase during period of seizure. | War Labor Board recommendation. | Toledo P. & W. R. Co. v. Stover, 60 F. Supp. 587 (S. D. Ill. 1945). |
| General Cable Co., Bayonne, N.J., plant. | 8/13/42 | 8/20/42 | 9220. 7 Fed. Reg. 6413. | None. | 8/10/42 | 8/13/42 | None. | War Labor Board recommendation. | |
| S. A. Woods Machine Co., South Boston, Mass. | 8/19/42 | 8/25/45 | 9225. 7 Fed. Reg. 6627. | None. | None. | None. | Maintenance of membership. | War Labor Board recommendation. | |
| Coal Mines. | 5/2/43 | 10/12/43 | 9340. 8 Fed. Reg. 5695. | None. | 4/22/43; 6/1/43; 6/20/43 | 5/2/43; 6/7/43*; (?)* | Six-day week; eight-hour day. (To increase take-home pay.) | Order of the Secretary of Interior. | United States v. Pewee Coal Co. 341 U.S. 114; NLRB v. West Ky. Coal Co., 152 F. 2d 198 (6th Cir. 1945); Glen Alden Coal Co. v. NLRB, 141 F. 2d 47 (3d Cir. 1944). |
| American R. Co. of Porto Rico. | 5/13/43 | 7/1/44 | 9341. 8 Fed. Reg. 6323. | None. | 5/12/43 | 5/13/43 | Wage increase. | War Labor Board recommendation. | |

### 3. Between June 25, 1943, and VJ Day.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE From | To | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED [5] | DURATION OF STOPPAGE From | To [6] | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE | BASIS FOR CHANGES | REPORTED LEGAL ACTION [8] |
|---|---|---|---|---|---|---|---|---|---|
| Atlantic Basin Iron Works, Brooklyn, N. Y. | 9/3/43 | 9/22/43 | 9375. 8 Fed. Reg. 12253. | War Labor Disputes Act. | None. | None. | Maintenance of membership. | War Labor Board recommendation. | |
| Coal Mines. | 11/1/43 | 6/21/44 | 9393. 8 Fed. Reg. 14877. | War Labor Disputes Act. | 10/12/43 11/1/43 | 11/4/43* | Changes in wages and hours. | Agreement with Secretary of Interior. | |
| Leather Manufacturers in Salem, Peabody, and Danvers, Mass. | 11/20/43 | 12/13/43 | 9395B. 8 Fed. Reg. 16957. | None. | 9/25/43 (sporadic) | 11/24/43* (sporadic) | None. (Jurisdictional strike.) | None. | |
| Western Electric Co., Point Breeze plant, Baltimore, Md. | 12/19/43 | 2/23/44 | 9408. 8 Fed. Reg. 16958. | War Labor Disputes Act. | 12/14/43 | 12/19/43 | None. (Strike in protest of War Labor Board segregation ruling.) | None. | |
| Railroads. | 12/30/43 | 1/18/44 | 9412. 8 Fed. Reg. 17395. | Act of Aug. 29, 1916. | None. | None. | Control relinquished when parties accepted Presidential compromise of wage demands. | Presidential arbitration based on Railway Labor Act Emergency Board recommendations. | Thorne v. Washington Terminal Co., 55 F. Supp. 139 (D.D.C. 1944). |
| Fall River, Mass., Textile Plants. | 2/7/44 | 4/28/44 | 9420. 9 Fed. Reg. 1563. | War Labor Disputes Act. | 12/13/43 | 2/14/44* | Property returned upon agreement by parties on seniority provisions. | War Labor Board recommendation. | |

[5] See n. 5, p. 621, supra. [6] See n. 6, p. 621, supra. [7] See n. 7, p. 621, supra. [8] See n. 8, p. 621, supra.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE | | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED[5] | DURATION OF STOPPAGE | | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE[7] | BASIS FOR CHANGES | REPORTED LEGAL ACTION[8] |
|---|---|---|---|---|---|---|---|---|---|
| | From | To | | | From | To[6] | | | |
| Department of Water and Power, Los Angeles, Calif. | 2/23/44 | ?/29/44 | 9426. 9 Fed. Reg. 2113. | War Labor Disputes Act. | 2/14/44 | 2/24/44 | None. | None. | |
| Jenkins Bros, Inc., Bridgeport, Conn. | 4/13/44 | ?/15/44 | 9435. 9 Fed. Reg. 4063. | § 9, Selective Service Act of 1940 as amended. | None. | None. | Wage increase. | War Labor Board recommendation. | In re Jenkins Bros., Inc., 15 W. L. R. 719 (D.D.C.1944).† |
| Ken-Rad Tube & Lamp Co., Owensboro, Ky. | 4/13/44 | ?/15/44 | 9436. 9 Fed. Reg. 4063. | § 9, Selective Service Act of 1940 as amended. | None. | None. | Changes in wage scales; maintenance of membership. | War Labor Board recommendation. | Ken-Rad Tube & Lamp Corp. v. Badeau, 55 F. Supp. 193 (W. D. Ky. 1944).† |
| Montgomery Ward & Co., Chicago, Ill., facilities. | 4/25/44 | ?/9/44 | 9438. 9 Fed. Reg. 4459. | None. | None. | None. | None. (Government extended contract pending NLRB election to determine bargaining representative.) | War Labor Board recommendation. | United States v. Montgomery Ward & Co., 150 F. 2d 369 (7th Cir. 1945).† |
| Montgomery Ward & Co., Hummer Mfg. division, Springfield, Ill. | 5/21/44 | ?/2/45 | 9443. 9 Fed. Reg. 5395. | § 9, Selective Service Act of 1940 as amended. | 5/5/44 | 5/21/44 | Maintenance of membership; voluntary checkoff. | War Labor Board recommendation. | |
| Philadelphia Transportation Co., Philadelphia, Pa. | 8/3/44 | ?/17/44 | 9459. 9 Fed. Reg. 9878. | Act of Aug. 29, 1916. First War Powers Act of 1941. § 9 of Selective Service Act of 1940, as amended. | 8/1/44 | 8/7/44* | None. (Strike protest of WLB nonsegregation ruling.) | None. | United States v. McMenamin, 58 F. Supp. 478 (E. D. Pa. 1944).† |
| Midwest Trucking Operators. | 8/11/44 | ?/1/45 ?/1/45 | 9462. 9 Fed. Reg. 10071. | Act of Aug. 29, 1916. First War Powers Act of 1941. § 9, Selective Service Act of 1940, as amended by the War Labor Disputes Act. | 8/4/44 | 8/11/44 | Wage increase. | War Labor Board recommendation. | |
| San Francisco, Calif., Machine Shops. | 8/14/44 8/19/44 | ?/14/45 | 9463. 9 Fed. Reg. 9879. 9466. 9 Fed. Reg. 10139. | § 9, Selective Service Act of 1940, as amended. | Sporadic. | Sporadic. | Union agreed not to discipline employees who worked overtime. Cancellation of employee draft deferments, gas rations, and job referral rights. | War Labor Board recommendation. | San Francisco Lodge No. 68 IAM v. Forrestal, 58 F. Supp. 466 (N. D. Calif. 1944). |
| Anthracite Coal Mines. | 8/23/44 9/19/44 | ?/24/45 | 9469.[9] 9 Fed. Reg. 10343. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 6/29/44 8/?/44 | 8/23/44 9/?/44 [10] | None. | None. | |
| International Nickel Co., Huntington, W. Va., plant. | 8/29/44 | ?0/14/44 | 9473. 9 Fed. Reg. 10613. | § 9, Selective Service Act of 1940 as amended. | 8/18/44 | 8/29/44 | None. | None. | |

5 See n. 5, p. 621, supra.
6 See n. 6, p. 621, supra.
7 See n. 7, p. 621, supra.
8 See n. 8, p. 621, supra.

9 This order was followed by a series drawn in the same terms extending the seizure [to] additional mines. The Executive Orders were: No. 9474, 9 Fed. Reg. ...15; No. 9476, 9 Fed. Reg. 10817; No. 9478, 9 Fed. Reg. 11045; No. 9481, 9 ... Reg. 11387; No. 9482, 9 Fed. Reg. 11459; No. 9483, 9 Fed. Reg. 11601.

10 A series of strikes for recognition by supervisory employees at the various mines were usually, though not always, terminated on seizure of the affected property.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE[6] | | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED[5] | DURATION OF STOPPAGE[7] | | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE[7] | BASIS FOR CHANGES | REPORTED LEGAL ACTION[8] |
|---|---|---|---|---|---|---|---|---|---|
| | From | To | | | From | To[6] | | | |
| Hughes Tool Co., Houston Tex., facilities. | 9/2/44 | /29/45 | 9475A. 9 Fed. Reg. 10943. | § 9, Selective Service Act of 1940 as amended. | None. | None. | Maintenance of membership during period of seizure. | War Labor Board recommendation. | |
| Cleveland Graphite Bronze Co., Cleveland, Ohio. | 9/5/44 | 1/8/44 | 9477. 9 Fed. Reg. 10941. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 8/31/44 | 9/5/44 | Union agreed to arbitrate grievance which had precipitated the strike. | War Labor Board recommendation. | |
| Twentieth Century Brass Works, Inc., Minneapolis, Minn. | 9/9/44 | /17/45 | 9480. 9 Fed. Reg. 11143. | § 9, Selective Service Act of 1940 as amended. | 8/21/44 | 9/9/44 | Wage increase. | War Labor Board recommendation. | |
| Farrell Cheek Steel Co., Sandusky, Ohio. | 9/23/44 | /28/45 | 9484. 9 Fed. Reg. 11731. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 9/11/44 | 9/23/44 | Wage increase; maintenance of membership during period of seizure. | War Labor Board recommendation. | |
| Toledo, Ohio, Machine Shops. | 11/4/44 | 1/6/44 | 9496. 9 Fed. Reg. 13187. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 10/27/44 | 11/5/44 | None. (Jurisdictional strike.) | None. | |
| Cudahy Bros. Co., Cudahy, Wis. | 12/6/44 | /31/45 | 9505. 9 Fed. Reg. 14473. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | None. | None. | Maintenance of membership; voluntary check-off. | War Labor Board recommendation. | |
| Montgomery Ward & Co., Detroit, Mich., and other facilities. | 12/27/44 | 0/18/45 | 9508. 9 Fed. Reg. 15079. | War Labor Disputes Act. § 9, Selective Service Act of 1940 as amended. | 12/9/44 | 12/27/44 | Maintenance of membership and voluntary check-off during period of seizure. | War Labor Board recommendation. | *National War Labor Board v. Montgomery Ward & Co.,* 144 F. 2d 528 (D. C. Cir. 1944). |
| Cleveland Electric Illuminating Co., Cleveland, Ohio. | 1/13/45 | /15/45 | 9511. 10 Fed. Reg. 549. | § 9, Selective Service Act of 1940 as amended. | 1/12/45 | 1/13/45 | None. | None. | |
| Bingham & Garfield R. R., Utah. | 1/24/45 | /29/45 | 9516. 10 Fed. Reg. 1313. | Act of Aug. 29, 1916. First War Powers Act of 1941. War Labor Disputes Act. | 1/23/45 | 1/24/45 | Property returned upon agreement by parties on wage scale for certain positions. | Railway Labor Act Emergency Board recommendation. | |
| American Enka Corp., Enka, N. C. | 2/18/45 | /6/45 | 9523. 10 Fed. Reg. 2133. | War Labor Disputes Act. Selective Service Act as amended. | 2/7/45 | 2/18/45 | None. (Strike over question of contract interpretation submitted to arbitration.) | War Labor Board recommendation. | |
| Coal Mines: Bituminous. | 4/10/45 | /12/45 9/25/45 | 9536. 10 Fed. Reg. 3939. | § 9, Selective Service Act as amended by the War Labor Disputes Act. | 4/1/45 | 4/11/45 | Wage increase. | Agreement of parties. | |
| Anthracite. | 5/3/45 | /23/45 | 9548. 10 Fed. Reg. 5025. | | 5/1/45 | 5/24/45* | Wage increase. | Agreement of parties. | |
| Cities Service Refining Corp., Lake Charles, La., plant. | 4/17/45 | 2/23/45 | 9540. 10 Fed. Reg. 4193. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | (?) | 4/17/45 | None. (Strike over housing conditions.) | None. | |

[5] See n. 5, p. 621, *supra.* [6] See n. 6, p. 6 ... *supra.* [7] See n. 7, p. 621, *supra.* [8] See n. 8, p. 621, *supra.*

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE | | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED [5] | DURATION OF STOPPAGE | | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE [7] | BASIS FOR CHANGES | REPORTED LEGAL ACTION [8] |
|---|---|---|---|---|---|---|---|---|---|
| | From | To | | | From | To [6] | | | |
| United Engineering Co., Ltd., San Francisco, Calif. | 4/25/45 | 7/31/45 | 9542. 10 Fed. Reg. 4591. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 4/12/45 | (?)* | Union's privileges under contract revoked. | War Labor Board recommendation. | |
| Cocker Machine & Foundry Co., Gastonia, N. C. | 5/20/45 | 7/31/45 | 9552. 10 Fed. Reg. 5757. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | (?) | 5/20/45 | Wage increase; maintenance of membership during period of seizure. | War Labor Board recommendation. | |
| Chicago, Ill., Motor Carriers. | 5/23/45 | 6/16/45 | 9554. 10 Fed. Reg. 5981. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. Act of Aug. 29, 1916. First War Powers Act of 1941. | 5/19/45 / 6/16/45 | 5/24/45 / 6/27/45* | Wage increase. | War Labor Board recommendation. | |
| Gaffney Mfg. Co., Gaffney, S. C. | 5/28/45 | 7/9/45 | 9559. 10 Fed. Reg. 6287. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | (?) | 5/28/45 | Wage increase and maintenance of membership during period of seizure. | War Labor Board recommendation. | |
| Mary-Leila Cotton Mills, Greensboro, Ga. | 6/1/45 | 7/31/45 | 9560. 10 Fed. Reg. 6547. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 4/1/45 | 6/1/45 | Contract extension; maintenance of membership and voluntary check-off during period of seizure. | War Labor Board recommendation. | |
| Humble Oil & Refining Co., Ingleside, Tex. plant. | 6/5/45 | 7/10/45 | 9564. 10 Fed. Reg. 6791. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | None. | None. | Maintenance of membership during period of seizure. | War Labor Board recommendation. | *Eighth Regional War Labor Bd. v. Humble Oil & Refining Co.*, 145 F. 2d 462 (5th Cir. 1945).† |
| Pure Oil Co., Cabin Creek oil field, Dawes, W. Va., facilities. | 6/6/45 | 7/10/45 | 9565. 10 Fed. Reg. 6792. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 5/14/45 | 6/6/45 | Maintenance of membership during period of seizure. | War Labor Board recommendation. | |
| Scranton Transit Co., Scranton, Pa. | 6/14/45 | 7/8/45 | 9570. 10 Fed. Reg. 7235. | § 9, Selective Service Act of 1940 as amended by § 3 of the War Labor Disputes Act. Act of Aug. 20, 1916. First War Powers Act of 1941. | 5/20/45 | 6/14/45 | None. | None. | |
| Diamond Alkali Co., Painesville, Ohio. | 6/19/45 | 7/19/45 | 9574. 10 Fed. Reg. 7435. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 6/15/45 | 6/19/45 | Property returned upon agreement by parties to wage increase. | None. | |
| Texas Co., Port Arthur, Tex., plant. | 7/1/45 | 7/10/45 | 9577A. 10 Fed. Reg. 8090. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 6/29/45 | 7/1/45 | None. (Strike over racial discrimination.) | None. | |

[5] See n. 5, p. 621, *supra*. [6] See n. 6, p. 6[?], *supra*. [7] See n. 7, p. 621, *supra*. [8] See n. 8, p. 621, *supra*.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE [5] | | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED [6] | DURATION OF STOPPAGE | | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE [7] | BASIS FOR CHANGES | REPORTED LEGAL ACTION [8] |
|---|---|---|---|---|---|---|---|---|---|
| | From | To | | | From | To [6] | | | |
| Goodyear Tire & Rubber Co., Akron, Ohio. | 7/4/45 | 30/45 | 9585. 10 Fed. Reg. 8335. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 6/20/45 | 7/4/45 | Agreement by union [to] submit future disputes to federal agency. | (?). | |
| Sinclair Rubber Co., Houston, Tex., butadiene plant. | 7/19/45 | /19/45 | 9589A. 10 Fed. Reg. 8949. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | None. | None. | Change in union security arrangements. | War Labor Board recommendation. | |
| Springfield Plywood Co., Springfield, Oreg. | 7/25/45 | 30/45 | 9593. 10 Fed. Reg. 9379. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | (?) | 7/25/45 | None. | None. | |
| U. S. Rubber Co., Detroit, Mich., facilities. | 7/31/45 | /10/45 | 9595. 10 Fed. Reg. 9571. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 7/14/45 | 7/31/45 | None. | None. | |

4. *Between VJ Day and the Expiration of the War Labor Disputes Act Seizure Powers, Dec. 31, 1946.*

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE | | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED | DURATION OF STOPPAGE | | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE | BASIS FOR CHANGES | REPORTED LEGAL ACTION |
|---|---|---|---|---|---|---|---|---|---|
| | From | To | | | From | To | | | |
| Illinois Central R. Co. | 8/23/45 | 27/46 | 9602. 10 Fed Reg. 10957. | § 9, Selective Service Act of 1940 as amended by § 3 of the War Labor Disputes Act. Act of Aug. 29, 1916. First War Powers Act of 1941. | None. | None. | None. (Jurisdictional strike) | Railway Labor Act Emergency Board recommended against change. | |
| Petroleum. Refineries and Pipelines. (One-half national refining capacity.) | 10/4/45 | /12/45 2/46 | 9639. 10 Fed. Reg. 12592. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 9/16/45 | 10/5/45 | Plants returned on agreement of owners to 18 percent wage increase. | Ad hoc fact-finding board recommendation. | |
| Capital Transit Co., Washington, D. C. | 11/21/45 | 7/46 | 9658. 10 Fed. Reg. 14351. | § 9, Selective Service Act of 1940 as amended by § 3 of the War Labor Disputes Act. Act of Aug. 29, 1916. First War Powers Act of 1941. | 11/6/45 11/20/45 | 11/7/45 11/21/45 | Facilities returned when parties agreed to arbitration award on wages. | Ad hoc arbitration board award. | |
| Great Lakes Towing Co., Cleveland, Ohio. | 11/29/45 | /18/46 | 9661. 10 Fed. Reg. 14591. | § 9, Selective Service Act of 1940 as amended by § 3 of the War Labor Disputes Act. Act of Aug. 29, 1916. First War Powers Act of 1941. | 9/4/45 11/1/45 | 11/29/45 | Wage increase. | National Wage Stabilization Board recommendation. | |
| Meatpacking Industry. | 1/24/46 | 12/46 22/46 | 9685. 11 Fed. Reg. 989. 9690. 11 Fed. Reg. 1837. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 1/16/46 | 1/28/46* | Plants returned as companies agreed to wage increase recommended by fact-finding board. | Ad hoc fact-finding board recommendation approved by National Wage Stabilization Board. | |

5 See n. 5, p. 621, *supra.* 6 See n. 6, p. 621, *supra.* 7 See n. 7, p. 621, *supra.* 8 See n. 8, p. 621, *supra.*

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE From | DURATION OF SEIZURE To | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED [5] | DURATION OF STOPPAGE From | DURATION OF STOPPAGE To [6] | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE [7] | BASIS FOR CHANGES | REPORTED LEGAL ACTION [8] |
|---|---|---|---|---|---|---|---|---|---|
| New York Harbor Tugboat Companies. | 2/5/46 | 3/46 | 9693. 11 Fed. Reg. 1421. | § 9, Selective Service Act of 1940 as amended by § 3 of the War Labor Disputes Act. Act of Aug. 29, 1916. First War Powers Act of 1941. | 2/4/46 | 2/13/46* | Properties returned after agreement of parties to arbitrate dispute. | None. | |
| Railroads. | 5/17/46 | 26/46 | 9727. 11 Fed. Reg. 5461. | § 9, Selective Service Act of 1940 as amended by § 3 of the War Labor Disputes Act. Act of Aug. 29, 1916. First War Powers Act of 1941. | 5/23/46 | 5/25/46* | Properties returned after unions agreed to Presidential compromise of wage demands. | Railway Labor Act Emergency Board recommendation as modified by President. | |
| Bituminous Coal Mines. | 5/21/46 | 30/47 | 9728. 11 Fed. Reg. 5593. | § 9, Selective Service Act of 1940 as amended by the War Labor Disputes Act. | 4/1/46; 5/25/46 | 5/11/46; 5/30/46* | Wage increase, welfare and retirement fund, mine safety provisions, and recognition of UMW as representative of supervisory employees during period of seizure. | Contract between union and Secretary of Interior. | United States v. United Mine Workers, 330 U. S. 258; Jones & Laughlin Steel Co. v. UMW, 159 F. 2d 18 (D. C. Cir. 1946); Krug v. Fox, 161 F. 2d 1013 (4th Cir. 1947).† |
| Monongahela Connecting R. Co., Pittsburgh, Pa. | 6/14/46 | 12/46 | 9736. 11 Fed. Reg. 6661. | § 9, Selective Service Act of 1940 as amended by § 3 of the War Labor Disputes Act. Act of Aug. 29, 1916. First War Powers Act of 1941. | 6/10/46 | 6/14/46 | None. (Property returned on recession of union from wage demands.) | None. | |

*5. Since the expiration of the War Labor Disputes Act Seizures Powers, Dec. 31, 1946.*

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE From | DURATION OF SEIZURE To | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED [5] | DURATION OF STOPPAGE From | DURATION OF STOPPAGE To [6] | CHANGES IN CONDITIONS OF EMPLOYMENT DURING SEIZURE [7] | BASIS FOR CHANGES | REPORTED LEGAL ACTION [8] |
|---|---|---|---|---|---|---|---|---|---|
| Railroads. | 5/10/48 | 0/48 | 9957. 13 Fed. Reg. 2503. | Act of Aug. 29, 1916. | None. | None. | Property returned on agreement of parties to wage increase. | Railway Labor Act Emergency Board recommendation as modified. | United States v. Brotherhood of Locomotive Engineers, 79 F. Supp. 485 (D. C. 1948). |
| Chicago, Rock Island & Pacific R. Co. | 7/8/50 | 23/52 | 10141. 15 Fed. Reg. 4363. | Act of Aug. 29, 1916. | 6/25/50 | 7/8/50 | Property returned on agreement of parties to wage increase. | Railway Labor Act Emergency Board recommendation as modified. | |
| Railroads. | 8/27/50 | 23/52 | 10155. 15 Fed. Reg. 5785. | Act of Aug. 29, 1916. | 12/10/50; 1/29/51; 3/9/52 | 12/15/50; 2/19/51; 3/12/52 | Agreement reached by carriers and some of the Brotherhoods put into effect. Property returned on agreement of parties to wage increase. | Railway Labor Act Emergency Board recommendation as modified. | |

⁵ See n. 5, p. 621, supra. ⁶ See n. 6, p. 621, supra. ⁷ See n. 7, p. 621, supra. ⁸ See n. 8, p. 621, supra.

World War II Period [4]—Seizures Unconnected With Labor Disputes.

| PLANT OR FACILITY SEIZED | DURATION OF SEIZURE | | EXECUTIVE ORDER | STATUTORY AUTHORITY CITED [5] | REASONS FOR SEIZURE | CHANGES INSTITUTED DURING SEIZURE |
|---|---|---|---|---|---|---|
| | From | To | | | | |
| Grand River Dam Authority, Oklahoma. | 11/19/41 | 7/31/46 | 8944. 6 Fed. Reg. 5947. | § 16, Federal Power Act. | This was a State power project, financed by federal loan and grant. Seizure was based on (1) State default on loan interest; (2) refusal of State legislature to issue bonds to complete financing (3) failure to meet scheduled completion date in lower-short defense area. | Federal Works Administrator replaced management and completed the project. Transferred to Department of Interior, Executive Order No. 9373, 8 Fed. Reg. 12001, 8/30/43. Returned pursuant to Act of July 31, 1946, 60 Stat. 743. |
| Brewster Aeronautical Corp., Long Island City, N. Y., Newark, N. J., Johnsville, Pa. | 4/18/42 | 5/20/42 | 9141. 7 Fed. Reg. 2961. | None. | (1) Inefficient management; (2) failure to operate at full capacity. (3) failure to maintain delivery schedules on Army and Navy aircraft. Congressional investigation suggested labor difficulties as well, due to employment of enemy aliens.) | New board of directors and officers installed; majority shareholders established 2½ year voting trust in favor of new president. |
| Triumph Explosives, Inc., Maryland and Delaware plants. | 10/12/42 | 2/28/43 | 9254. 7 Fed. Reg. 8333. | None. | Overpayments (presumably bribes) of $1,400,000 to procurement officers. | New board of directors and officers; indictments against former officials. |
| Howarth Pivoted Bearings Co., Philadelphia, Pa. | 6/14/43 | 6/5/43 | 9351. 8 Fed. Reg. 8097. | None. | Inefficient management. | Designees of Secretary of Navy operated plant for duration of war. |
| Remington Rand, Inc., Southport, N. Y., plant. | 11/23/43 | 9/30/44 | 9399. 8 Fed. Reg. 16269. | § 9, Selective Service Act of 1940 as amended. | (1) Norden bombsight parts production of unacceptable quality; (2) deliveries behind schedule. | Designees of Secretary of Navy supervised operations for duration of seizure. |
| Los Angeles Shipbuilding & Drydock Corp., Los Angeles, Calif. | 12/8/43 | 8/25/45 | 9400. 8 Fed. Reg. 16641. | § 9, Selective Service Act of 1940 as amended. | (1) Excessive costs; (2) production behind schedule. | Operated by contractor (Todd Shipyard Co.) for duration of war. |
| York Safe & Lock Co., York, Pa. | 1/23/44 | 3/15/45 | 9416. 9 Fed. Reg. 936. | § 9, Selective Service Act of 1940 as amended. | (1) Inefficient management; (2) deliveries behind schedule. | Designees of Secretary of Navy operated company for duration of war, except for a portion which was condemned and transferred to Blaw-Knox Co. |
| Lord Mfg. Co., Erie, Pa.[11] | 10/24/44 | 8/25/45 | 9438. 9 Fed. Reg. 12860. | Tit. VIII, Revenue Act of 1943. § 9, Selective Service Act of 1940 as amended. | Refusal to deliver items at "fair prices," fixed by the Secretary of the Navy in contract renegotiation. | Designees of Secretary of Navy operated company for duration of war. |

[4] See n. 4, p. 621, supra. [5] See n. 5, p. 6... supra. [11] See Lord Mfg. Co. v. Collisson, 62 F. Supp. 79 (W. D. Pa. 1945).

Mr. Justice Douglas, concurring.

There can be no doubt that the emergency which caused the President to seize these steel plants was one that bore heavily on the country. But the emergency did not create power; it merely marked an occasion when power should be exercised. And the fact that it was necessary that measures be taken to keep steel in production does not mean that the President, rather than the Congress, had the constitutional authority to act. The Congress, as well as the President, is trustee of the national welfare. The President can act more quickly than the Congress. The President with the armed services at his disposal can move with force as well as with speed. All executive power—from the reign of ancient kings to the rule of modern dictators—has the outward appearance of efficiency.

Legislative power, by contrast, is slower to exercise. There must be delay while the ponderous machinery of committees, hearings, and debates is put into motion. That takes time; and while the Congress slowly moves into action, the emergency may take its toll in wages, consumer goods, war production, the standard of living of the people, and perhaps even lives. Legislative action may indeed often be cumbersome, time-consuming, and apparently inefficient. But as Mr. Justice Brandeis stated in his dissent in *Myers* v. *United States,* 272 U. S. 52, 293:

> "The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy."

We therefore cannot decide this case by determining which branch of government can deal most expeditiously with the present crisis. The answer must depend on the allocation of powers under the Constitution. That in turn requires an analysis of the conditions giving rise to the seizure and of the seizure itself.

The relations between labor and industry are one of the crucial problems of the era. Their solution will doubtless entail many methods—education of labor leaders and business executives; the encouragement of mediation and conciliation by the President and the use of his great office in the cause of industrial peace; and the passage of laws. Laws entail sanctions—penalties for their violation. One type of sanction is fine and imprisonment. Another is seizure of property. An industry may become so lawless, so irresponsible as to endanger the whole economy. Seizure of the industry may be the only wise and practical solution.

The method by which industrial peace is achieved is of vital importance not only to the parties but to society as well. A determination that sanctions should be applied, that the hand of the law should be placed upon the parties, and that the force of the courts should be directed against them, is an exercise of legislative power. In some nations that power is entrusted to the executive branch as a matter of course or in case of emergencies. We chose another course. We chose to place the legislative power of the Federal Government in the Congress. The language of the Constitution is not ambiguous or qualified. It places not *some* legislative power in the Congress; Article I, Section 1 says "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

The legislative nature of the action taken by the President seems to me to be clear. When the United States

takes over an industrial plant to settle a labor controversy, it is condemning property. The seizure of the plant is a taking in the constitutional sense. *United States* v. *Pewee Coal Co.,* 341 U. S. 114. A permanent taking would amount to the nationalization of the industry. A temporary taking falls short of that goal. But though the seizure is only for a week or a month, the condemnation is complete and the United States must pay compensation for the temporary possession. *United States* v. *General Motors Corp.,* 323 U. S. 373; *United States* v. *Pewee Coal Co., supra.*

The power of the Federal Government to condemn property is well established. *Kohl* v. *United States,* 91 U. S. 367. It can condemn for any public purpose; and I have no doubt but that condemnation of a plant, factory, or industry in order to promote industrial peace would be constitutional. But there is a duty to pay for all property taken by the Government. The command of the Fifth Amendment is that no "private property be taken for public use, without just compensation." That constitutional requirement has an important bearing on the present case.

The President has no power to raise revenues. That power is in the Congress by Article I, Section 8 of the Constitution. The President might seize and the Congress by subsequent action might ratify the seizure.[1] But until and unless Congress acted, no condemnation would be lawful. The branch of government that has the power to pay compensation for a seizure is the only one able to authorize a seizure or make lawful one that

---

[1] What a President may do as a matter of expediency or extremity may never reach a definitive constitutional decision. For example, President Lincoln suspended the writ of habeas corpus, claiming the constitutional right to do so. See *Ex parte Merryman,* 17 Fed. Cas. No. 9,487. Congress ratified his action by the Act of March 3, 1863. 12 Stat. 755.

the President has effected.[2] That seems to me to be the necessary result of the condemnation provision in the Fifth Amendment. It squares with the theory of checks and balances expounded by MR. JUSTICE BLACK in the opinion of the Court in which I join.

If we sanctioned the present exercise of power by the President, we would be expanding Article II of the Constitution and rewriting it to suit the political conveniences of the present emergency. Article II which vests the "executive Power" in the President defines that power with particularity. Article II, Section 2 makes the Chief Executive the Commander in Chief of the Army and Navy. But our history and tradition rebel at the thought that the grant of military power carries with it authority over civilian affairs. Article II, Section 3 provides that the President shall "from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." The power to recommend legislation, granted to the President, serves only to emphasize that it is his function to recommend and that it is the function of the Congress to legislate. Article II,

---

[2] Mr. Justice Brandeis, speaking for the Court in *United States* v. *North American Co.,* 253 U. S. 330, 333, stated that the basis of the Government's liability for a taking of property was legislative authority, "In order that the Government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power."

That theory explains cases like *United States* v. *Causby,* 328 U. S. 256, where the acts of the officials resulting in a taking were acts authorized by the Congress, though the Congress had not treated the acts as one of appropriation of private property.

Wartime seizures by the military in connection with military operations (cf. *United States* v. *Russell,* 13 Wall. 623) are also in a different category.

Section 3 also provides that the President "shall take Care that the Laws be faithfully executed." But, as MR. JUSTICE BLACK and MR. JUSTICE FRANKFURTER point out, the power to execute the laws starts and ends with the laws Congress has enacted.

The great office of President is not a weak and powerless one. The President represents the people and is their spokesman in domestic and foreign affairs. The office is respected more than any other in the land. It gives a position of leadership that is unique. The power to formulate policies and mould opinion inheres in the Presidency and conditions our national life. The impact of the man and the philosophy he represents may at times be thwarted by the Congress. Stalemates may occur when emergencies mount and the Nation suffers for lack of harmonious, reciprocal action between the White House and Capitol Hill. That is a risk inherent in our system of separation of powers. The tragedy of such stalemates might be avoided by allowing the President the use of some legislative authority. The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement. Some future generation may, however, deem it so urgent that the President have legislative authority that the Constitution will be amended. We could not sanction the seizures and condemnations of the steel plants in this case without reading Article II as giving the President not only the power to execute the laws but to make some. Such a step would most assuredly alter the pattern of the Constitution.

We pay a price for our system of checks and balances, for the distribution of power among the three branches of government. It is a price that today may seem exorbitant to many. Today a kindly President uses the seizure power to effect a wage increase and to keep the steel furnaces in production. Yet tomorrow another

634

President might use the same power to prevent a wage increase, to curb trade-unionists, to regiment labor as oppressively as industry thinks it has been regimented by this seizure.

MR. JUSTICE JACKSON, concurring in the judgment and opinion of the Court.

That comprehensive and undefined presidential powers hold both practical advantages and grave dangers for the country will impress anyone who has served as legal adviser to a President in time of transition and public anxiety. While an interval of detached reflection may temper teachings of that experience, they probably are a more realistic influence on my views than the conventional materials of judicial decision which seem unduly to accentuate doctrine and legal fiction. But as we approach the question of presidential power, we half overcome mental hazards by recognizing them. The opinions of judges, no less than executives and publicists, often suffer the infirmity of confusing the issue of a power's validity with the cause it is invoked to promote, of confounding the permanent executive office with its temporary occupant. The tendency is strong to emphasize transient results upon policies—such as wages or stabilization—and lose sight of enduring consequences upon the balanced power structure of our Republic.

A judge, like an executive adviser, may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power as they actually present themselves. Just what our forefathers did envision, or would have envisioned had they foreseen modern conditions, must be divined from materials almost as enigmatic as the dreams Joseph was called upon to interpret for Pharaoh. A century and a half of partisan debate and scholarly speculation yields no net result but only supplies more or less apt quotations from

respected sources on each side of any question. They largely cancel each other.[1] And court decisions are indecisive because of the judicial practice of dealing with the largest questions in the most narrow way.

The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress. We may well begin by a somewhat over-simplified grouping of practical situations in which a President may doubt, or others may challenge, his powers, and by distinguishing roughly the legal consequences of this factor of relativity.

1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.[2] In these cir-

---

[1] A Hamilton may be matched against a Madison. 7 The Works of Alexander Hamilton, 76–117; 1 Madison, Letters and Other Writings, 611–654. Professor Taft is counterbalanced by Theodore Roosevelt. Taft, Our Chief Magistrate and His Powers, 139–140; Theodore Roosevelt, Autobiography, 388–389. It even seems that President Taft cancels out Professor Taft. Compare his "Temporary Petroleum Withdrawal No. 5" of September 27, 1909, *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 467, 468, with his appraisal of executive power in "Our Chief Magistrate and His Powers" 139–140.

[2] It is in this class of cases that we find the broadest recent statements of presidential power, including those relied on here. *United States* v. *Curtiss-Wright Corp.*, 299 U. S. 304, involved, not the question of the President's power to act without congressional au-

cumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government

thority, but the question of his right to act under and in accord with an Act of Congress. The constitutionality of the Act under which the President had proceeded was assailed on the ground that it delegated legislative powers to the President. Much of the Court's opinion is *dictum*, but the *ratio decidendi* is contained in the following language:

"When the President is to be authorized by legislation to act in respect of a matter intended to affect a situation in foreign territory, the legislator properly bears in mind the important consideration that the form of the President's action—or, indeed, whether he shall act at all—may well depend, among other things, upon the nature of the confidential information which he has or may thereafter receive, or upon the effect which his action may have upon our foreign relations. This consideration, in connection with what we have already said on the subject, discloses the unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed. As this court said in *Mackenzie* v. *Hare*, 239 U. S. 299, 311, 'As a government, the United States is invested with all the attributes of sovereignty. As it has the character of nationality it has the powers of nationality, especially those which concern its relations and intercourse with other countries. *We should hesitate long before limiting or embarrassing such powers.*' (Italics supplied.)" *Id.*, at 321–322.

That case does not solve the present controversy. It recognized internal and external affairs as being in separate categories, and held that the strict limitation upon congressional delegations of power to the President over internal affairs does not apply with respect to delegations of power in external affairs. It was intimated that the President might act in external affairs without congressional authority, but not that he might act contrary to an Act of Congress.

Other examples of wide definition of presidential powers under statutory authorization are *Chicago & Southern Air Lines, Inc.* v. *Waterman Steamship Corp.*, 333 U. S. 103, and *Hirabayashi* v. *United States*, 320 U. S. 81. But see, *Jecker* v. *Montgomery*, 13 How. 498, 515; *United States* v. *Western Union Telegraph Co.*, 272 F. 311; aff'd, 272 F. 893; rev'd on consent of the parties, 260 U. S. 754; *United States Harness Co.* v. *Graham*, 288 F. 929.

as an undivided whole lacks power. A seizure executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.

2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.[3]

3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by dis-

---

[3] Since the Constitution implies that the writ of habeas corpus may be suspended in certain circumstances but does not say by whom, President Lincoln asserted and maintained it as an executive function in the face of judicial challenge and doubt. *Ex parte Merryman*, 17 Fed. Cas. 144; *Ex parte Milligan*, 4 Wall. 2, 125; see *Ex parte Bollman*, 4 Cranch 75, 101. Congress eventually ratified his action. Habeas Corpus Act of March 3, 1863, 12 Stat. 755. See Hall, Free Speech in War Time, 21 Col. L. Rev. 526. Compare *Myers* v. *United States*, 272 U. S. 52, with *Humphrey's Executor* v. *United States*, 295 U. S. 602; and *Hirabayashi* v. *United States*, 320 U. S. 81, with the case at bar. Also compare *Ex parte Vallandigham*, 1 Wall. 243, with *Ex parte Milligan*, *supra*.

abling the Congress from acting upon the subject.[4] Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

Into which of these classifications does this executive seizure of the steel industry fit? It is eliminated from the first by admission, for it is conceded that no congressional authorization exists for this seizure. That takes away also the support of the many precedents and declarations which were made in relation, and must be confined, to this category.[5]

---

[4] President Roosevelt's effort to remove a Federal Trade Commissioner was found to be contrary to the policy of Congress and impinging upon an area of congressional control, and so his removal power was cut down accordingly. *Humphrey's Executor* v. *United States,* 295 U. S. 602. However, his exclusive power of removal in executive agencies, affirmed in *Myers* v. *United States,* 272 U. S. 52, continued to be asserted and maintained. *Morgan* v. *Tennessee Valley Authority,* 115 F. 2d 990, cert. denied, 312 U. S. 701; *In re Power to Remove Members of the Tennessee Valley Authority,* 39 Op. Atty. Gen. 145; President Roosevelt's Message to Congress of March 23, 1938, The Public Papers and Addresses of Franklin D. Roosevelt, 1938 (Rosenman), 151.

[5] The oft-cited Louisiana Purchase had nothing to do with the separation of powers as between the President and Congress, but only with state and federal power. The Louisiana Purchase was subject to rather academic criticism, not upon the ground that Mr. Jefferson acted without authority from Congress, but that neither had express authority to expand the boundaries of the United States by purchase or annexation. Mr. Jefferson himself had strongly opposed the doctrine that· the States' delegation of powers to the Federal Government could be enlarged by resort to implied powers. Afterwards in a letter to John Breckenridge, dated August 12, 1803, he declared:

"The Constitution has made no provision for our holding foreign territory, still less for incorporating foreign nations into our Union. The executive in seizing the fugitive occurrence which so much ad-

Can it then be defended under flexible tests available to the second category? It seems clearly eliminated from that class because Congress has not left seizure of private property an open field but has covered it by three statutory policies inconsistent with this seizure. In cases where the purpose is to supply needs of the Government itself, two courses are provided: one, seizure of a plant which fails to comply with obligatory orders placed by the Government;[6] another, condemnation of facilities, including temporary use under the power of eminent domain.[7] The third is applicable where it is the general economy of the country that is to be protected rather than exclusive governmental interests.[8] None of these were invoked. In choosing a different and inconsistent way of his own, the President cannot claim that it is necessitated or invited by failure of Congress to legislate upon the occasions, grounds and methods for seizure of industrial properties.

---

vances the good of their country, have done an act beyond the Constitution. The Legislature in casting behind them metaphysical subtleties, and risking themselves like faithful servants, must ratify and pay for it, and throw themselves on their country for doing for them unauthorized, what we know they would have done for themselves had they been in a situation to do it." 10 The Writings of Thomas Jefferson 407, 411.

[6] Selective Service Act of 1948, § 18, 62 Stat. 625, 50 U. S. C. App. (Supp. IV) § 468 (c).

[7] Defense Production Act of 1950, § 201, 64 Stat. 799, amended, 65 Stat. 132, 50 U. S. C. App. (Supp. IV) § 2081. For the latitude of the condemnation power which underlies this Act, see *United States* v. *Westinghouse Co.*, 339 U. S. 261, and cases therein cited.

[8] Labor Management Relations Act, 1947, §§ 206–210, 61 Stat. 136, 155, 156, 29 U. S. C. (Supp. IV) §§ 141, 176–180. The analysis, history and application of this Act are fully covered by the opinion of the Court, supplemented by that of MR. JUSTICE FRANKFURTER and of MR. JUSTICE BURTON, in which I concur.

This leaves the current seizure to be justified only by the severe tests under the third grouping, where it can be supported only by any remainder of executive power after subtraction of such powers as Congress may have over the subject. In short, we can sustain the President only by holding that seizure of such strike-bound industries is within his domain and beyond control by Congress. Thus, this Court's first review of such seizures occurs under circumstances which leave presidential power most vulnerable to attack and in the least favorable of possible constitutional postures.

I did not suppose, and I am not persuaded, that history leaves it open to question, at least in the courts, that the executive branch, like the Federal Government as a whole, possesses only delegated powers. The purpose of the Constitution was not only to grant power, but to keep it from getting out of hand. However, because the President does not enjoy unmentioned powers does not mean that the mentioned ones should be narrowed by a niggardly construction. Some clauses could be made almost unworkable, as well as immutable, by refusal to indulge some latitude of interpretation for changing times. I have heretofore, and do now, give to the enumerated powers the scope and elasticity afforded by what seem to be reasonable, practical implications instead of the rigidity dictated by a doctrinaire textualism.

The Solicitor General seeks the power of seizure in three clauses of the Executive Article, the first reading, "The executive Power shall be vested in a President of the United States of America." Lest I be thought to exaggerate, I quote the interpretation which his brief puts upon it: "In our view, this clause constitutes a grant of all the executive powers of which the Government is capable." If that be true, it is difficult to see why the

forefathers bothered to add several specific items, including some trifling ones.[9]

The example of such unlimited executive power that must have most impressed the forefathers was the prerogative exercised by George III, and the description of its evils in the Declaration of Independence leads me to doubt that they were creating their new Executive in his image. Continental European examples were no more appealing. And if we seek instruction from our own times, we can match it only from the executive powers in those governments we disparagingly describe as totalitarian. I cannot accept the view that this clause is a grant in bulk of all conceivable executive power but regard it as an allocation to the presidential office of the generic powers thereafter stated.

The clause on which the Government next relies is that "The President shall be Commander in Chief of the Army and Navy of the United States . . . ." These cryptic words have given rise to some of the most persistent controversies in our constitutional history. Of course, they imply something more than an empty title. But just what authority goes with the name has plagued presidential advisers who would not waive or narrow it by nonassertion yet cannot say where it begins or ends. It undoubtedly puts the Nation's armed forces under presidential command. Hence, this loose appellation is sometimes advanced as support for any presidential action, internal or external, involving use of force, the

---

[9] ". . . he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices . . . ." U. S. Const., Art. II, § 2. He ". . . shall Commission all the Officers of the United States." U. S. Const., Art. II, § 3. Matters such as those would seem to be inherent in the Executive if anything is.

idea being that it vests power to do anything, anywhere, that can be done with an army or navy.

That seems to be the logic of an argument tendered at our bar—that the President having, on his own responsibility, sent American troops abroad derives from that act "affirmative power" to seize the means of producing a supply of steel for them. To quote, "Perhaps the most forceful illustration of the scope of Presidential power in this connection is the fact that American troops in Korea, whose safety and effectiveness are so directly involved here, were sent to the field by an exercise of the President's constitutional powers." Thus, it is said, he has invested himself with "war powers."

I cannot foresee all that it might entail if the Court should indorse this argument. Nothing in our Constitution is plainer than that declaration of a war is entrusted only to Congress. Of course, a state of war may in fact exist without a formal declaration. But no doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture.[10]

---

[10] How widely this doctrine espoused by the President's counsel departs from the early view of presidential power is shown by a comparison. President Jefferson, without authority from Congress, sent the American fleet into the Mediterranean, where it engaged in a naval battle with the Tripolitan fleet. He sent a message to Congress on December 8, 1801, in which he said:

"Tripoli, the least considerable of the Barbary States, had come forward with demands unfounded either in right or in compact, and had permitted itself to denounce war on our failure to comply before a given day. The style of the demand admitted but one answer. I sent a small squadron of frigates into the Mediterranean . . . with orders to protect our commerce against the threatened attack. . . . Our commerce in the Mediterranean was blockaded and that of the

I do not, however, find it necessary or appropriate to consider the legal status of the Korean enterprise to discountenance argument based on it.

Assuming that we are in a war *de facto,* whether it is or is not a war *de jure,* does that empower the Commander in Chief to seize industries he thinks necessary to supply our army? The Constitution expressly places in Congress power "to raise and *support* Armies" and "to *provide* and *maintain* a Navy." (Emphasis supplied.) This certainly lays upon Congress primary responsibility for supplying the armed forces. Congress alone controls the raising of revenues and their appropriation and may determine in what manner and by what means they shall be spent for military and naval procurement. I suppose no one would doubt that Congress can take over war supply as a Government enterprise. On the other hand, if Congress sees fit to rely on free private enterprise collectively bargaining with free labor for support and maintenance of our armed forces, can the Executive, because of lawful disagreements incidental to that process, seize the facility for operation upon Government-imposed terms?

There are indications that the Constitution did not contemplate that the title Commander in Chief *of the*

---

Atlantic in peril. . . . One of the Tripolitan cruisers having fallen in with and engaged the small schooner *Enterprise,* . . . was captured, after a heavy slaughter of her men . . . . Unauthorized by the Constitution, without the sanction of Congress, to go beyond the line of defense, the vessel, being disabled from committing further hostilities, was liberated with its crew. The Legislature will doubtless consider whether, by authorizing measures of offense also, they will place our force on an equal footing with that of its adversaries. I communicate all material information on this subject, that in the exercise of this important function confided by the Constitution to the Legislature exclusively their judgment may form itself on a knowledge and consideration of every circumstance of weight." I Richardson, Messages and Papers of the Presidents, 314.

*Army and Navy* will constitute him also Commander in Chief of the country, its industries and its inhabitants. He has no monopoly of "war powers," whatever they are. While Congress cannot deprive the President of the command of the army and navy, only Congress can provide him an army or navy to command. It is also empowered to make rules for the "Government and Regulation of land and naval Forces," by which it may to some unknown extent impinge upon even command functions.

That military powers of the Commander in Chief were not to supersede representative government of internal affairs seems obvious from the Constitution and from elementary American history. Time out of mind, and even now in many parts of the world, a military commander can seize private housing to shelter his troops. Not so, however, in the United States, for the Third Amendment says, "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law." Thus, even in war time, his seizure of needed military housing must be authorized by Congress. It also was expressly left to Congress to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions . . . ."[11] Such a limitation on the command power, written at a time when the militia rather than a standing army was contemplated as the military weapon of the Republic, underscores the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. Congress, fulfilling that function, has authorized the President to use the army to enforce certain civil rights.[12] On the other hand, Congress has forbidden him to use the army for the pur-

---

[11] U. S. Const., Art. I, § 8, cl. 15.
[12] 14 Stat. 29, 16 Stat. 143, 8 U. S. C. § 55.

pose of executing general laws except when *expressly* authorized by the Constitution or by Act of Congress.[13]

While broad claims under this rubric often have been made, advice to the President in specific matters usually has carried overtones that powers, even under this head, are measured by the command functions usual to the topmost officer of the army and navy. Even then, heed has been taken of any efforts of Congress to negative his authority.[14]

We should not use this occasion to circumscribe, much less to contract, the lawful role of the President as Commander in Chief. I should indulge the widest latitude of interpretation to sustain his exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society. But, when it is turned inward, not because of rebellion but because of a lawful economic struggle between industry and labor, it should have no such indulgence. His command power is not such an absolute as might be implied from that office in a militaristic system but is subject to limitations consistent with a constitutional Republic whose law and policy-making branch

---

[13] 20 Stat. 152, 10 U. S. C. § 15.

[14] In 1940, President Roosevelt proposed to transfer to Great Britain certain overage destroyers and small patrol boats then under construction. He did not presume to rely upon any claim of constitutional power as Commander in Chief. On the contrary, he was advised that such destroyers—if certified not to be essential to the defense of the United States—could be "transferred, exchanged, sold, or otherwise disposed of," because Congress had so authorized him. Accordingly, the destroyers were exchanged for air bases. In the same opinion, he was advised that Congress had prohibited the release or transfer of the so-called "mosquito boats" then under construction, so those boats were not transferred. *Acquisition of Naval and Air Bases in Exchange for Over-age Destroyers,* 39 Op. Atty. Gen. 484. See also *Training of British Flying Students in the United States,* 40 Op. Atty. Gen. 58.

is a representative Congress. The purpose of lodging dual titles in one man was to insure that the civilian would control the military, not to enable the military to subordinate the presidential office. No penance would ever expiate the sin against free government of holding that a President can escape control of executive powers by law through assuming his military role. What the power of command may include I do not try to envision, but I think it is not a military prerogative, without support of law, to seize persons or property because they are important or even essential for the military and naval establishment.

The third clause in which the Solicitor General finds seizure powers is that "he shall take Care that the Laws be faithfully executed . . . ." [15] That authority must be matched against words of the Fifth Amendment that "No person shall be . . . deprived of life, liberty or property, without due process of law . . . ." One gives a governmental authority that reaches so far as there is law, the other gives a private right that authority shall go no farther. These signify about all there is of the principle that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules.

The Solicitor General lastly grounds support of the seizure upon nebulous, inherent powers never expressly granted but said to have accrued to the office from the customs and claims of preceding administrations. The plea is for a resulting power to deal with a crisis or an emergency according to the necessities of the case, the unarticulated assumption being that necessity knows no law.

Loose and irresponsible use of adjectives colors all nonlegal and much legal discussion of presidential powers.

---

[15] U. S. Const., Art. II, § 3.

"Inherent" powers, "implied" powers, "incidental" powers, "plenary" powers, "war" powers and "emergency" powers are used, often interchangeably and without fixed or ascertainable meanings.

The vagueness and generality of the clauses that set forth presidential powers afford a plausible basis for pressures within and without an administration for presidential action beyond that supported by those whose responsibility it is to defend his actions in court. The claim of inherent and unrestricted presidential powers has long been a persuasive dialectical weapon in political controversy. While it is not surprising that counsel should grasp support from such unadjudicated claims of power, a judge cannot accept self-serving press statements of the attorney for one of the interested parties as authority in answering a constitutional question, even if the advocate was himself. But prudence has counseled that actual reliance on such nebulous claims stop short of provoking a judicial test.[16]

---

[16] President Wilson, just before our entrance into World War I, went before the Congress and asked its approval of his decision to authorize merchant ships to carry defensive weapons. He said:

"No doubt I already possess that authority without special warrant of law, by the plain implication of my constitutional duties and powers; but I prefer, in the present circumstances, not to act upon general implication. I wish to feel that the authority and the power of the Congress are behind me in whatever it may become necessary for me to do. We are jointly the servants of the people and must act together and in their spirit, so far as we can divine and interpret it." XVII Richardson, *op. cit.*, 8211.

When our Government was itself in need of shipping whilst ships flying the flags of nations overrun by Hitler, as well as belligerent merchantmen, were immobilized in American harbors where they had taken refuge, President Roosevelt did not assume that it was in his power to seize such foreign vessels to make up our own deficit. He informed Congress: "I am satisfied, after consultation with the heads of the interested departments and agencies of the Government,

The Solicitor General, acknowledging that Congress has never authorized the seizure here, says practice of prior Presidents has authorized it. He seeks color of legality from claimed executive precedents, chief of which is President Roosevelt's seizure on June 9, 1941, of the California plant of the North American Aviation Company. Its superficial similarities with the present case, upon analysis, yield to distinctions so decisive that it

that we should have statutory authority to take over any such vessels as our needs may require . . . ." 87 Cong. Rec. 3072 (77th Cong., 1st Sess.); The Public Papers and Addresses of Franklin D. Roosevelt, 1941 (Rosenman), 94. The necessary statutory authority was shortly forthcoming. 55 Stat. 242.

In his first inaugural address President Roosevelt pointed out two courses to obtain legislative remedies, one being to enact measures he was prepared to recommend, the other to enact measures "the Congress may build out of its experience and wisdom." He continued, "But in the event that the Congress shall fail to take one of these two courses, and in the event that the national emergency is still critical, I shall not evade the clear course of duty that will then confront me. *I shall ask the Congress for the one remaining instrument to meet the crisis*—broad Executive power to wage a war against the emergency, as great as the power that would be given to me if we were in fact invaded by a foreign foe." (Emphasis supplied.) The Public Papers and Addresses of Franklin D. Roosevelt, 1933 (Rosenman), 15.

On March 6, 1933, President Roosevelt proclaimed the Bank Holiday. The Proclamation did not invoke constitutional powers of the Executive but expressly and solely relied upon the Act of Congress of October 6, 1917, 40 Stat. 411, § 5 (b), as amended. He relied steadily on legislation to empower him to deal with economic emergency. The Public Papers and Addresses of Franklin D. Roosevelt, 1933 (Rosenman), 24.

It is interesting to note Holdsworth's comment on the powers of legislation by proclamation when in the hands of the Tudors. "The extent to which they could be legally used was never finally settled in this century, because the Tudors made so tactful a use of their powers that no demand for the settlement of this question was raised." 4 Holdsworth, History of English Law, 104.

cannot be regarded as even a precedent, much less an authority for the present seizure.[17]

The appeal, however, that we declare the existence of inherent powers *ex necessitate* to meet an emergency asks us to do what many think would be wise, although

---

[17] The North American Aviation Company was under direct and binding contracts to supply defense items to the Government. No such contracts are claimed to exist here. Seizure of plants which refused to comply with Government orders had been expressly authorized by Congress in § 9 of the Selective Service Act of 1940, 54 Stat. 885, 892, so that the seizure of the North American plant was entirely consistent with congressional policy. The company might have objected on technical grounds to the seizure, but it was taken over with acquiescence, amounting to all but consent, of the owners who had admitted that the situation was beyond their control. The strike involved in the North American case was in violation of the union's collective agreement and the national labor leaders approved the seizure to end the strike. It was described as in the nature of an insurrection, a Communist-led political strike against the Government's lend-lease policy. Here we have only a loyal, lawful, but regrettable economic disagreement between management and labor. The North American plant contained government-owned machinery, material and goods in the process of production to which workmen were forcibly denied access by picketing strikers. Here no Government property is protected by the seizure. See New York Times of June 10, 1941, pp. 1, 14 and 16, for substantially accurate account of the proceedings and the conditions of violence at the North American plant.

The North American seizure was regarded as an execution of congressional policy. I do not regard it as a precedent for this, but, even if I did, I should not bind present judicial judgment by earlier partisan advocacy.

Statements from a letter by the Attorney General to the Chairman of the Senate Committee on Labor and Public Welfare, dated February 2, 1949, with reference to pending labor legislation, while not cited by any of the parties here, are sometimes quoted as being in support of the "inherent" powers of the President. The proposed bill contained a mandatory provision that during certain investigations the disputants in a labor dispute should continue operations under the terms and conditions of employment existing prior to the

it is something the forefathers omitted. They knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies. Aside from suspension of the privilege of the writ of habeas corpus in time of rebellion or invasion, when the public safety may require it,[18] they made no express provision for exercise of extraordinary authority because of a crisis.[19] I do not think we rightfully may so amend their work, and, if we could, I am not convinced it would be wise to do so, although many modern nations have forthrightly recognized that war and economic crises may upset the normal balance between liberty and au-

---

beginning of the dispute. It made no provision as to how continuance should be enforced and specified no penalty for disobedience. The Attorney General advised that in appropriate circumstances the United States would have access to the courts to protect the national health, safety and welfare. This was the rule laid down by this Court in *Texas & N. O. R. Co.* v. *Brotherhood of Railway Clerks,* 281 U. S. 548. The Attorney General observed:

"However, with regard to the question of the power of the Government under Title III, I might point out that the inherent power of the President to deal with emergencies that affect the health, safety and welfare of the entire Nation is exceedingly great. See Opinion of Attorney General Murphy of October 4, 1939 (39 Op. A. G. 344, 347) ; *United States* v. *United Mine Workers of America,* 330 U. S. 258 (1947)." See Hearings before the Senate Committee on Labor and Public Welfare on S. 249, 81st Cong., 1st Sess. 263.

Regardless of the general reference to "inherent powers," the citations were instances of congressional authorization. I do not suppose it is open to doubt that power to see that the laws are faithfully executed was ample basis for the specific advice given by the Attorney General in this letter.

[18] U. S. Const., Art. I, § 9, cl. 2.

[19] I exclude, as in a very limited category by itself, the establishment of martial law. Cf. *Ex parte Milligan,* 4 Wall. 2; *Duncan* v. *Kahanamoku,* 327 U. S. 304.

thority. Their experience with emergency powers may not be irrelevant to the argument here that we should say that the Executive, of his own volition, can invest himself with undefined emergency powers.

Germany, after the First World War, framed the Weimar Constitution, designed to secure her liberties in the Western tradition. However, the President of the Republic, without concurrence of the Reichstag, was empowered temporarily to suspend any or all individual rights if public safety and order were seriously disturbed or endangered. This proved a temptation to every government, whatever its shade of opinion, and in 13 years suspension of rights was invoked on more than 250 occasions. Finally, Hitler persuaded President Von Hindenberg to suspend all such rights, and they were never restored.[20]

The French Republic provided for a very different kind of emergency government known as the "state of siege." It differed from the German emergency dictatorship, particularly in that emergency powers could not be assumed at will by the Executive but could only be granted as a parliamentary measure. And it did not, as in Germany, result in a suspension or abrogation of law but was a legal institution governed by special legal rules and terminable by parliamentary authority.[21]

Great Britain also has fought both World Wars under a sort of temporary dictatorship created by legislation.[22] As Parliament is not bound by written constitutional limitations, it established a crisis government simply by

---

[20] 1 Nazi Conspiracy and Aggression 126–127; Rossiter, Constitutional Dictatorship, 33–61; Brecht, Prelude to Silence, 138.

[21] Rossiter, Constitutional Dictatorship, 117–129.

[22] Defence of the Realm Act, 1914, 4 & 5 Geo. V, c. 29, as amended, c. 63; Emergency Powers (Defence) Act, 1939, 2 & 3 Geo. VI, c. 62; Rossiter, Constitutional Dictatorship, 135–184.

652

delegation to its Ministers of a larger measure than usual of its own unlimited power, which is exercised under its supervision by Ministers whom it may dismiss. This has been called the "high-water mark in the voluntary surrender of liberty," but, as Churchill put it, "Parliament stands custodian of these surrendered liberties, and its most sacred duty will be to restore them in their fullness when victory has crowned our exertions and our perseverance." [23] Thus, parliamentary control made emergency powers compatible with freedom.

This contemporary foreign experience may be inconclusive as to the wisdom of lodging emergency powers somewhere in a modern government. But it suggests that emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them. That is the safeguard that would be nullified by our adoption of the "inherent powers" formula. Nothing in my experience convinces me that such risks are warranted by any real necessity, although such powers would, of course, be an executive convenience.

In the practical working of our Government we already have evolved a technique within the framework of the Constitution by which normal executive powers may be considerably expanded to meet an emergency. Congress may and has granted extraordinary authorities which lie dormant in normal times but may be called into play by the Executive in war or upon proclamation of a national emergency. In 1939, upon congressional request, the Attorney General listed ninety-nine such separate statutory grants by Congress of emergency or wartime executive powers.[24] They were invoked from time to time as need appeared. Under this procedure we retain Government

[23] Churchill, The Unrelenting Struggle, 13. See also id., at 279–281.

[24] 39 Op. Atty. Gen. 348.

by law—special, temporary law, perhaps, but law none-theless. The public may know the extent and limitations of the powers that can be asserted, and persons affected may be informed from the statute of their rights and duties.

In view of the ease, expedition and safety with which Congress can grant and has granted large emergency powers, certainly ample to embrace this crisis, I am quite unimpressed with the argument that we should affirm possession of them without statute. Such power either has no beginning or it has no end. If it exists, it need submit to no legal restraint. I am not alarmed that it would plunge us straightway into dictatorship, but it is at least a step in that wrong direction.

As to whether there is imperative necessity for such powers, it is relevant to note the gap that exists between the President's paper powers and his real powers. The Constitution does not disclose the measure of the actual controls wielded by the modern presidential office. That instrument must be understood as an Eighteenth-Century sketch of a government hoped for, not as a blueprint of the Government that is. Vast accretions of federal power, eroded from that reserved by the States, have magnified the scope of presidential activity. Subtle shifts take place in the centers of real power that do not show on the face of the Constitution.

Executive power has the advantage of concentration in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far over-shadow any others that almost alone he fills the public eye and ear. No other personality in public life can begin to compete with him in access to the public mind through modern methods of communications. By his prestige as head of state and his influence upon public opinion he exerts a leverage upon those who are supposed

to check and balance his power which often cancels their effectiveness.

Moreover, rise of the party system has made a significant extraconstitutional supplement to real executive power. No appraisal of his necessities is realistic which overlooks that he heads a political system as well as a legal system. Party loyalties and interests, sometimes more binding than law, extend his effective control into branches of government other than his own and he often may win, as a political leader, what he cannot command under the Constitution. Indeed, Woodrow Wilson, commenting on the President as leader both of his party and of the Nation, observed, "If he rightly interpret the national thought and boldly insist upon it, he is irresistible . . . . His office is anything he has the sagacity and force to make it." [25] I cannot be brought to believe that this country will suffer if the Court refuses further to aggrandize the presidential office, already so potent and so relatively immune from judicial review,[26] at the expense of Congress.

But I have no illusion that any decision by this Court can keep power in the hands of Congress if it is not wise and timely in meeting its problems. A crisis that challenges the President equally, or perhaps primarily, challenges Congress. If not good law, there was worldly wisdom in the maxim attributed to Napoleon that "The tools belong to the man who can use them." We may say that power to legislate for emergencies belongs in the hands of Congress, but only Congress itself can prevent power from slipping through its fingers.

The essence of our free Government is "leave to live by no man's leave, underneath the law"—to be governed by those impersonal forces which we call law. Our Gov-

---

[25] Wilson, Constitutional Government in the United States, 68–69.

[26] Rossiter, The Supreme Court and the Commander in Chief, 126–132.

ernment is fashioned to fulfill this concept so far as humanly possible. The Executive, except for recommendation and veto, has no legislative power. The executive action we have here originates in the individual will of the President and represents an exercise of authority without law. No one, perhaps not even the President, knows the limits of the power he may seek to exert in this instance and the parties affected cannot learn the limit of their rights. We do not know today what powers over labor or property would be claimed to flow from Government possession if we should legalize it, what rights to compensation would be claimed or recognized, or on what contingency it would end. With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.

Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up.[27]

MR. JUSTICE BURTON, concurring in both the opinion and judgment of the Court.

My position may be summarized as follows:

The validity of the President's order of seizure is at issue and ripe for decision. Its validity turns upon its relation to the constitutional division of governmental power between Congress and the President.

---

[27] We follow the judicial tradition instituted on a memorable Sunday in 1612, when King James took offense at the independence of his judges and, in rage, declared: "Then I am to be *under* the law— which it is treason to affirm." Chief Justice Coke replied to his King: "Thus wrote Bracton, 'The King ought not to be under any man, but he is under God and the Law.'" 12 Coke 65 (as to its verity, 18 Eng. Hist. Rev. 664–675); 1 Campbell, Lives of the Chief Justices (1849), 272.

The Constitution has delegated to Congress power to authorize action to meet a national emergency of the kind we face.[1] Aware of this responsibility, Congress has responded to it. It has provided at least two procedures for the use of the President.

It has outlined one in the Labor Management Relations Act, 1947, better known as the Taft-Hartley Act. The accuracy with which Congress there describes the present emergency demonstrates its applicability. It says:

> "Whenever in the opinion of the President of the United States, a threatened or actual strike or lockout affecting an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce, will, if permitted to occur or to continue, imperil the national health or safety, he may appoint a board of inquiry to inquire into the issues involved in the dispute and to make a written report to him within such time as he shall prescribe. . . ."[2]

---

[1] "Article. I.

"Section. 1. All legislative Powers herein granted shall be vested in a Congress of the United States . . . .

. . . . .

"Section. 8. The Congress shall have Power . . . ;

. . . . .

"To regulate Commerce with foreign Nations, and among the several States . . . ;

. . . . .

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

[2] 61 Stat. 155, 29 U. S. C. (Supp. IV) § 176.

In that situation Congress has authorized not only negotiation, conciliation and impartial inquiry but also a 60-day cooling-off period under injunction, followed by 20 days for a secret ballot upon the final offer of settlement and then by recommendations from the President to Congress.[3]

For the purposes of this case the most significant feature of that Act is its omission of authority to seize an affected industry. The debate preceding its passage demonstrated the significance of that omission. Collective bargaining, rather than governmental seizure, was to be relied upon. Seizure was not to be resorted to without specific congressional authority. Congress reserved to itself the opportunity to authorize seizure to meet particular emergencies.[4]

---

[3] 61 Stat. 155–156, 29 U. S. C. (Supp. IV) §§ 176–180.

[4] The Chairman of the Senate Committee sponsoring the bill said in the Senate:

"We did not feel that we should put into the law, as a part of the collective-bargaining machinery, an ultimate resort to compulsory arbitration, or to seizure, or to any other action. We feel that it would interfere with the whole process of collective bargaining. If such a remedy is available as a routine remedy, there will always be pressure to resort to it by whichever party thinks it will receive better treatment through such a process than it would receive in collective bargaining, and it will back out of collective bargaining. It will not make a bona-fide attempt to settle if it thinks it will receive a better deal under the final arbitration which may be provided.

"We have felt that perhaps in the case of a general strike, or in the case of other serious strikes, after the termination of every possible effort to resolve the dispute, the remedy might be an emergency act by Congress for that particular purpose.

"I have had in mind drafting such a bill, giving power to seize the plants, and other necessary facilities, to seize the unions, their money, and their treasury, and requisition trucks and other equipment; in fact, to do everything that the British did in their general strike of 1926. But while such a bill might be prepared, I should

The President, however, chose not to use the Taft-Hartley procedure. He chose another course, also authorized by Congress. He referred the controversy to the Wage Stabilization Board.[5] If that course had led to a settlement of the labor dispute, it would have avoided the need for other action. It, however, did not do so.

Now it is contended that although the President did not follow the procedure authorized by the Taft-Hartley Act, his substituted procedure served the same purpose and must be accepted as its equivalent. Without appraising that equivalence, it is enough to point out that neither procedure carried statutory authority for the seizure of private industries in the manner now at issue.[6] The exhaustion of both procedures fails to cloud the

be unwilling to place such a law on the books until we actually face such an emergency, and Congress applies the remedy for the particular emergency only. Eighty days will provide plenty of time within which to consider the possibility of what should be done; and we believe very strongly that there should not be anything in this law which prohibits finally the right to strike." 93 Cong. Rec. 3835–3836.

Part of this quotation was relied upon by this Court in *Bus Employees* v. *Wisconsin Board*, 340 U. S. 383, 396, note 21.

[5] Under Titles IV and V of the Defense Production Act of 1950, 64 Stat. 803–812, 50 U. S. C. App. (Supp. IV) §§ 2101–2123; and see Exec. Order No. 10233, 16 Fed. Reg. 3503.

[6] Congress has authorized other types of seizure under conditions not present here. Section 201 of the Defense Production Act authorizes the President to acquire specific "real property, including facilities, temporary use thereof, or other interest therein . . ." by condemnation. 64 Stat. 799, as amended, 65 Stat. 132, see 50 U. S. C. App. (Supp. IV) § 2081. There have been no declarations of taking or condemnation proceedings in relation to any of the properties involved here. Section 18 of the Selective Service Act of 1948 authorizes the President to take possession of a plant or other facility failing to fill certain defense orders placed with it in the manner there prescribed. 62 Stat. 625, 50 U. S. C. App. (Supp. IV) § 468. No orders have been so placed with the steel plants seized.

clarity of the congressional reservation of seizure for its own consideration.

The foregoing circumstances distinguish this emergency from one in which Congress takes no action and outlines no governmental policy. In the case before us, Congress authorized a procedure which the President declined to follow. Instead, he followed another procedure which he hoped might eliminate the need for the first. Upon its failure, he issued an executive order to seize the steel properties in the face of the reserved right of Congress to adopt or reject that course as a matter of legislative policy.

This brings us to a further crucial question. Does the President, in such a situation, have inherent constitutional power to seize private property which makes congressional action in relation thereto unnecessary? We find no such power available to him under the present circumstances. The present situation is not comparable to that of an imminent invasion or threatened attack. We do not face the issue of what might be the President's constitutional power to meet such catastrophic situations. Nor is it claimed that the current seizure is in the nature of a military command addressed by the President, as Commander-in-Chief, to a mobilized nation waging, or imminently threatened with, total war.[7]

---

[7] The President and Congress have recognized the termination of the major hostilities in the total wars in which the Nation has been engaged. Many wartime procedures have expired or been terminated.

The War Labor Disputes Act, 57 Stat. 163 *et seq.*, 50 U. S. C. App. §§ 1501–1511, expired June 30, 1947, six months after the President's declaration of the end of hostilities, 3 CFR, 1946 Supp., p. 77. The Japanese Peace Treaty was approved by the Senate March 20, 1952, Cong. Rec., Mar. 20, 1952, p. 2635, and proclaimed by the President April 28, 1952, 17 Fed. Reg. 3813.

The controlling fact here is that Congress, within its constitutionally delegated power, has prescribed for the President specific procedures, exclusive of seizure, for his use in meeting the present type of emergency. Congress has reserved to itself the right to determine where and when to authorize the seizure of property in meeting such an emergency. Under these circumstances, the President's order of April 8 invaded the jurisdiction of Congress. It violated the essence of the principle of the separation of governmental powers. Accordingly, the injunction against its effectiveness should be sustained.

MR. JUSTICE CLARK, concurring in the judgment of the Court.

One of this Court's first pronouncements upon the powers of the President under the Constitution was made by Mr. Chief Justice John Marshall some one hundred and fifty years ago. In *Little* v. *Barreme*,[1] he used this characteristically clear language in discussing the power of the President to instruct the seizure of the *Flying Fish,* a vessel bound from a French port: "It is by no means clear that the president of the United States whose high duty it is to 'take care that the laws be faithfully executed,' and who is commander in chief of the armies and navies of the United States, might not, without any special authority for that purpose, in the then existing state of things, have empowered the officers commanding the armed vessels of the United States, to seize and send into port for adjudication, American vessels which were forfeited by being engaged in this illicit commerce. But when it is observed that [an act of Congress] gives a special authority to seize on the high seas, and limits that authority to the seizure of vessels bound or sailing *to* a French port, the legislature seem to have prescribed that

---

[1] 2 Cranch 170 (1804).

the manner in which this law shall be carried into execution, was to exclude a seizure of any vessel *not* bound *to* a French port." [2] Accordingly, a unanimous Court held that the President's instructions had been issued without authority and that they could not "legalize an act which without those instructions would have been a plain trespass." I know of no subsequent holding of this Court to the contrary.[3]

The limits of presidential power are obscure. However, Article II, no less than Article I, is part of "a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." [4] Some of our Presidents, such as Lincoln, "felt that measures otherwise unconstitutional might become lawful by becoming indispensable to the preservation of the Constitution through the preservation of the na-

---

[2] *Id.,* at 177–178 (emphasis changed).

[3] Decisions of this Court which have upheld the exercise of presidential power include the following: *Prize Cases,* 2 Black 635 (1863) (subsequent ratification of President's acts by Congress); *In re Neagle,* 135 U. S. 1 (1890) (protection of federal officials from personal violence while performing official duties); *In re Debs,* 158 U. S. 564 (1895) (injunction to prevent forcible obstruction of interstate commerce and the mails); *United States* v. *Midwest Oil Co.,* 236 U. S. 459 (1915) (acquiescence by Congress in more than 250 instances of exercise of same power by various Presidents over period of 80 years); *Myers* v. *United States,* 272 U. S. 52 (1926) (control over subordinate officials in executive department) [but see *Humphrey's Executor* v. *United States,* 295 U. S. 602, 626–628 (1935)]; *Hirabayashi* v. *United States,* 320 U. S. 81 (1943), and *Korematsu* v. *United States,* 323 U. S. 214 (1944) (express congressional authorization); cf. *United States* v. *Russell,* 13 Wall. 623 (1871) (imperative military necessity in area of combat during war; *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304 (1936) (power to negotiate with foreign governments); *United States* v. *United Mine Workers,* 330 U. S. 258 (1947) (seizure under specific statutory authorization).

[4] Mr. Chief Justice Marshall, in *McCulloch* v. *Maryland,* 4 Wheat. 316, 415 (1819).

tion." [5] Others, such as Theodore Roosevelt, thought the President to be capable, as a "steward" of the people, of exerting all power save that which is specifically prohibited by the Constitution or the Congress.[6] In my view—taught me not only by the decision of Mr. Chief Justice Marshall in *Little* v. *Barreme,* but also by a score of other pronouncements of distinguished members of this bench—the Constitution does grant to the President extensive authority in times of grave and imperative national emergency. In fact, to my thinking, such a grant may well be necessary to the very existence of the Constitution itself. As Lincoln aptly said, "[is] it possible to lose the nation and yet preserve the Constitution?" [7] In describing this authority I care not whether one calls it "residual," "inherent," "moral," "implied," "aggregate," "emergency," or otherwise. I am of the conviction that those who have had the gratifying experience of being the President's lawyer have used one or more of these adjectives only with the utmost of sincerity and the highest of purpose.

I conclude that where Congress has laid down specific procedures to deal with the type of crisis confronting the President, he must follow those procedures in meeting the crisis; but that in the absence of such action by Congress, the President's independent power to act depends upon the gravity of the situation confronting the nation. I cannot sustain the seizure in question because here, as in *Little* v. *Barreme,* Congress had prescribed methods to be followed by the President in meeting the emergency at hand.

---

[5] Letter of April 4, 1864, to A. G. Hodges, in 10 Complete Works of Abraham Lincoln (Nicolay and Hay ed. 1894), 66.

[6] Roosevelt, Autobiography (1914 ed.), 371–372.

[7] Letter of April 4, 1864, to A. G. Hodges, in 10 Complete Works of Abraham Lincoln (Nicolay and Hay ed. 1894), 66.

Three statutory procedures were available: those provided in the Defense Production Act of 1950, the Labor Management Relations Act, and the Selective Service Act of 1948. In this case the President invoked the first of these procedures; he did not invoke the other two.

The Defense Production Act of 1950 provides for mediation of labor disputes affecting national defense. Under this statutory authorization, the President has established the Wage Stabilization Board. The Defense Production Act, however, grants the President no power to seize real property except through ordinary condemnation proceedings, which were not used here, and creates no sanctions for the settlement of labor disputes.

The Labor Management Relations Act, commonly known as the Taft-Hartley Act, includes provisions adopted for the purpose of dealing with nationwide strikes. They establish a procedure whereby the President may appoint a board of inquiry and thereafter, in proper cases, seek injunctive relief for an 80-day period against a threatened work stoppage. The President can invoke that procedure whenever, in his opinion, "a threatened or actual strike . . . affecting an entire industry . . . will, if permitted to occur or to continue, imperil the national health or safety." [8] At the time that Act was passed, Congress specifically rejected a proposal to empower the President to seize any "plant, mine, or facility" in which a threatened work stoppage would, in his judgment, "imperil the public health or security." [9] Instead, the Taft-Hartley Act directed the President, in the event a strike had not been settled during the 80-day injunction period, to submit to Congress "a full and comprehensive report . . . together with such recommendations as he may see fit to make for consideration and

[8] 61 Stat. 155, 29 U. S. C. (Supp. IV) § 176.

[9] 93 Cong. Rec. 3637–3645; cf. *id.*, at 3835–3836.

appropriate action." [10] The legislative history of the Act demonstrates Congress' belief that the 80-day period would afford it adequate opportunity to determine whether special legislation should be enacted to meet the emergency at hand.[11]

The Selective Service Act of 1948 gives the President specific authority to seize plants which fail to produce goods required by the armed forces or the Atomic Energy Commission for national defense purposes. The Act provides that when a producer from whom the President has ordered such goods "refuses or fails" to fill the order within a period of time prescribed by the President, the President may take immediate possession of the producer's plant.[12] This language is significantly broader than

---

[10] 61 Stat. 156, 29 U. S. C. (Supp. IV) § 180.

[11] *E. g.*, S. Rep. No. 105, 80th Cong., 1st Sess. 15; 93 Cong. Rec. 3835–3836; *id.*, at 4281.

[12] The producer must have been notified that the order was placed pursuant to the Act. The Act provides in pertinent part as follows:

"(a) Whenever the President after consultation with and receiving advice from the National Security Resources Board determines that it is in the interest of the national security for the Government to obtain prompt delivery of any articles or materials the procurement of which has been authorized by the Congress exclusively for the use of the armed forces of the United States, or for the use of the Atomic Energy Commission, he is authorized, through the head of any Government agency, to place with any person operating a plant, mine, or other facility capable of producing such articles or materials an order for such quantity of such articles or materials as the President deems appropriate. Any person with whom an order is placed pursuant to the provisions of this section shall be advised that such order is placed pursuant to the provisions of this section.

. . . . .

"(c) In case any person with whom an order is placed pursuant to the provisions of subsection (a) refuses or fails—

. . . . .

"(2) to fill such order within the period of time prescribed by the President or as soon thereafter as possible as determined by the President;

that used in the National Defense Act of 1916 and the Selective Training and Service Act of 1940, which provided for seizure when a producer "refused" to supply essential defense materials, but not when he "failed" to do so.[13]

These three statutes furnish the guideposts for decision in this case. Prior to seizing the steel mills on April 8 the President had exhausted the mediation procedures of the Defense Production Act through the Wage Stabilization Board. Use of those procedures had failed to avert the impending crisis; however, it had resulted in a 99-day postponement of the strike. The Government argues that this accomplished more than the maximum 80-day waiting period possible under the sanctions of the Taft-Hartley Act, and therefore amounted to compliance with the substance of that Act. Even if one were to accept this somewhat hyperbolic conclusion, the hard fact remains that neither the Defense Production Act nor Taft-Hartley authorized the seizure challenged here, and the Government made no effort to comply with the proce-

"(3) to produce the kind or quality of articles or materials ordered; or

"(4) to furnish the quantity, kind, and quality of articles or materials ordered at such price as shall be negotiated between such person and the Government agency concerned; or in the event of failure to negotiate a price, to furnish the quantity, kind, and quality of articles or materials ordered at such price as he may subsequently be determined to be entitled to receive under subsection (d);

"the President is authorized to take immediate possession of any plant, mine, or other facility of such person and to operate it, through any Government agency, for the production of such articles or materials as may be required by the Government." 62 Stat. 625, 50 U. S. C. App. (Supp. IV) § 468. The Act was amended in 1951 and redesignated the Universal Military Training and Service Act, but no change was made in this section. 65 Stat. 75.

[13] 39 Stat. 213; 54 Stat. 892.

dures established by the Selective Service Act of 1948, a statute which expressly authorizes seizures when producers fail to supply necessary defense matériel.[14]

For these reasons I concur in the judgment of the Court. As Mr. Justice Story once said: "For the executive department of the government, this court entertain the most entire respect; and amidst the multiplicity of cares in that department, it may, without any violation of decorum, be presumed, that sometimes there may be an inaccurate construction of a law. It is our duty to expound the laws as we find them in the records of state;

---

[14] The Government has offered no explanation, in the record, the briefs, or the oral argument, as to why it could not have made both a literal and timely compliance with the provisions of that Act. Apparently the Government could have placed orders with the steel companies for the various types of steel needed for defense purposes, and instructed the steel companies to ship the matériel directly to producers of planes, tanks, and munitions. The Act does not require that government orders cover the entire capacity of a producer's plant before the President has power to seize.

Our experience during World War I demonstrates the speed with which the Government can invoke the remedy of seizing plants which fail to fill compulsory orders. The Federal Enameling & Stamping Co., of McKees Rocks, Pa., was served with a compulsory order on September 13, 1918, and seized on the same day. The Smith & Wesson plant at Springfield, Mass., was seized on September 13, 1918, after the company had failed to make deliveries under a compulsory order issued the preceding week. Communication from Ordnance Office to War Department Board of Appraisers, entitled "Report on Plants Commandeered by the Ordnance Office," Dec. 19, 1918, pp. 3, 4, in National Archives, Records of the War Department, Office of the Chief of Ordnance, O. O. 004.002/260. Apparently the Mosler Safe Co., of Hamilton, Ohio, was seized on the same day on which a compulsory order was issued. *Id.*, at 2; Letter from counsel for Mosler Safe Co. to Major General George W. Goethals, Director of Purchase, Storage and Traffic, War Department, Dec. 9, 1918, p. 1, in National Archives, Records of the War Department, Office of the General Staff, PST Division 400.1202.

and we cannot, when called upon by the citizens of the country, refuse our opinion, however it may differ from that of very great authorities." [15]

MR. CHIEF JUSTICE VINSON, with whom MR. JUSTICE REED and MR. JUSTICE MINTON join, dissenting.

The President of the United States directed the Secretary of Commerce to take temporary possession of the Nation's steel mills during the existing emergency because "a work stoppage would immediately jeopardize and imperil our national defense and the defense of those joined with us in resisting aggression, and would add to the continuing danger of our soldiers, sailors, and airmen engaged in combat in the field." The District Court ordered the mills returned to their private owners on the ground that the President's action was beyond his powers under the Constitution.

This Court affirms. Some members of the Court are of the view that the President is without power to act in time of crisis in the absence of express statutory authorization. Other members of the Court affirm on the basis of their reading of certain statutes. Because we cannot agree that affirmance is proper on any ground, and because of the transcending importance of the questions presented not only in this critical litigation but also to the powers of the President and of future Presidents to act in time of crisis, we are compelled to register this dissent.

I.

In passing upon the question of Presidential powers in this case, we must first consider the context in which those powers were exercised.

[15] *The Orono*, 18 Fed. Cas. No. 10,585 (Cir. Ct. D. Mass. 1812).

Those who suggest that this is a case involving extraordinary powers should be mindful that these are extraordinary times. A world not yet recovered from the devastation of World War II has been forced to face the threat of another and more terrifying global conflict.

Accepting in full measure its responsibility in the world community, the United States was instrumental in securing adoption of the United Nations Charter, approved by the Senate by a vote of 89 to 2. The first purpose of the United Nations is to "maintain international peace and security, and to that end: to take effective collective measures for the prevention and removal of threats to the peace, and for the suppression of acts of aggression or other breaches of the peace, . . . ." [1] In 1950, when the United Nations called upon member nations "to render every assistance" to repel aggression in Korea, the United States furnished its vigorous support.[2] For almost two full years, our armed forces have been fighting in Korea, suffering casualties of over 108,000 men. Hostilities have not abated. The "determination of the United Nations to continue its action in Korea to meet the aggression" has been reaffirmed.[3] Congressional support of the action in Korea has been manifested by provisions for increased military manpower and equipment and for economic stabilization, as hereinafter described.

Further efforts to protect the free world from aggression are found in the congressional enactments of the Truman Plan for assistance to Greece and Turkey [4] and

---

[1] 59 Stat. 1031, 1037 (1945); 91 Cong. Rec. 8190 (1945).

[2] U. N. Security Council, U. N. Doc. S/1501 (1950); Statement by the President, June 26, 1950, United States Policy in the Korean Crisis, Dept. of State Pub. (1950), 16.

[3] U. N. General Assembly, U. N. Doc. A/1771 (1951).

[4] 61 Stat. 103 (1947).

the Marshall Plan for economic aid needed to build up the strength of our friends in Western Europe.[5] In 1949, the Senate approved the North Atlantic Treaty under which each member nation agrees that an armed attack against one is an armed attack against all.[6] Congress immediately implemented the North Atlantic Treaty by authorizing military assistance to nations dedicated to the principles of mutual security under the United Nations Charter.[7] The concept of mutual security recently has been extended by treaty to friends in the Pacific.[8]

Our treaties represent not merely legal obligations but show congressional recognition that mutual security for the free world is the best security against the threat of aggression on a global scale. The need for mutual security is shown by the very size of the armed forces outside the free world. Defendant's brief informs us that the Soviet Union maintains the largest air force in the world and maintains ground forces much larger than those presently available to the United States and the countries joined with us in mutual security arrangements. Constant international tensions are cited to demonstrate how precarious is the peace.

Even this brief review of our responsibilities in the world community discloses the enormity of our undertaking. Success of these measures may, as has often been

---

[5] 62 Stat. 137 (1948), as amended, 63 Stat. 50 (1949), 64 Stat. 198 (1950).

[6] 63 Stat. 2241, 2252 (1949), extended to Greece and Turkey, S. Exec. E, 82d Cong., 2d Sess. (1952), advice and consent of the Senate granted. 98 Cong. Rec. 930.

[7] 63 Stat. 714 (1949).

[8] S. Execs. A, B, C and D, 82d Cong., 2d Sess. (1952), advice and consent of the Senate granted. 98 Cong. Rec. 2594, 2595, 2605.

observed, dramatically influence the lives of many generations of the world's peoples yet unborn. Alert to our responsibilities, which coincide with our own self-preservation through mutual security, Congress has enacted a large body of implementing legislation. As an illustration of the magnitude of the over-all program, Congress has appropriated $130 billion for our own defense and for military assistance to our allies since the June, 1950, attack in Korea.

In the Mutual Security Act of 1951, Congress authorized "military, economic, and technical assistance to friendly countries to strengthen the mutual security and individual and collective defenses of the free world, . . . ." [9] Over $5½ billion were appropriated for military assistance for fiscal year 1952, the bulk of that amount to be devoted to purchase of military equipment.[10] A request for over $7 billion for the same purpose for fiscal year 1953 is currently pending in Congress.[11] In addition to direct shipment of military equipment to nations of the free world, defense production in those countries relies upon shipment of machine tools and allocation of steel tonnage from the United States.[12]

Congress also directed the President to build up our own defenses. Congress, recognizing the "grim fact . . . that the United States is now engaged in a struggle for survival" and that "it is imperative that we now take those necessary steps to make our strength equal to the peril of the hour," granted authority to draft men into

---

[9] 65 Stat. 373 (1951).

[10] 65 Stat. 730 (1951); see H. R. Doc. No. 147, 82d Cong., 1st Sess. 3 (1951).

[11] See H. R. Doc. No. 382, 82d Cong., 2d Sess. (1952).

[12] Hearings before Senate Committee on Foreign Relations on the Mutual Security Act of 1952, 82d Cong., 2d Sess. 565–566 (1952); Hearings before House Committee on Foreign Affairs on the Mutual Security Act of 1952, 82d Cong., 2d Sess. 370 (1952).

the armed forces.[13] As a result, we now have over 3,500,000 men in our armed forces.[14]

Appropriations for the Department of Defense, which had averaged less than $13 billion per year for the three years before attack in Korea, were increased by Congress to $48 billion for fiscal year 1951 and to $60 billion for fiscal year 1952.[15] A request for $51 billion for the Department of Defense for fiscal year 1953 is currently pending in Congress.[16] The bulk of the increase is for military equipment and supplies—guns, tanks, ships, planes and ammunition—all of which require steel. Other defense programs requiring great quantities of steel include the large scale expansion of facilities for the Atomic Energy Commission[17] and the expansion of the Nation's productive capacity affirmatively encouraged by Congress.[18]

Congress recognized the impact of these defense programs upon the economy. Following the attack in Korea, the President asked for authority to requisition property and to allocate and fix priorities for scarce goods. In the Defense Production Act of 1950, Congress granted the powers requested and, *in addition*, granted power to stabilize prices and wages and to provide for settlement

---

[13] 65 Stat. 75 (1951); S. Rep. No. 117, 82d Cong., 1st Sess. 3 (1951).

[14] Address by Secretary of Defense Lovett before the American Society of Newspaper Editors, Washington, April 18, 1952.

[15] Fiscal Year 1952, 65 Stat. 423, 760 (1951); F. Y. 1951, 64 Stat. 595, 1044, 1223, 65 Stat. 48 (1950–1951); F. Y. 1950, 63 Stat. 869, 973, 987 (1949); F. Y. 1949, 62 Stat. 647 (1948); F. Y. 1948, 61 Stat. 551 (1947).

[16] See H. R. Rep. No. 1685, 82d Cong., 2d Sess. 2 (1952), on H. R. 7391.

[17] See H. R. Rep. No. 384, 82d Cong., 1st Sess. 5 (1951); 97 Cong. Rec. 13647–13649.

[18] Defense Production Act, Tit. III. 64 Stat. 798, 800 (1950), 65 Stat. 138 (1951).

of labor disputes arising in the defense program.[19] The Defense Production Act was extended in 1951, a Senate Committee noting that in the dislocation caused by the programs for purchase of military equipment "lies the seed of an economic disaster that might well destroy the military might we are straining to build." [20] Significantly, the Committee examined the problem "in terms of just one commodity, steel," and found "a graphic picture of the over-all inflationary danger growing out of reduced civilian supplies and rising incomes." Even before Korea, steel production at levels above theoretical 100% capacity was not capable of supplying civilian needs alone. Since Korea, the tremendous military demand for steel has far exceeded the increases in productive capacity. This Committee emphasized that the shortage of steel, even with the mills operating at full capacity, coupled with increased civilian purchasing power, presented grave danger of disastrous inflation.[21]

The President has the duty to execute the foregoing legislative programs. Their successful execution depends upon continued production of steel and stabilized prices for steel. Accordingly, when the collective bargaining agreements between the Nation's steel producers and their employees, represented by the United Steel Workers, were due to expire on December 31, 1951, and a strike shutting down the entire basic steel industry was threatened, the President acted to avert a complete shutdown of steel production. On December 22, 1951, he certified the dispute to the Wage Stabilization Board, requesting that the Board investigate the dispute and promptly report its recommendation as to fair and equitable terms of settlement. The Union complied with the President's

[19] Note 18, *supra*, Tits. IV and V.

[20] S. Rep. No. 470, 82d Cong., 1st Sess. 8 (1951).

[21] *Id.*, at 8–9.

request and delayed its threatened strike while the dispute was before the Board. After a special Board panel had conducted hearings and submitted a report, the full Wage Stabilization Board submitted its report and recommendations to the President on March 20, 1952.

The Board's report was acceptable to the Union but was rejected by plaintiffs. The Union gave notice of its intention to strike as of 12:01 a. m., April 9, 1952, but bargaining between the parties continued with hope of settlement until the evening of April 8, 1952. After bargaining had failed to avert the threatened shutdown of steel production, the President issued the following Executive Order:

"WHEREAS on December 16, 1950, I proclaimed the existence of a national emergency which requires that the military, naval, air, and civilian defenses of this country be strengthened as speedily as possible to the end that we may be able to repel any and all threats against our national security and to fulfill our responsibilities in the efforts being made throughout the United Nations and otherwise to bring about a lasting peace; and

"WHEREAS American fighting men and fighting men of other nations of the United Nations are now engaged in deadly combat with the forces of aggression in Korea, and forces of the United States are stationed elsewhere overseas for the purpose of participating in the defense of the Atlantic Community against aggression; and

"WHEREAS the weapons and other materials needed by our armed forces and by those joined with us in the defense of the free world are produced to a great extent in this country, and steel is an indispensable component of substantially all of such weapons and materials; and

674

"WHEREAS steel is likewise indispensable to the carrying out of programs of the Atomic Energy Commission of vital importance to our defense efforts; and

"WHEREAS a continuing and uninterrupted supply of steel is also indispensable to the maintenance of the economy of the United States, upon which our military strength depends; and

"WHEREAS a controversy has arisen between certain companies in the United States producing and fabricating steel and the elements thereof and certain of their workers represented by the United Steel Workers of America, CIO, regarding terms and conditions of employment; and

"WHEREAS the controversy has not been settled through the processes of collective bargaining or through the efforts of the Government, including those of the Wage Stabilization Board, to which the controversy was referred on December 22, 1951, pursuant to Executive Order No. 10233, and a strike has been called for 12:01 A. M., April 9, 1952; and

"WHEREAS a work stoppage would immediately jeopardize and imperil our national defense and the defense of those joined with us in resisting aggression, and would add to the continuing danger of our soldiers, sailors, and airmen engaged in combat in the field; and

"WHEREAS in order to assure the continued availability of steel and steel products during the existing emergency, it is necessary that the United States take possession of and operate the plants, facilities, and other property of the said companies as hereinafter provided:

"NOW, THEREFORE, by virtue of the authority vested in me by the Constitution and laws of the

United States, and as President of the United States and Commander in Chief of the armed forces of the United States, it is hereby ordered as follows:

"1. The Secretary of Commerce is hereby authorized and directed to take possession of all or such of the plants, facilities, and other property of the companies named in the list attached hereto, or any part thereof, as he may deem necessary in the interests of national defense; and to operate or to arrange for the operation thereof and to do all things necessary for, or incidental to, such operation. . . ." [22]

The next morning, April 9, 1952, the President addressed the following Message to Congress:

*"To the Congress of the United States:*

"The Congress is undoubtedly aware of the recent events which have taken place in connection with the management-labor dispute in the steel industry. These events culminated in the action which was taken last night to provide for temporary operation of the steel mills by the Government.

"I took this action with the utmost reluctance. The idea of Government operation of the steel mills is thoroughly distasteful to me and I want to see it ended as soon as possible. However, in the situation which confronted me yesterday, I felt that I could make no other choice. The other alternatives appeared to be even worse—so much worse that I could not accept them.

"One alternative would have been to permit a shutdown in the steel industry. The effects of such a shut-down would have been so immediate and damaging with respect to our efforts to support our Armed Forces and to protect our national security that it made this alternative unthinkable.

[22] Exec. Order 10340, 17 Fed. Reg. 3139 (1952).

"The only way that I know of, other than Government operation, by which a steel shut-down could have been avoided was to grant the demands of the steel industry for a large price increase. I believed and the officials in charge of our stabilization agencies believed that this would have wrecked our stabilization program. I was unwilling to accept the incalculable damage which might be done to our country by following such a course.

"Accordingly, it was my judgment that Government operation of the steel mills for a temporary period was the least undesirable of the courses of action which lay open. In the circumstances, I believed it to be, and now believe it to be, my duty and within my powers as President to follow that course of action.

"It may be that the Congress will deem some other course to be wiser. It may be that the Congress will feel we should give in to the demands of the steel industry for an exorbitant price increase and take the consequences so far as resulting inflation is concerned.

"It may be that the Congress will feel the Government should try to force the steel workers to continue to work for the steel companies for another long period, without a contract, even though the steel workers have already voluntarily remained at work without a contract for 100 days in an effort to reach an orderly settlement of their differences with management.

"It may even be that the Congress will feel that we should permit a shut-down of the steel industry, although that would immediately endanger the safety of our fighting forces abroad and weaken the whole structure of our national security.

"I do not believe the Congress will favor any of these courses of action, but that is a matter for the Congress to determine.

"It may be, on the other hand, that the Congress will wish to pass legislation establishing specific terms and conditions with reference to the operation of the steel mills by the Government. Sound legislation of this character might be very desirable.

"On the basis of the facts that are known to me at this time, I do not believe that immediate congressional action is essential; but I would, of course, be glad to cooperate in developing any legislative proposals which the Congress may wish to consider.

"If the Congress does not deem it necessary to act at this time, I shall continue to do all that is within my power to keep the steel industry operating and at the same time make every effort to bring about a settlement of the dispute so the mills can be returned to their private owners as soon as possible." [23]

Twelve days passed without action by Congress. On April 21, 1952, the President sent a letter to the President of the Senate in which he again described the purpose and need for his action and again stated his position that "The Congress can, if it wishes, reject the course of action I have followed in this matter." [24] Congress has not so acted to this date.

Meanwhile, plaintiffs instituted this action in the District Court to compel defendant to return possession of the steel mills seized under Executive Order 10340. In this litigation for return of plaintiffs' properties, we assume that defendant Charles Sawyer is not immune from judicial restraint and that plaintiffs are entitled to equitable relief if we find that the Executive Order

---

[23] Cong. Rec., April 9, 1952, pp. 3962–3963.

[24] Cong. Rec., April 21, 1952, p. 4192.

under which defendant acts is unconstitutional. We also assume without deciding that the courts may go behind a President's finding of fact that an emergency exists. But there is not the slightest basis for suggesting that the President's finding in this case can be undermined. Plaintiffs moved for a preliminary injunction before answer or hearing. Defendant opposed the motion, filing uncontroverted affidavits of Government officials describing the facts underlying the President's order.

Secretary of Defense Lovett swore that "a work stoppage in the steel industry will result immediately in serious curtailment of production of essential weapons and munitions of all kinds." He illustrated by showing that 84% of the national production of certain alloy steel is currently used for production of military-end items and that 35% of total production of another form of steel goes into ammunition, 80% of such ammunition now going to Korea. The Secretary of Defense stated that: "We are holding the line [in Korea] with ammunition and not with the lives of our troops."

Affidavits of the Chairman of the Atomic Energy Commission, the Secretary of the Interior, defendant as Secretary of Commerce, and the Administrators of the Defense Production Administration, the National Production Authority, the General Services Administration and the Defense Transport Administration were also filed in the District Court. These affidavits disclose an enormous demand for steel in such vital defense programs as the expansion of facilities in atomic energy, petroleum, power, transportation and industrial production, including steel production. Those charged with administering allocations and priorities swore to the vital part steel production plays in our economy. The affidavits emphasize the critical need for steel in our defense program,

the absence of appreciable inventories of steel, and the drastic results of any interruption in steel production.

One is not here called upon even to consider the possibility of executive seizure of a farm, a corner grocery store or even a single industrial plant. Such considerations arise only when one ignores the central fact of this case—that the Nation's entire basic steel production would have shut down completely if there had been no Government seizure. Even ignoring for the moment whatever confidential information the President may possess as "the Nation's organ for foreign affairs," [25] the uncontroverted affidavits in this record amply support the finding that "a work stoppage would immediately jeopardize and imperil our national defense."

Plaintiffs do not remotely suggest any basis for rejecting the President's finding that *any* stoppage of steel production would immediately place the Nation in peril. Moreover, even self-generated doubts that *any* stoppage of steel production constitutes an emergency are of little comfort here. The Union and the plaintiffs bargained for 6 months with over 100 issues in dispute—issues not limited to wage demands but including the union shop and other matters of principle between the parties. At the time of seizure there was not, and there is not now, the slightest evidence to justify the belief that any strike will be of short duration. The Union and the steel companies may well engage in a lengthy struggle. Plaintiffs' counsel tells us that "sooner or later" the mills will operate again. That may satisfy the steel companies and, perhaps, the Union. But our soldiers and our allies will hardly be cheered with the assurance that the ammunition upon which their lives depend will be forthcoming—"sooner or later," or, in other words, "too little and too late."

---

[25] *Chicago & Southern Air Lines* v. *Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948), and cases cited.

Accordingly, if the President has any power under the Constitution to meet a critical situation in the absence of express statutory authorization, there is no basis whatever for criticizing the exercise of such power in this case.

## II.

The steel mills were seized for a public use. The power of eminent domain, invoked in this case, is an essential attribute of sovereignty and has long been recognized as a power of the Federal Government. *Kohl* v. *United States,* 91 U. S. 367 (1876). Plaintiffs cannot complain that any provision in the Constitution prohibits the exercise of the power of eminent domain in this case. The Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." It is no bar to this seizure for, if the taking is not otherwise unlawful, plaintiffs are assured of receiving the required just compensation. *United States* v. *Pewee Coal Co.,* 341 U. S. 114 (1951).

Admitting that the Government could seize the mills, plaintiffs claim that the implied power of eminent domain can be exercised only under an Act of Congress; under no circumstances, they say, can that power be exercised by the President unless he can point to an express provision in enabling legislation. This was the view adopted by the District Judge when he granted the preliminary injunction. Without an answer, without hearing evidence, he determined the issue on the basis of his "fixed conclusion . . . that defendant's acts are illegal" because the President's only course in the face of an emergency is to present the matter to Congress and await the final passage of legislation which will enable the Government to cope with threatened disaster.

Under this view, the President is left powerless at the very moment when the need for action may be most pressing and when no one, other than he, is immediately

capable of action. Under this view, he is left powerless
because a power not expressly given to Congress is never-
theless found to rest exclusively with Congress.

Consideration of this view of executive impotence
calls for further examination of the nature of the separa-
tion of powers under our tripartite system of Government.

The Constitution provides:
> Art. I,
>> Section 1. "All legislative Powers herein granted
>> shall be vested in a Congress of the United
>> States, . . . ."
> Art. II,
>> Section 1. "The executive Power shall be vested
>> in a President of the United States of Amer-
>> ica. . . ."
>> Section 2. "The President shall be Commander
>> in Chief of the Army and Navy of the United
>> States, . . . ."
>> "He shall have Power, by and with the Ad-
>> vice and Consent of the Senate, to make
>> Treaties, provided two thirds of the Senators
>> present concur; . . . ."
>> Section 3. "He shall from time to time give to
>> the Congress Information of the State of the
>> Union, and recommend to their Consideration
>> such Measures as he shall judge necessary and
>> expedient; . . . he shall take Care that the
>> Laws be faithfully executed, . . . ."
> Art. III,
>> Section 1. "The judicial Power of the United
>> States, shall be vested in one supreme Court,
>> and in such inferior Courts as the Congress
>> may from time to time ordain and establish."

The whole of the "executive Power" is vested in the Presi-
dent. Before entering office, the President swears that he
"will faithfully execute the Office of President of the

United States, and will to the best of [his] Ability, preserve, protect and defend the Constitution of the United States." Art. II, § 1.

This comprehensive grant of the executive power to a single person was bestowed soon after the country had thrown the yoke of monarchy. Only by instilling initiative and vigor in all of the three departments of Government, declared Madison, could tyranny in any form be avoided.[26] Hamilton added: "Energy in the Executive is a leading character in the definition of good government. It is essential to the protection of the community against foreign attacks; it is not less essential to the steady administration of the laws; to the protection of property against those irregular and high-handed combinations which sometimes interrupt the ordinary course of justice; to the security of liberty against the enterprises and assaults of ambition, of faction, and of anarchy." [27] It is thus apparent that the Presidency was deliberately fashioned as an office of power and independence. Of course, the Framers created no autocrat capable of arrogating any power unto himself at any time. But neither did they create an automaton impotent to exercise the powers of Government at a time when the survival of the Republic itself may be at stake.

In passing upon the grave constitutional question presented in this case, we must never forget, as Chief Justice Marshall admonished, that the Constitution is "intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs," and that "[i]ts means are adequate to its ends." [28] Cases do arise presenting questions which could not have been foreseen by the Framers. In such cases, the Constitution has been treated as a living document adaptable to new situa-

---

[26] The Federalist, No. XLVIII.

[27] The Federalist, No. LXX.

[28] *McCulloch* v. *Maryland,* 4 Wheat. 316, 415, 424 (1819).

tions.[29] But we are not called upon today to expand the
Constitution to meet a new situation. For, in this case,
we need only look to history and time-honored principles
of constitutional law—principles that have been applied
consistently by all branches of the Government through-
out our history. It is those who assert the invalidity of
the Executive Order who seek to amend the Constitution
in this case.

## III.

A review of executive action demonstrates that our
Presidents have on many occasions exhibited the leader-
ship contemplated by the Framers when they made the
President Commander in Chief, and imposed upon him
the trust to "take Care that the Laws be faithfully exe-
cuted." With or without explicit statutory authoriza-
tion, Presidents have at such times dealt with national
emergencies by acting promptly and resolutely to enforce
legislative programs, at least to save those programs until
Congress could act. Congress and the courts have re-
sponded to such executive initiative with consistent
approval.

Our first President displayed at once the leadership
contemplated by the Framers. When the national reve-
nue laws were openly flouted in some sections of Penn-
sylvania, President Washington, without waiting for a
call from the state government, summoned the militia
and took decisive steps to secure the faithful execution
of the laws.[30] When international disputes engendered
by the French revolution threatened to involve this
country in war, and while congressional policy remained
uncertain, Washington issued his Proclamation of Neu-
trality. Hamilton, whose defense of the Proclamation

---

[29] *United States* v. *Classic,* 313 U. S. 299, 315–316 (1941); *Home
Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 442–443 (1934).
[30] 4 Annals of Congress 1411, 1413 (1794).

684

has endured the test of time, invoked the argument that the Executive has the duty to do that which will preserve peace until Congress acts and, in addition, pointed to the need for keeping the Nation informed of the requirements of existing laws and treaties as part of the faithful execution of the laws.[31]

President John Adams issued a warrant for the arrest of Jonathan Robbins in order to execute the extradition provisions of a treaty. This action was challenged in Congress on the ground that no specific statute prescribed the method to be used in executing the treaty. John Marshall, then a member of the House of Representatives, made the following argument in support of the President's action:

"The treaty, which is a law, enjoins the performance of a particular object. The person who is to perform this object is marked out by the Constitution, since the person is named who conducts the foreign intercourse, and is to take care that the laws be faithfully executed. The means by which it is to be performed, the force of the nation, are in the hands of this person. Ought not this person to perform the object, although the particular mode of using the means has not been prescribed? Congress, unquestionably, may prescribe the mode, and Congress may devolve on others the whole execution of the contract; but, till this be done, it seems the duty of the Executive department to execute the contract by any means it possesses." [32]

Efforts in Congress to discredit the President for his action failed.[33] Almost a century later, this Court had

[31] IV Works of Hamilton (Lodge ed. 1904) 432–444.

[32] 10 Annals of Congress 596, 613–614 (1800); also printed in 5 Wheat., App. pp. 3, 27 (1820).

[33] 10 Annals of Congress 619 (1800).

occasion to give its express approval to "the masterly and conclusive argument of John Marshall." [34]

Jefferson's initiative in the Louisiana Purchase, the Monroe Doctrine, and Jackson's removal of Government deposits from the Bank of the United States further serve to demonstrate by deed what the Framers described by word when they vested the whole of the executive power in the President.

Without declaration of war, President Lincoln took energetic action with the outbreak of the War Between the States. He summoned troops and paid them out of the Treasury without appropriation therefor. He proclaimed a naval blockade of the Confederacy and seized ships violating that blockade. Congress, far from denying the validity of these acts, gave them express approval. The most striking action of President Lincoln was the Emancipation Proclamation, issued in aid of the successful prosecution of the War Between the States, but wholly without statutory authority. [35]

In an action furnishing a most apt precedent for this case, President Lincoln without statutory authority directed the seizure of rail and telegraph lines leading to Washington. [36] Many months later, Congress recognized and confirmed the power of the President to seize railroads and telegraph lines and provided criminal penalties for interference with Government operation. [37] This Act did not confer on the President any additional powers of seizure. Congress plainly rejected the view that the President's acts had been without legal sanction until

---

[34] *Fong Yue Ting* v. *United States*, 149 U. S. 698, 714 (1893).

[35] See *Prize Cases*, 2 Black 635 (1863); Randall, Constitutional Problems Under Lincoln (1926); Corwin, The President: Office and Powers (1948 ed.), 277–281.

[36] War of the Rebellion, Official Records of the Union and Confederate Armies, Series I, Vol. II (1880), pp. 603–604.

[37] 12 Stat. 334 (1862).

686

ratified by the legislature. Sponsors of the bill declared that its purpose was only to confirm the power which the President already possessed.[38] Opponents insisted a statute authorizing seizure was unnecessary and might even be construed as limiting existing Presidential powers.[39]

Other seizures of private property occurred during the War Between the States, just as they had occurred during previous wars.[40] In *United States* v. *Russell*, 13 Wall. 623 (1872), three river steamers were seized by Army Quartermasters on the ground of "imperative military necessity." This Court affirmed an award of compensation, stating:

> "Extraordinary and unforeseen occasions arise, however, beyond all doubt, in cases of extreme necessity in time of war or of immediate and impending public danger, in which private property may be impressed into the public service, or may be seized and appropriated to the public use, or may even be destroyed without the consent of the owner.
>
> . . . . .
>
> "Exigencies of the kind do arise in time of war or impending public danger, but it is the emergency, as was said by a great magistrate, that gives the right,

---

[38] Senator Wade, Cong. Globe, 37th Cong., 2d Sess. 509 (1862); Rep. Blair, *id.*, at 548.

[39] Senators Browning, Fessenden, Cowan, Grimes, *id.*, at 510, 512, 516, 520.

[40] In 1818, the House Committee on Military Affairs recommended payment of compensation for vessels seized by the Army during the War of 1812. American State Papers, Claims (1834), 649. *Mitchell* v. *Harmony*, 13 How. 115, 134 (1852), involving seizure of a wagon train by an Army officer during the Mexican War, noted that such executive seizure was proper in case of emergency, but affirmed a personal judgment against the officer on the ground that no emergency had been found to exist. The judgment was paid by the United States pursuant to Act of Congress. 10 Stat. 727 (1852).

and it is clear that the emergency must be shown to exist before the taking can be justified. Such a justification may be shown, and when shown the rule is well settled that the officer taking private property for such a purpose, if the emergency is fully proved, is not a trespasser, and that the government is bound to make full compensation to the owner." [41]

In *In re Neagle,* 135 U. S. 1 (1890), this Court held that a federal officer had acted in line of duty when he was guarding a Justice of this Court riding circuit. It was conceded that there was no specific statute authorizing the President to assign such a guard. In holding that such a statute was not necessary, the Court broadly stated the question as follows:

"[The President] is enabled to fulfil the duty of his great department, expressed in the phrase that 'he shall take care that the laws be faithfully executed.'

"Is this duty limited to the enforcement of acts of Congress or of treaties of the United States according to their *express terms,* or does it include the rights, duties and obligations growing out of the Constitution itself, our international relations, and all the protection implied by the nature of the government under the Constitution?" [42]

The latter approach was emphatically adopted by the Court.

President Hayes authorized the wide-spread use of federal troops during the Railroad Strike of 1877.[43] President Cleveland also used the troops in the Pullman Strike

---

[41] 13 Wall., at 627–628. Such a compensable taking was soon distinguished from the noncompensable taking and destruction of property during the extreme exigencies of a military campaign. *United States* v. *Pacific R. Co.,* 120 U. S. 227 (1887).

[42] 135 U. S., at 64.

[43] Rich, The Presidents and Civil Disorder (1941), 72–86.

of 1895 and his action is of special significance. No statute authorized this action. No call for help had issued from the Governor of Illinois; indeed Governor Altgeld disclaimed the need for supplemental forces. But the President's concern was that federal laws relating to the free flow of interstate commerce and the mails be continuously and faithfully executed without interruption.[44] To further this aim his agents sought and obtained the injunction upheld by this Court in *In re Debs,* 158 U. S. 564 (1895). The Court scrutinized each of the steps taken by the President to insure execution of the "mass of legislation" dealing with commerce and the mails and gave his conduct full approval. Congress likewise took note of this use of Presidential power to forestall apparent obstacles to the faithful execution of the laws. By separate resolutions, both the Senate and the House commended the Executive's action.[45]

President Theodore Roosevelt seriously contemplated seizure of Pennsylvania coal mines if a coal shortage necessitated such action.[46] In his autobiography, President Roosevelt expounded the "Stewardship Theory" of Presidential power, stating that "the executive as subject only to the people, and, under the Constitution, bound to serve the people affirmatively in cases where the Constitution does not explicitly forbid him to render the service."[47] Because the contemplated seizure of the coal mines was based on this theory, then ex-President Taft criticized President Roosevelt in a passage in his book relied upon by the District Court in this case. Taft, Our Chief Magistrate and His Powers (1916), 139–147. In the same book, however, President Taft agreed that

---

[44] Cleveland, The Government in the Chicago Strike of 1894 (1913).

[45] 26 Cong. Rec. 7281–7284, 7544–7546 (1894).

[46] Theodore Roosevelt, Autobiography (1916 ed.), 479–491.

[47] *Id.,* at 378.

such powers of the President as the duty to "take Care that the Laws be faithfully executed" could not be confined to "express Congressional statutes." *Id.*, at 88. *In re Neagle, supra,* and *In re Debs, supra,* were cited as conforming with Taft's concept of the office, *id.*, at pp. 88–94, as they were later to be cited with approval in his opinion as Chief Justice in *Myers* v. *United States,* 272 U. S. 52, 133 (1926).[48]

In 1909, President Taft was informed that government-owned oil lands were being patented by private parties at such a rate that public oil lands would be depleted in a matter of months. Although Congress had explicitly provided that these lands were open to purchase by United States citizens, 29 Stat. 526 (1897), the President nevertheless ordered the lands withdrawn from sale "[i]n aid of proposed legislation." In *United States* v. *Midwest Oil Co.,* 236 U. S. 459 (1915), the President's action was sustained as consistent with executive practice throughout our history. An excellent brief was filed in the case by the Solicitor General, Mr. John W. Davis, together with Assistant Attorney General Knaebel, later Reporter for this Court. In this brief, the situation confronting President Taft was described as "an emergency; there was no time to wait for the action of Congress." The brief then discusses the powers of the President under the Constitution in such a case:

> "Ours is a self-sufficient Government within its sphere. (*Ex parte Siebold,* 100 U. S., 371, 395; *in re Debs,* 158 U. S., 564, 578.) 'Its means are adequate to its ends' (*McCulloch* v. *Maryland,* 4

---

[48] *Humphrey's Executor* v. *United States,* 295 U. S. 602, 626 (1935), disapproved expressions in the *Myers* opinion only to the extent that they related to the President's power to remove members of quasi-legislative and quasi-judicial commissions as contrasted with executive employees.

Wheat., 316, 424), and it is rational to assume that its active forces will be found equal in most things to the emergencies that confront it. While perfect flexibility is not to be expected in a Government of divided powers, and while division of power is one of the principal features of the Constitution, it is the plain duty of those who are called upon to draw the dividing lines to ascertain the essential, recognize the practical, and avoid a slavish formalism which can only serve to ossify the Government and reduce its efficiency without any compensating good. The function of making laws is peculiar to Congress, and the Executive can not exercise that function to any degree. But this is not to say that all of the *subjects* concerning which laws might be made are perforce removed from the possibility of Executive influence. The Executive may act upon things and upon men in many relations which have not, though they might have, been actually regulated by Congress. In other words, just as there are fields which are peculiar to Congress and fields which are peculiar to the Executive, so there are fields which are common to both, in the sense that the Executive may move within them until they shall have been occupied by legislative action. These are not the fields of legislative prerogative, but fields within which the lawmaking power may enter and dominate whenever it chooses. This situation results from the fact that the President is the active agent, not of Congress, but of the Nation. As such he performs the duties which the Constitution lays upon him immediately, and as such, also, he executes the laws and regulations adopted by Congress. He is the agent of the people of the United States, deriving all his powers from them and responsible directly to them. In no

sense is he the agent of Congress. He obeys and executes the laws of Congress, not because Congress is enthroned in authority over him, but because the Constitution directs him to do so.

"Therefore it follows that in ways short of making laws or disobeying them, the Executive may be under a grave constitutional duty to act for the national protection in situations not covered by the acts of Congress, and in which, even, it may not be said that his action is the direct expression of any particular one of the independent powers which are granted to him specifically by the Constitution. Instances wherein the President has felt and fulfilled such a duty have not been rare in our history, though, being for the public benefit and approved by all, his acts have seldom been challenged in the courts. We are able, however, to present a number of apposite cases which were subjected to judicial inquiry."

The brief then quotes from such cases as *In re Debs, supra,* and *In re Neagle, supra,* and continues:

"As we understand the doctrine of the *Neagle case,* and the cases therein cited, it is clearly this: The Executive is authorized to exert *the power of the United States* when he finds this necessary for the protection of the agencies, the instrumentalities, or the property of the Government. This does not mean an authority to disregard the wishes of Congress on the subject, when that subject lies within its control and when those wishes have been expressed, and it certainly does not involve the slightest semblance of a power to legislate, much less to 'suspend' legislation already passed by Congress. It involves the performance of specific acts, not of a

legislative but purely of an executive character—acts which are not in themselves laws, but which presuppose a 'law' authorizing him to perform them. This law is not expressed, either in the Constitution or in the enactments of Congress, but reason and necessity compel that it be implied from the exigencies of the situation.

"In none of the cases which we have mentioned, nor in the cases cited in the extracts taken from the *Neagle case,* was it possible to say that the action of the President was directed, expressly or impliedly, by Congress. The situations dealt with had never been covered by any act of Congress, and there was no ground whatever for a contention that the possibility of their occurrence had ever been specifically considered by the legislative mind. In none of those cases did the action of the President amount merely to the execution of some specific law.

"Neither does any of them stand apart in principle from the case at bar, as involving the exercise of specific constitutional powers of the President in a degree in which this case does not involve them. Taken collectively, the provisions of the Constitution which designate the President as the official who must represent us in foreign relations, in commanding the Army and Navy, in keeping Congress informed of the state of the Union, in insuring the faithful execution of the laws and in recommending new ones, considered in connection with the sweeping declaration that the executive power shall be vested in him, completely demonstrate that his is the watchful eye, the active hand, the overseeing dynamic force of the United States." [49]

[49] Brief for the United States, No. 278, October Term, 1914, pp. 11, 75–77, 88–90.

This brief is valuable not alone because of the caliber of its authors but because it lays bare in succinct reasoning the basis of the executive practice which this Court approved in the *Midwest Oil* case.

During World War I, President Wilson established a War Labor Board without awaiting specific direction by Congress.[50] With William Howard Taft and Frank P. Walsh as co-chairmen, the Board had as its purpose the prevention of strikes and lockouts interfering with the production of goods needed to meet the emergency. Effectiveness of War Labor Board decision was accomplished by Presidential action, including seizure of industrial plants.[51] Seizure of the Nation's railroads was also ordered by President Wilson.[52]

Beginning with the Bank Holiday Proclamation[53] and continuing through World War II, executive leadership and initiative were characteristic of President Franklin D. Roosevelt's administration. In 1939, upon the outbreak

---

[50] National War Labor Board. Bureau of Labor Statistics, Bull. 287 (1921).

[51] *Id.*, at 24–25, 32–34. See also, 2 Official U. S. Bull. (1918), No. 412; 8 Baker, Woodrow Wilson, Life & Letters (1939), 400–402; Berman, Labor Disputes and the President (1924), 125–153; Pringle, The Life and Times of William Howard Taft (1939), 915–925.

[52] 39 Stat. 619, 645 (1916), provides that the President may take possession of any system of transportation in time of war. Following seizure of the railroads by President Wilson, Congress enacted detailed legislation regulating the mode of federal control. 40 Stat. 451 (1918).

When Congress was considering the statute authorizing the President to seize communications systems whenever he deemed such action necessary during the war, 40 Stat. 904 (1918), Senator (later President) Harding opposed on the ground that there was no need for such stand-by powers because, in event of a present necessity, the Chief Executive "ought to" seize communications lines, "else he would be unfaithful to his duties as such Chief Executive." 56 Cong. Rec. 9064 (1918).

[53] 48 Stat. 1689 (1933).

of war in Europe, the President proclaimed a limited national emergency for the purpose of strengthening our national defense.[54] In May of 1941, the danger from the Axis belligerents having become clear, the President proclaimed "an unlimited national emergency" calling for mobilization of the Nation's defenses to repel aggression.[55] The President took the initiative in strengthening our defenses by acquiring rights from the British Government to establish air bases in exchange for overage destroyers.[56]

In 1941, President Roosevelt acted to protect Iceland from attack by Axis powers, when British forces were withdrawn, by sending our forces to occupy Iceland. Congress was informed of this action on the same day that our forces reached Iceland.[57] The occupation of Iceland was but one of "at least 125 incidents" in our history in which Presidents, "without congressional authorization, and in the absence of a declaration of war, [have] ordered the Armed Forces to take action or maintain positions abroad." [58]

Some six months before Pearl Harbor, a dispute at a single aviation plant at Inglewood, California, interrupted a segment of the production of military aircraft. In spite of the comparative insignificance of this work stoppage to total defense production as contrasted with the complete paralysis now theatened by a shutdown of the entire basic steel industry, and even though

---

[54] 54 Stat. 2643 (1939).

[55] 55 Stat. 1647 (1941).

[56] 86 Cong. Rec. 11354 (1940) (Message of the President). See 39 Op. Atty. Gen. 484 (1940). Attorney General Jackson's opinion did not extend to the transfer of "mosquito boats," solely because an express statutory prohibition on transfer was applicable.

[57] 87 Cong. Rec. 5868 (1941) (Message of the President).

[58] Powers of the President to Send the Armed Forces Outside the United States, Report prepared by executive department for use of joint committee of Senate Committees on Foreign Relations and Armed Services, 82d Cong., 1st Sess., Committee Print, 2 (1951).

our armed forces were not then engaged in combat, President Roosevelt ordered the seizure of the plant "pursuant to the powers vested in [him] by the Constitution and laws of the United States, as President of the United States of America and Commander in Chief of the Army and Navy of the United States." [59] The Attorney General (Jackson) vigorously proclaimed that the President had the moral duty to keep this Nation's defense effort a "going concern." His ringing moral justification was coupled with a legal justification equally well stated:

> "The Presidential proclamation rests upon the aggregate of the Presidential powers derived from the Constitution itself and from statutes enacted by the Congress.
>
> "The Constitution lays upon the President the duty 'to take care that the laws be faithfully executed.' Among the laws which he is required to find means to execute are those which direct him to equip an enlarged army, to provide for a strengthened navy, to protect Government property, to protect those who are engaged in carrying out the business of the Government, and to carry out the provisions of the Lend-Lease Act. For the faithful execution of such laws the President has back of him not only each general law-enforcement power conferred by the various acts of Congress but the aggregate of all such laws plus that wide discretion as to method vested in him by the Constitution for the purpose of executing the laws.
>
> "The Constitution also places on the President the responsibility and vests in him the powers of Commander in Chief of the Army and of the Navy. These weapons for the protection of the continued existence of the Nation are placed in his sole com-

---

[59] Exec. Order 8773, 6 Fed. Reg. 2777 (1941).

696

mand and the implication is clear that he should not allow them to become paralyzed by failure to obtain supplies for which Congress has appropriated the money and which it has directed the President to obtain." [60]

At this time, Senator Connally proposed amending the Selective Training and Service Act to authorize the President to seize any plant where an interruption of production would unduly impede the defense effort.[61] Proponents of the measure in no way implied that the legislation would add to the powers already possessed by the President [62] and the amendment was opposed as unnecessary since the President already had the power.[63] The amendment relating to plant seizures was not approved at that session of Congress.[64]

Meanwhile, and also prior to Pearl Harbor, the President ordered the seizure of a shipbuilding company and an aircraft parts plant.[65] Following the declaration of war, but prior to the Smith-Connally Act of 1943, five additional industrial concerns were seized to avert inter-

[60] See 89 Cong. Rec. 3992 (1943). The Attorney General also noted that the dispute at North American Aviation was Communist inspired and more nearly resembled an insurrection than a labor strike. The relative size of North American Aviation and the impact of an interruption in production upon our defense effort were not described.

[61] 87 Cong. Rec. 4932 (1941). See also S. 1600 and S. 2054, 77th Cong., 1st Sess. (1941).

[62] Reps. May, Whittington; 87 Cong. Rec. 5895, 5972 (1941).

[63] Reps. Dworshak, Feddis, Harter, Dirksen, Hook; 87 Cong. Rec. 5901, 5910, 5974, 5975 (1941).

[64] The plant seizure amendment passed the Senate, but was rejected in the House after a Conference Committee adopted the amendment. 87 Cong. Rec. 6424 (1941).

[65] Exec. Order 8868, 6 Fed. Reg. 4349 (1941); Exec. Order 8928, 6 Fed. Reg. 5559 (1941).

ruption of needed production.[66] During the same period, the President directed seizure of the Nation's coal mines to remove an obstruction to the effective prosecution of the war.[67]

The procedures adopted by President Roosevelt closely resembled the methods employed by President Wilson. A National War Labor Board, like its predecessor of World War I, was created by Executive Order to deal effectively and fairly with disputes affecting defense production.[68] Seizures were considered necessary, upon disobedience of War Labor Board orders, to assure that the mobilization effort remained a "going concern," and to enforce the economic stabilization program.

At the time of the seizure of the coal mines, Senator Connally's bill to provide a statutory basis for seizures and for the War Labor Board was again before Congress. As stated by its sponsor, the purpose of the bill was not to augment Presidential power, but to "let the country know that the Congress is squarely behind the President." [69] As in the case of the legislative recognition of President Lincoln's power to seize, Congress again recognized that the President already had the necessary power, for there was no intention to "ratify" past actions of doubtful validity. Indeed, when Senator Tydings offered an amendment to the Connally bill expressly to confirm and validate the seizure of the coal mines, sponsors of the bill

---

[66] Exec. Order 9141, 7 Fed. Reg. 2961 (1942); Exec. Order 9220, 7 Fed. Reg. 6413 (1942); Exec. Order 9225, 7 Fed. Reg. 6627 (1942); Exec. Order 9254, 7 Fed. Reg. 8333 (1942); Exec. Order 9351, 8 Fed. Reg. 8097 (1943).

[67] Exec. Order 9340, 8 Fed. Reg. 5695 (1943).

[68] Exec. Order 9017, 7 Fed. Reg. 237 (1942); 1 Termination Report of the National War Labor Board 5–11.

[69] 89 Cong. Rec. 3807 (1943). Similar views of the President's existing power were expressed by Senators Lucas, Wheeler, Austin and Barkley. Id., at 3885–3887, 3896, 3992.

698

opposed the amendment as casting doubt on the legality of the seizure and the amendment was defeated.[70] When the Connally bill, S. 796, came before the House, all parts after the enacting clause were stricken and a bill introduced by Representative Smith of Virginia was substituted and passed. This action in the House is significant because the Smith bill did not contain the provisions authorizing seizure by the President but did contain provisions controlling and regulating activities in respect to properties seized by the Government under statute "or otherwise." [71] After a conference, the seizure provisions of the Connally bill, enacted as the Smith-Connally or War Labor Disputes Act of 1943, 57 Stat. 163, were agreed to by the House.

Following passage of the Smith-Connally Act, seizures to assure continued production on the basis of terms recommended by the War Labor Board were based upon that Act as well as upon the President's power under the Constitution and the laws generally. A question did arise as to whether the statutory language relating to "any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials" [72] authorized the seizure of properties of Montgomery Ward & Co., a retail department store and mail-order concern. The Attorney General (Biddle) issued an opinion that the President possessed the power to seize Montgomery Ward properties to prevent a work stoppage whether or not the terms of the Smith-Connally Act authorized such a seizure.[73] This opinion was in line with

---

[70] 89 Cong. Rec. 3989–3992 (1943).

[71] S. 796, 78th Cong., 1st Sess., §§ 12, 13 (1943), as passed by the House.

[72] 57 Stat. 163, 164 (1943).

[73] 40 Op. Atty. Gen. 312 (1944). See also Hearings before House Select Committee to Investigate Seizure of Montgomery Ward & Co., 78th Cong., 2d Sess. 117–132 (1944).

the views on Presidential powers maintained by the Attorney General's predecessors (Murphy [74] and Jackson [75]) and his successor (Clark [76]). Accordingly, the President ordered seizure of the Chicago properties of Montgomery Ward in April, 1944, when that company refused to obey a War Labor Board order concerning the bargaining representative of its employees in Chicago.[77] In Congress, a Select Committee to Investigate Seizure of the Property of Montgomery Ward & Co., assuming that the terms of the Smith-Connally Act did not cover this seizure, concluded that the seizure "was not only within the constitutional power but was the plain duty of the President." [78] Thereafter, an election determined the bargaining representative for the Chicago employees and the properties were returned to Montgomery Ward & Co. In December, 1944, after continued defiance of a series of War Labor Board orders, President Roosevelt ordered the seizure of Montgomery Ward properties throughout the country.[79] The Court of Appeals for the Seventh Circuit upheld this seizure on statutory grounds and also indicated its disapproval of a lower court's denial of seizure power apart from express statute.[80]

---

[74] 39 Op. Atty. Gen. 343, 347 (1939).

[75] Note 60, *supra.*

[76] Letter introduced in Hearings before Senate Committee on Labor and Public Welfare on S. 249, 81st Cong., 1st Sess. 232 (1949) pointing to the "exceedingly great" powers of the President to deal with emergencies even before the Korean crisis.

[77] Exec. Order 9438, 9 Fed. Reg. 4459 (1944).

[78] H. R. Rep. No. 1904, 78th Cong., 2d Sess. 25 (1944) (the Committee divided along party lines).

[79] Exec. Order 9508, 9 Fed. Reg. 15079 (1944).

[80] *United States* v. *Montgomery Ward & Co.,* 150 F. 2d 369 (C. A. 7th Cir. 1945), reversing 58 F. Supp. 408 (N. D. Ill. 1945). See also *Ken-Rad Tube & Lamp Corp.* v. *Badeau,* 55 F. Supp. 193, 197–199 (W. D. Ky. 1944), where the court held that a seizure was proper with or without express statutory authorization.

700

More recently, President Truman acted to repel aggression by employing our armed forces in Korea.[81] Upon the intervention of the Chinese Communists, the President proclaimed the existence of an unlimited national emergency requiring the speedy build-up of our defense establishment.[82] Congress responded by providing for increased manpower and weapons for our own armed forces, by increasing military aid under the Mutual Security Program and by enacting economic stabilization measures, as previously described.

This is but a cursory summary of executive leadership. But it amply demonstrates that Presidents have taken prompt action to enforce the laws and protect the country whether or not Congress happened to provide in advance for the particular method of execution. At the minimum, the executive actions reviewed herein sustain the action of the President in this case. And many of the cited examples of Presidential practice go far beyond the extent of power necessary to sustain the President's order to seize the steel mills. The fact that temporary executive seizures of industrial plants to meet an emergency have not been directly tested in this Court furnishes not the slightest suggestion that such actions have been illegal. Rather, the fact that Congress and the courts have consistently recognized and given their support to such executive action indicates that such a power of seizure has been accepted throughout our history.

History bears out the genius of the Founding Fathers, who created a Government subject to law but not left subject to inertia when vigor and initiative are required.

---

[81] United States Policy in the Korean Crisis (1950), Dept. of State Pub. 3922.

[82] 15 Fed. Reg. 9029 (1950).

## IV.

Focusing now on the situation confronting the President on the night of April 8, 1952, we cannot but conclude that the President was performing his duty under the Constitution to "take Care that the Laws be faithfully executed"—a duty described by President Benjamin Harrison as "the central idea of the office." [83]

The President reported to Congress the morning after the seizure that he acted because a work stoppage in steel production would immediately imperil the safety of the Nation by preventing execution of the legislative programs for procurement of military equipment. And, while a shutdown could be averted by granting the price concessions requested by plaintiffs, granting such concessions would disrupt the price stabilization program also enacted by Congress. Rather than fail to execute either legislative program, the President acted to execute both.

Much of the argument in this case has been directed at straw men. We do not now have before us the case of a President acting solely on the basis of his own notions of the public welfare. Nor is there any question of unlimited executive power in this case. The President himself closed the door to any such claim when he sent his Message to Congress stating his purpose to abide by any action of Congress, whether approving or disapproving his seizure action. Here, the President immediately made sure that Congress was fully informed of the temporary action he had taken only to preserve the legislative programs from destruction until Congress could act.

The absence of a specific statute authorizing seizure of the steel mills as a mode of executing the laws—both the military procurement program and the anti-inflation program—has not until today been thought to prevent

---

[83] Harrison, This Country of Ours (1897), 98.

the President from executing the laws. Unlike an administrative commission confined to the enforcement of the statute under which it was created, or the head of a department when administering a particular statute, the President is a constitutional officer charged with taking care that a "mass of legislation" be executed. Flexibility as to mode of execution to meet critical situations is a matter of practical necessity. This practical construction of the "Take Care" clause, advocated by John Marshall, was adopted by this Court in *In re Neagle, In re Debs* and other cases cited *supra.* See also *Ex parte Quirin,* 317 U. S. 1, 26 (1942). Although more restrictive views of executive power, advocated in dissenting opinions of Justices Holmes, McReynolds and Brandeis, were emphatically rejected by this Court in *Myers* v. *United States, supra,* members of today's majority treat these dissenting views as authoritative.

There is no statute prohibiting seizure as a method of enforcing legislative programs. Congress has in no wise indicated that its legislation is not to be executed by the taking of private property (subject of course to the payment of just compensation) if its legislation cannot otherwise be executed. Indeed, the Universal Military Training and Service Act authorizes the seizure of *any* plant that fails to fill a Government contract [84] or the properties of *any* steel producer that fails to allocate steel as directed for defense production.[85] And the Defense Production Act authorizes the President to requisition equipment and condemn real property needed without delay in the defense effort.[86] Where Congress authorizes seizure in instances not necessarily crucial to the defense

---

[84] 62 Stat. 604, 626 (1948), 50 U. S. C. App. (Supp. IV) § 468 (c).

[85] 62 Stat. 604, 627 (1948), 50 U. S. C. App. (Supp. IV) § 468 (h) (1).

[86] Tit. II, 64 Stat. 798, 799 (1950), as amended, 65 Stat. 138 (1951).

program, it can hardly be said to have disclosed an intention to prohibit seizures where essential to the execution of that legislative program.

Whatever the extent of Presidential power on more tranquil occasions, and whatever the right of the President to execute legislative programs as he sees fit without reporting the mode of execution to Congress, the single Presidential purpose disclosed on this record is to faithfully execute the laws by acting in an emergency to maintain the status quo, thereby preventing collapse of the legislative programs until Congress could act. The President's action served the same purposes as a judicial stay entered to maintain the status quo in order to preserve the jurisdiction of a court. In his Message to Congress immediately following the seizure, the President explained the necessity of his action in executing the military procurement and anti-inflation legislative programs and expressed his desire to cooperate with any legislative proposals approving, regulating or rejecting the seizure of the steel mills. Consequently, there is no evidence whatever of any Presidential purpose to defy Congress or act in any way inconsistent with the legislative will.

In *United States* v. *Midwest Oil Co., supra,* this Court approved executive action where, as here, the President acted to preserve an important matter until Congress could act—even though his action in that case was contrary to an express statute. In this case, there is no statute prohibiting the action taken by the President in a matter not merely important but threatening the very safety of the Nation. Executive inaction in such a situation, courting national disaster, is foreign to the concept of energy and initiative in the Executive as created by the Founding Fathers. The Constitution was itself "adopted in a period of grave emergency. . . . While emergency does not create power, emergency may furnish

the occasion for the exercise of power." [87] The Framers knew, as we should know in these times of peril, that there is real danger in Executive weakness. There is no cause to fear Executive tyranny so long as the laws of Congress are being faithfully executed. Certainly there is no basis for fear of dictatorship when the Executive acts, as he did in this case, only to save the situation until Congress could act.

## V.

Plaintiffs place their primary emphasis on the Labor Management Relations Act of 1947, hereinafter referred to as the Taft-Hartley Act, but do not contend that that Act contains any provision prohibiting seizure.

Under the Taft-Hartley Act, as under the Wagner Act, collective bargaining and the right to strike are at the heart of our national labor policy. Taft-Hartley preserves the right to strike in any emergency, however serious, subject only to an 80-day delay in cases of strikes imperiling the national health and safety.[88] In such a case, the President *may* appoint a board of inquiry to report the facts of the labor dispute. Upon receiving that report, the President *may* direct the Attorney General to petition a District Court to enjoin the strike. If the injunction is granted, it may continue in effect for no more than 80 days, during which time the board of inquiry makes further report and efforts are made to settle the dispute. When the injunction is dissolved, the President is directed to submit a report to Congress together with his recommendations.[89]

Enacted after World War II, Taft-Hartley restricts the right to strike against private employers only to a lim-

---

[87] *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 425–426 (1934).

[88] See *Bus Employees* v. *Wisconsin Board,* 340 U. S. 383 (1951).

[89] §§ 206–210, Labor Management Relations Act of 1947. 29 U. S. C. (Supp. IV) §§ 176–180.

ited extent and for the sole purpose of affording an additional period of time within which to settle the dispute. Taft-Hartley in no way curbs strikes before an injunction can be obtained and after an 80-day injunction is dissolved.

Plaintiffs admit that the emergency procedures of Taft-Hartley are not mandatory. Nevertheless, plaintiffs apparently argue that, since Congress did provide the 80-day injunction method for dealing with emergency strikes, the President cannot claim that an emergency exists until the procedures of Taft-Hartley have been exhausted. This argument was not the basis of the District Court's opinion and, whatever merit the argument might have had following the enactment of Taft-Hartley, it loses all force when viewed in light of the statutory pattern confronting the President in this case.

In Title V of the Defense Production Act of 1950,[90] Congress stated:

> "It is the intent of Congress, in order to provide for effective price and wage stabilization pursuant to title IV of this Act and to maintain uninterrupted production, that there be effective procedures for the settlement of labor disputes affecting national defense." ( § 501.)

Title V authorized the President to initiate labor-management conferences and to take action appropriate to carrying out the recommendations of such conferences and the provisions of Title V. (§ 502.) Due regard is to be given to collective bargaining practice and stabilization policies and no action taken is to be inconsistent with Taft-Hartley and other laws. (§ 503.) The purpose of these provisions was to authorize the President "to establish a board, commission or other agency, sim-

---

[90] 64 Stat. 812, 65 Stat. 132 (1950).

ilar to the War Labor Board of World War II, to carry out the title." [91]

The President authorized the Wage Stabilization Board (WSB), which administers the wage stabilization functions of Title IV of the Defense Production Act, also to deal with labor disputes affecting the defense program.[92] When extension of the Defense Production Act was before Congress in 1951, the Chairman of the Wage Stabilization Board described in detail the relationship between the Taft-Hartley procedures applicable to labor disputes imperiling the national health and safety and the new WSB disputes procedures especially devised for settlement of labor disputes growing out of the needs of the defense program.[93] Aware that a technique separate from Taft-Hartley had been devised, members of Congress attempted to divest the WSB of its disputes powers. These attempts were defeated in the House, were not brought to a vote in the Senate, and the Defense Production Act was extended through June 30, 1952, without change in the disputes powers of the WSB.[94]

---

[91] H. R. Rep. No. 3042, 81st Cong., 2d Sess. 35 (1950) (Conference Report). See also S. Rep. No. 2250, 81st Cong., 2d Sess. 41 (1950).

[92] Exec. Order 10161, 15 Fed. Reg. 6105 (1950), as amended, Exec. Order 10233, 16 Fed. Reg. 3503 (1951).

[93] Hearings before the House Committee on Banking and Currency on Defense Production Act Amendments of 1951, 82d Cong., 1st Sess. 305–306, 312–313 (1951).

[94] The Lucas Amendment to abolish the disputes function of the WSB was debated at length in the House, the sponsor of the amendment pointing out the similarity of the WSB functions to those of the War Labor Board and noting the seizures that occurred when War Labor Board orders were not obeyed. 97 Cong. Rec. 8390–8415. The amendment was rejected by a vote of 217 to 113. *Id.*, at 8415. A similar amendment introduced in the Senate was withdrawn. 97 Cong. Rec. 7373–7374. The Defense Production Act was extended without amending Tit. V or otherwise affecting the disputes functions of the WSB. 65 Stat. 132 (1951).

Certainly this legislative creation of a new procedure for dealing with defense disputes negatives any notion that Congress intended the earlier and discretionary Taft-Hartley procedure to be an exclusive procedure.

Accordingly, as of December 22, 1951, the President had a choice between alternate procedures for settling the threatened strike in the steel mills: one route created to deal with peacetime disputes; the other route specially created to deal with disputes growing out of the defense and stabilization program. There is no question of bypassing a statutory procedure because both of the routes available to the President in December were based upon statutory authorization. Both routes were available in the steel dispute. The Union, by refusing to abide by the defense and stabilization program, could have forced the President to invoke Taft-Hartley at that time to delay the strike a maximum of 80 days. Instead, the Union agreed to cooperate with the defense program and submit the dispute to the Wage Stabilization Board.

Plaintiffs had no objection whatever at that time to the President's choice of the WSB route. As a result, the strike was postponed, a WSB panel held hearings and reported the position of the parties and the WSB recommended the terms of a settlement which it found were fair and equitable. Moreover, the WSB performed a function which the board of inquiry contemplated by Taft-Hartley could not have accomplished when it checked the recommended wage settlement against its own wage stabilization regulations issued pursuant to its stabilization functions under Title IV of the Defense Production Act. Thereafter, the parties bargained on the basis of the WSB recommendation.

When the President acted on April 8, he had exhausted the procedures for settlement available to him. Taft-Hartley was a route parallel to, not connected with, the WSB procedure. The strike had been delayed 99

days as contrasted with the maximum delay of 80 days under Taft-Hartley. There had been a hearing on the issues in dispute and bargaining which promised settlement up to the very hour before seizure had broken down. Faced with immediate national peril through stoppage in steel production on the one hand and faced with destruction of the wage and price legislative programs on the other, the President took temporary possession of the steel mills as the only course open to him consistent with his duty to take care that the laws be faithfully executed.

Plaintiffs' property was taken and placed in the possession of the Secretary of Commerce to prevent any interruption in steel production. It made no difference whether the stoppage was caused by a union-management dispute over terms and conditions of employment, a union-Government dispute over wage stabilization or a management-Government dispute over price stabilization. The President's action has thus far been effective, not in settling the dispute, but in saving the various legislative programs at stake from destruction until Congress could act in the matter.

## VI.

The diversity of views expressed in the six opinions of the majority, the lack of reference to authoritative precedent, the repeated reliance upon prior dissenting opinions, the complete disregard of the uncontroverted facts showing the gravity of the emergency and the temporary nature of the taking all serve to demonstrate how far afield one must go to affirm the order of the District Court.

The broad executive power granted by Article II to an officer on duty 365 days a year cannot, it is said, be invoked to avert disaster. Instead, the President must confine himself to sending a message to Congress recommending action. Under this messenger-boy concept of

the Office, the President cannot even act to preserve legislative programs from destruction so that Congress will have something left to act upon. There is no judicial finding that the executive action was unwarranted because there was in fact no basis for the President's finding of the existence of an emergency [95] for, under this view, the gravity of the emergency and the immediacy of the threatened disaster are considered irrelevant as a matter of law.

Seizure of plaintiffs' property is not a pleasant undertaking. Similarly unpleasant to a free country are the draft which disrupts the home and military procurement which causes economic dislocation and compels adoption of price controls, wage stabilization and allocation of materials. The President informed Congress that even a temporary Government operation of plaintiffs' properties was "thoroughly distasteful" to him, but was necessary to prevent immediate paralysis of the mobilization program. Presidents have been in the past, and any man worthy of the Office should be in the future, free to take at least interim action necessary to execute legislative programs essential to survival of the Nation. A sturdy judiciary should not be swayed by the unpleasantness or unpopularity of necessary executive action, but must independently determine for itself whether the President was acting, as required by the Constitution, to "take Care that the Laws be faithfully executed."

As the District Judge stated, this is no time for "timorous" judicial action. But neither is this a time for timorous executive action. Faced with the duty of executing the defense programs which Congress had enacted and the disastrous effects that any stoppage in steel production would have on those programs, the President acted to preserve those programs by seizing the steel mills.

---

[95] Compare *Sterling* v. *Constantin*, 287 U. S. 378, 399–401 (1932).

There is no question that the possession was other than temporary in character and subject to congressional direction—either approving, disapproving or regulating the manner in which the mills were to be administered and returned to the owners. The President immediately informed Congress of his action and clearly stated his intention to abide by the legislative will. No basis for claims of arbitrary action, unlimited powers or dictatorial usurpation of congressional power appears from the facts of this case. On the contrary, judicial, legislative and executive precedents throughout our history demonstrate that in this case the President acted in full conformity with his duties under the Constitution. Accordingly, we would reverse the order of the District Court.